**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**
**WESTERN DISTRICT**

| | |
|---|---|
| ASHLEY STOCK,<br><br>                     *Plaintiff*,<br><br>      v.<br><br>JAMES L. GRAY III, in his official capacity as President of the Missouri Board of Pharmacy; CHRISTIAN S. TADRUS, in his official capacity as Vice-President of the Missouri Board of Pharmacy; DOUGLAS R. LANG, in his official capacity as Member of the Missouri Board of Pharmacy; ANITA L. PARRAN, in her official capacity as Public Member of the Missouri Board of Pharmacy; CHRISTINA M. LINDSAY, in her official capacity as Member of the Missouri Board of Pharmacy; COLBY GROVE, in his official capacity as Member of the Missouri Board of Pharmacy; and PAMELA L. MARSHALL, in her official capacity as Member of the Missouri Board of Pharmacy,<br><br>                  *Defendants*. | Civil Action No. _____ |

**PLAINTIFF ASHLEY STOCK'S**
**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

### Introduction

1.    The efficacy of ivermectin and hydroxychloroquine sulfate tablets for human use to treat COVID-19 is a highly controversial, and recently politicized, subject. Eventually the truth will prevail in the marketplace of ideas as proponents for various positions make their case and provide evidence.

2.     This Court need not resolve that scientific question. Ashley Stock brings this action because she merely wishes to participate in the debate without penalty. The First Amendment requires nothing less.

3.     Unfortunately, Missouri Revised Statute § 338.055.7, signed into law last month, impermissibly distorts the marketplace of ideas. It forbids pharmacists from "contact[ing] the prescribing physician or the patient to dispute the efficacy of ivermectin tablets or hydroxychloroquine sulfate tablets for human use." Yet pharmacists in Missouri are as entitled as every other citizen to express their viewpoints on the efficacy of certain drugs. *See Nat'l Inst. of Family & Life Advocates v. Becerra,* 138 S. Ct. 2361 (2018). In fact, professionals' voices are nowhere more essential to the marketplace of ideas than "in the fields of medicine and public health, where information can save lives." *Id.* at 2374 (internal quotation omitted). Section 338.055.7 threatens Missouri pharmacists with professional liability if they communicate views that the state disagrees with. That dangerous precedent is not only wrongheaded, it's unconstitutional.

4.     Ashley Stock, a Missouri-licensed pharmacist working for a retail pharmacy in St. Louis, regularly interacts with prescribers and patients, consulting with both regarding pharmaceutical efficacy and possible available alternatives to prescribed drugs and dosages. Such communication includes consulting, inquiring, debating, disputing the efficacy of, or otherwise discussing her professional opinions with prescribers and patients about prescriptions for hydroxychloroquine and ivermectin. Therefore, § 338.055.7 threatens to punish Stock for this speech—otherwise her lawful and necessary professional duty—and threatens her professional reputation and livelihood.

5.     This civil rights action seeks a declaration that the second sentence of § 338.055.7 on its face violates the First Amendment (as incorporated through the Fourteenth Amendment) and an injunction preventing Defendants, in their official capacities, from enforcing that prohibition on pharmacist speech.

## JURISDICTION AND VENUE

6.     Plaintiff brings this action pursuant to Section 1 of the Civil Rights Act of 1871, 42 U.S.C. § 1983, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02, for violations of the First and Fourteenth Amendments to the United States Constitution.

7.     This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a).

8.     Venue is proper in this district under 28 U.S.C. § 1391(b).

## PARTIES

9.     Plaintiff Ashley Stock is a Missouri-licensed pharmacist who is employed by Van's Delivery Pharmacy in St. Louis, Missouri. She is a citizen of Missouri who is domiciled in Fenton, MO.

10.     Defendants James L. Gray III, Christian S. Tadrus, Douglas R. Lang, Anita L. Parran, Christina M. Lindsay, Colby Grove, and Pamela L. Marshall, are the members of the Missouri Board of Pharmacy (the "Board"), each of whom is being sued in his or her official capacity. Created in 1909, the Board is a creature of statute, governed principally by the Missouri Pharmacy Practice Act contained in Section 338 of the Revised Statutes of Missouri. Among its primary duties are "[i]nvestigating complaints … against any licensee or registrant," and "[d]isciplining licensees which may include, public censure, probation, suspension or revocation of a licensee/registrant …." Investigations from which disciplinary action may result "may be based on public complaints, information from other state and/or federal agencies, or violations discovered by the Board." Board of Pharmacy, Missouri Division of Professional Registration, *About the Board*, https://pr.mo.gov/pharmacists-about-the-board.asp [https://web.archive.org/web/20201206185331/https://pr.mo.gov/pharmacists-about-the-board.asp]. Public complaints "may be based upon personal knowledge or upon information and belief." 20 CSR 2220-2.050(2).

11.     The address for the Board of Pharmacy is 3605 MO Blvd. Jefferson City, MO 65109.

## FACTS

### The plaintiff

12.     Plaintiff Ashley Stock graduated with a Doctorate in Pharmacy from the St. Louis College of Pharmacy at University of Health Sciences and Pharmacy in St. Louis in 2012.

13.     Stock sat for and passed the North American Pharmacist Licensure Examination and the Multistate Pharmacy Jurisprudence Examination in July 2012, and was licensed to practice as a pharmacist by the State of Missouri in July 2012.

14.     Stock is a licensed pharmacist in Missouri in good standing subject to oversight and discipline by the Missouri Board of Pharmacy.

15.     Stock works full time as a retail pharmacist for Van's Delivery Pharmacy in St. Louis, Missouri, beginning her work there in January 2022.

16.     She previously worked as a retail pharmacist for Walgreens in St. Louis, Missouri.

17.     Stock's job responsibilities include dispensing prescription medications and counseling patients on the safe use of such medications based on her professional expertise.

18.     Since March 2020, in her job as a retail pharmacist, Stock has received prescriptions from physicians for hydroxychloroquine and ivermectin for her to fill and dispense to patients at the pharmacy.

19.     Since March 2020, Stock has had conversations with doctors and patients during which she disputed the efficacy of both hydroxychloroquine and ivermectin for human use as a COVID-19 treatment.

20.     Since March 2020, Stock has contacted prescribing physicians from which she has received prescriptions for hydroxychloroquine and ivermectin, to discuss, debate,

4

and dispute the efficacy of hydroxychloroquine and ivermectin for human use as a COVID-19 treatment and the dosage amounts of the prescriptions.

21.     If, after Stock's discussions, the prescribing physicians or patients insisted on seeking hydroxychloroquine or ivermectin to treat COVID-19, Stock sometimes refused to fill those prescriptions.

22.     According to the Code of Ethics for Pharmacists, adopted by the membership of the American Pharmacists Association in 1994, pharmacists must "help individuals achieve optimum benefit from their medications"; they must "place[] concern for the well-being of the patient at the center of professional practice"; they must "tell the truth and…act with conviction of conscience"; they must "maintain knowledge and abilities as new medications, devices, and technologies become available and as health information advances"; and they should "encourag[e] patients to participate in decisions about their health." American Pharmacists Association, Code of Ethics, https://aphanet.pharmacist.com/code-ethics [https://web.archive.org/web/20220313062553/https://aphanet.pharmacist.com/code-ethics].

23.     Stock believes that counseling patients and doctors to the best of her professional judgment is required as a matter of professional ethics, even when that means contacting the patient or doctor to dispute the efficacy of a given medication.

24.     Patients and doctors have previously thanked Stock after she initiates contact with them to provide guidance or to suggest alterative pharmaceutical options that are more effective.

### Hydroxychloroquine

25.     Hydroxychloroquine is a structural analog to chloroquine, an antimalarial drug. Hydroxychloroquine was developed in the 1940s for human consumption as an anti-malarial medication. The Food and Drug Administration ("FDA") has indicated use of the drug for the treatment of malaria, certain drug-resistant parasites uncommon in

the United States, rheumatoid arthritis, and lupus. https://www.accessdata.fda.gov/drugsatfda_docs/label/2022/009768s056lbl.pdf [https://web.archive.org/web/20220701002208/https://www.accessdata.fda.gov/drugsatfda_docs/label/2022/009768s056lbl.pdf]. Hydroxychloroquine is not approved by the FDA for the treatment of COVID-19. The FDA has not approved any animal drug product that contains hydroxychloroquine.

26. The FDA cautions against the use of hydroxychloroquine for the treatment of COVID-19 outside of the hospital setting or clinical trials. *Hydroxychloroquine or chloroquine for COVID-19: Drug Safety Communication - FDA Cautions Against Use Outside of the Hospital Setting or a Clinical Trial Due to Risk of Heart Rhythm Problems*, Food and Drug Admin. https://www.fda.gov/safety/medical-product-safety-information/hydroxychloroquine-or-chloroquine-covid-19-drug-safety-communication-fda-cautions-against-use [https://web.archive.org/web/20220630043551/https://www.fda.gov/safety/medical-product-safety-information/hydroxychloroquine-or-chloroquine-covid-19-drug-safety-communication-fda-cautions-against-use].

27. Early in the pandemic, as doctors were experimenting with treatments for the novel coronavirus, health authorities in India, China, South Korea and Italy recommended chloroquine for the treatment of COVID-19. Kwak Sung-sun, *Physicians work out treatment guidelines for coronavirus*, KOREAN BIOMEDICAL REVIEW (Feb. 13, 2020), *available at* http://www.koreabiomed.com/news/articleView.html?idxno=7428 [https://web.archive.org/web/20220510120153/http://www.koreabiomed.com/news/articleView.html?idxno=7428].

28. On March 18, 2020, the World Health Organization announced that chloroquine and hydroxychloroquine would be among the four drugs studied as part of the multinational solidarity clinical trial. Hannah Devlin, Ian Sample, *What are the prospects for a Covid-19 treatment?*, THE GUARDIAN (Mar. 19, 2020), *available at*

https://www.theguardian.com/science/2020/mar/19/prospects-treatment-coronavirus-drugs-vaccines
[https://web.archive.org/web/20220529233438/https://www.theguardian.com/science/2020/mar/19/prospects-treatment-coronavirus-drugs-vaccines].

29.     On March 19, 2020, then President Trump encouraged the use of hydroxychloroquine during a national press conference, leading to a massive increase in demand for the drug. Michael Liu *et al.*, *Internet Searches for Unproven COVID-19 Therapies in the United States* 180, JAMA Internal Medicine, 1116-1118 (2020).

30.     Speculative procurement of hydroxychloroquine occurred across the country. For example, on March 20, 2020, the Board sanctioned a pharmacist who, among other improprieties, used a false prescription to obtain hydroxychloroquine. https://pr.mo.gov/boards/pharmacy/orders/PHA-2019010826.pdf
[https://web.archive.org/web/20220308153118/https://pr.mo.gov/boards/pharmacy/orders/PHA-2019010826.pdf]. The clinic that the pharmacist falsely attributed the prescriptions to alerted the Board that it had not written the prescription. *Id*. Subsequent investigation revealed a string of fraudulent prescriptions spanning years, and ultimately resulting in criminal convictions. *Id*.

31.     On April 24, 2020, the FDA cautioned against using hydroxychloroquine outside a hospital setting or clinical trial after reviewing case reports of adverse effects including ventricular tachycardia, ventricular fibrillation, and in some cases death. Food and Drug Admin., *supra*.

32.     On June 15, 2020, the FDA revoked the emergency use authorization, citing consultation with the Biomedical Advanced Research and Development Authority that led them to conclude that "it is no longer reasonable to believe that oral formulations of hydroxychloroquine (HCQ) and chloroquine (CQ) may be effective in treating COVID-19." Moreover, because of "ongoing serious cardiac adverse events and other potential serious side effects, the known and potential benefits of chloroquine and

hydroxychloroquine no longer outweigh the known and potential risks for the authorized use." *Coronavirus (COVID-19) Update: FDA Revokes Emergency Use Authorization for Chloroquine and Hydroxychloroquine,* Food and Drug Admin., https://www.fda.gov/news-events/press-announcements/coronavirus-covid-19-update-fda-revokes-emergency-use-authorization-chloroquine-and [https://web.archive.org/web/20220624134111/https://www.fda.gov/news-events/press-announcements/coronavirus-covid-19-update-fda-revokes-emergency-use-authorization-chloroquine-and].

33.    In November 2020, a U.S. National Institutes of Health clinical trial evaluating the safety and effectiveness of hydroxychloroquine for the treatment of adults with COVID-19 formally concluded that the drug provided no clinical benefit for COVID-19 treatment and recommended against its use. *Hydroxychloroquine does not benefit adults hospitalized with COVID-19*, National Institutes of Health (Nov. 9, 2020), https://www.nih.gov/news-events/news-releases/hydroxychloroquine-does-not-benefit-adults-hospitalized-covid-19 [https://web.archive.org/web/20220630054406/https://www.nih.gov/news-events/news-releases/hydroxychloroquine-does-not-benefit-adults-hospitalized-covid-19].

34.    But telehealth organizations, frequently across state lines, have prescribed hydroxychloroquine. *See* Vera Bergengruen, *How 'America's Frontline Doctors' Sold Access to Bogus COVID-19 Treatments—and Left Patients in the Lurch*, TIME (Aug. 26, 2021), https://time.com/6092368/americas-frontline-doctors-covid-19-misinformation/ [https://web.archive.org/web/20220630002441/https://time.com/6092368/americas-frontline-doctors-covid-19-misinformation/].

35.    Stock does not believe hydroxychloroquine is an effective treatment for COVID-19 compared to available alternatives.

**Ivermectin**

36. Ivermectin is an anti-parasitic drug originally marketed by Merck that has been used in humans and animals since the 1970s.

37. Ivermectin is not approved by the FDA for the treatment of COVID-19. *FAQ: COVID-19 and Ivermectin Intended for Animals,* Food and Drug Admin., https://www.fda.gov/animal-veterinary/product-safety-information/faq-covid-19-and-ivermectin-intended-animals [https://web.archive.org/web/20220627144217/https://www.fda.gov/animal-veterinary/product-safety-information/faq-covid-19-and-ivermectin-intended-animals].

38. Scientists studied ivermectin as a potential COVID-19-inhibiting drug. Some *in vitro* drug screening studies early in the pandemic showed that ivermectin has an antiviral effect on certain positive-sense single-strand RNA viruses, including SARS-CoV-2, the virus that causes COVID-19. Fatemeh Heidary, Reza Gharebaghi, *Ivermectin: a systematic review from antiviral effects to COVID-19 complementary regimen*, Nature Public Health Emergency Collection, 593-602 (2020) (discussing prior COVID-19 ivermectin studies).

39. Follow up studies concluded that while ivermectin could inhibit replication of SARS-CoV-2, the doses needed would be significantly greater than humans could safely ingest. Mike Bray et al., *Ivermectin and COVID-19: A report in Antiviral Research, widespread interest, an FDA warning, two letters to the editor and the authors' responses*, 178 Antiviral Research (2020).

40. Nevertheless, in December of 2020, Dr. Pierre Kory testified before the Senate Homeland Security and Government Affairs Committee that ivermectin is a "miracle drug" for the treatment of COVID-19. Testimony of Pierre Kory, MD, Homeland Security Committee Meeting: Focus on Early Treatment of COVID-19. *Focus on Early Treatment of COVID-19 before the Homeland Security Comm.*, 116th Congress (2020) (Testimony of Dr. Pierre Kory, President, Front Line COVID-19 Critical Care Alliance)

*available at* https://www.hsgac.senate.gov/imo/media/doc/Testimony-Kory-2020-12-08.pdf [https://web.archive.org/web/20220629192128/https://www.hsgac.senate.gov/imo/media/doc/Testimony-Kory-2020-12-08.pdf].

41.     Numerous lawmakers, as well as then-President Trump, endorsed Dr. Kory's testimony, and promoted ivermectin as a COVID-19 drug. Ben Collins, Brancy Zadronzy, *Clamoring for ivermectin, some turn to a pro-Trump telemedicine website*, CNBC (Aug. 27, 2021), https://www.cnbc.com/2021/08/27/clamoring-for-ivermectin-some-turn-to-pro-trump-telemedicine-website.html [https://web.archive.org/web/20211118081346/https://www.cnbc.com/2021/08/27/clamoring-for-ivermectin-some-turn-to-pro-trump-telemedicine-website.html].

42.     Subsequently, in January of 2021 the National Institutes of Health released Treatment Guidelines that suggest there is insufficient evidence of ivermectin's effects to recommend for or against it. *Ivermectin*, National Institutes of Health, https://www.covid19treatmentguidelines.nih.gov/therapies/antiviral-therapy/ivermectin/ [https://web.archive.org/web/20220618222625/https://www.covid19treatmentguidelines.nih.gov/therapies/antiviral-therapy/ivermectin/].

43.     In early 2021, the European Medicines Agency recommended against ivermectin's use for the prevention of COVID-19. EMA advises against use of ivermectin for the prevention or treatment of COVID-19 outside randomized clinical trials, European Medicines Agency (Mar. 22, 2021), https://www.ema.europa.eu/en/news/ema-advises-against-use-ivermectin-prevention-treatment-covid-19-outside-randomised-clinical-trials [https://web.archive.org/web/20220623053101/https://www.ema.europa.eu/en/news/ema-advises-against-use-ivermectin-prevention-treatment-covid-19-outside-randomised-clinical-trials].

44.     Also in early 2021, Merck issued a statement that attempting to use ivermectin to treat COVID-19 may be unsafe. *Merck Statement on Ivermectin use During the COVID-19 Pandemic*, Merck (Feb. 4, 2021), https://www.merck.com/news/merck-statement-on-ivermectin-use-during-the-covid-19-pandemic/

[https://web.archive.org/web/20220612153613/https://www.merck.com/news/merck-statement-on-ivermectin-use-during-the-covid-19-pandemic/].

45.     In March of 2021, the World Health Organization stated that ivermectin should not be used for the treatment of COVID-19. WHO advises that ivermectin only be used to treat COVID-19 within clinical trials, World Health Organization, https://www.who.int/news-room/feature-stories/detail/who-advises-that-ivermectin-only-be-used-to-treat-covid-19-within-clinical-trials

[https://web.archive.org/web/20220621004825/https://www.who.int/news-room/feature-stories/detail/who-advises-that-ivermectin-only-be-used-to-treat-covid-19-within-clinical-trials].

46.     Despite these warnings, prescriptions for ivermectin ballooned, reaching 88,000 prescriptions dispensed during the week of August 13, 2021 compared to an average of 3600 weekly prescriptions before 2020. Chua K, Conti RM, *Becker NV. US Insurer Spending on Ivermectin Prescriptions for COVID-19*. JAMA. 2022;327(6):584–587 (Jan. 13, 2022), https://jamanetwork.com/journals/jama/fullarticle/2788253

[https://web.archive.org/web/20220630002453/https://jamanetwork.com/journals/jama/fullarticle/2788253].

47.     Telehealth companies now have dedicated pages for ivermectin that advertise the ease of obtaining a prescription of the drug.  *How to get Ivermectin*, Front Line Covid-19 Critical Care Alliance, https://covid19criticalcare.com/guide-for-this-website/how-to-get-ivermectin/

[https://web.archive.org/web/20220615173409/https://covid19criticalcare.com/guide-for-this-website/how-to-get-ivermectin/];     Faith     Hope     Love     Medical,

https://faithhopelovemedical.com/

[https://web.archive.org/web/20220701013306/https://faithhopelovemedical.com/].

48.     These prescriptions are off-label, and many patients refuse to divulge what the prescriptions are for.

49.     Many pharmacists who are skeptical of ivermectin's effectiveness as a COVID-19 cure try to consult with patients about why they were prescribed ivermectin and/or refuse to fill the prescriptions.

50.     Stock does not believe that ivermectin is an effective treatment for COVID-19 compared to available alternatives.

**Mo. Rev. Stat. § 338.055.7**

*Overview*

51.     A product of COVID culture wars, § 338.055.7, RSMo., seeks to advance one side of the debate by both protecting pharmacists from Board sanction for filling prescriptions for hydroxychloroquine and ivermectin, and forbidding pharmacists from communicating any professional opinion against the efficacy of the drugs to either prescribers or patients:

> "The board shall not deny, revoke, or suspend, or otherwise take any disciplinary action against, a certificate of registration or authority, permit, or license required by this chapter for any person due to the lawful dispensing, distributing, or selling of ivermectin tablets or hydroxychloroquine sulfate tablets for human use in accordance with prescriber directions. **A pharmacist shall not contact the prescribing physician or the patient to dispute the efficacy of ivermectin tablets or hydroxychloroquine sulfate tablets for human use unless the physician or patient inquires of the pharmacist about the efficacy of ivermectin tablets or hydroxychloroquine sulfate tablets**."

Mo. Rev. Stat. § 338.055.7 (emphasis added).

52. The effective date of Section 338.055.7 is August 28, 2022; all references to the statute in this Complaint refer to the that version, which has not yet been printed in a supplement by the Missouri Revisor of Statutes, but is available at the Revisor's official website as of the date of this filing. *See* §338.055.7, RSMo. 2022, https://revisor.mo.gov/main/OneSection.aspx?section=338.055.

53. While pharmacists will now be *protected* from disciplinary action for dispensing ivermectin tablets or hydroxychloroquine sulfate tablets, under the new law, pharmacists such as Stock face disciplinary action, including the potential loss of their license for communicating with prescribers and counseling patients about either drug in certain ways.

54. Stock, and all pharmacists in Missouri, now face the impossible—and constitutionally impermissible—conundrum of deciding whether to endanger their livelihood when choosing whether to speak in a manner that is both vital to their professional duties to patients and protected by the First Amendment.

55. The power arrogated by Missouri under Section 338.055.7 could in the future be used to suppress criticism of other politically-favored medications. Free, frank and full discussion of controversial medications and treatments is essential to the public interest.

*Legislative History*

56. Legislators introduced Missouri House Bill No. 2149 to repeal sections 334.530 and 334.655 of the Missouri Revised Statutes to improve retention of physical therapy graduates from Missouri universities. Mo. Sen., Forty-Seventh Day, Second Session 57:00-57:20 (Apr. 12, 2022); Mo. House., First Day, One Hundred First Assembly, Second Session (Jan. 5, 2022).

57. The bill evolved to be a general bill dealing with professional licensing requirements in the state of Missouri.

13

58.    Senate Amendment 4028S04.19S, introduced as an amendment to House Bill No. 2149 on February 12, 2022, added the following relevant text to the Missouri Pharmacy Practice Act:

> "The board shall not deny, revoke, or suspend, or otherwise take any disciplinary action against, a certificate of registration or authority, permit, or license required by this chapter for any person due to the lawful dispensing, distributing, or selling of ivermectin tablets or hydroxychloroquine sulfate tablets for human use in accordance with prescriber directions. No person licensed under this chapter who dispenses, distributes, or sells ivermectin tablets or hydroxychloroquine sulfate tablets for human use shall ask the patient or prescriber, or otherwise require of the patient or prescriber, the reason or purpose for which the medications shall be used, except in circumstances in which it is necessary for purposes of the patient's health insurance or to clarify dosage for the health and safety of the patient."

59.    During a debate on the Senate floor, Senator Rick Brattin, in support of the amendment, focused his attention entirely on the provision of the amendment that insulates doctors from professional liability. He responded that it was "true" to a fellow Senator's statement that "[the choice of ivermectin and hydroxychloroquine] is very political." Mo. Sen., Forty-Seventh Day, Second Session 1:48:46-1:48:56 (Apr. 12, 2022).

60.    During the same debate, Senator Brattin acknowledged that "[ivermectin and hydroxychloroquine have] been the most politicized medication ever." Mo. Sen., Forty-Seventh Day, Second Session 1:54:04-1:54:09 (Apr. 12, 2022).

61.    In response to another allegation that the bill was politically motivated, Senator Brattin alleged that the Board of Registration for the Healing Arts was itself "weaponized." Mo. Sen., Forty-Seventh Day, Second Session 1:56:22 (Apr. 12, 2022).

62. In an interview with the Kansas City Star, Senator Brattin again stated that he wanted to protect doctors from "the politicization of those two drugs." Kacen Bayless, *Missouri bill bars pharmacists from questioning ivermectin effectiveness*, THE KANSAS CITY STAR (May 19, 2022), *available at* https://www.kansascity.com/news/politics-government/article261400142.html [https://web.archive.org/web/20220519210354/https://www.kansascity.com/news/politics-government/article261400142.html].

63. There was no public legislative debate regarding any significant burden to the state or citizens caused by pharmacists engaging in speech disputing or questioning the efficaciousness of ivermectin or hydroxychloroquine.

64. The amendment passed unanimously later that afternoon with minor language changes:

> "The board shall not deny, revoke, or suspend, or otherwise take any disciplinary action against, a certificate of registration or authority, permit, or license required by this chapter for any person due to the lawful dispensing, distributing, or selling of ivermectin tablets or hydroxychloroquine sulfate tablets for human use in accordance with prescriber directions. A pharmacist shall not contact the prescribing physician or the patient to dispute the efficacy of ivermectin tablets or hydroxychloroquine sulfate tablets for human use unless the physician or patient inquires of the pharmacist about the efficacy of ivermectin tablets or hydroxychloroquine sulfate tablets." Mo. Sen. Amend. 4028H.06S, (Mo. 2022).

*Potential Discipline Under § 338.055.7*

65. Section 338.140 of the Missouri Revised Statutes vests the Board with its rulemaking power and the "power to employ an attorney to conduct prosecutions or to

assist in the conduct of prosecutions pursuant to sections [of § 338, including § 338.055.7]." § 338.140.1.

66.     Additionally, the Board "may issue letters of reprimand, censure or warning … for any violations that could result in disciplinary action," and, at its sole discretion, "enter into a voluntary compliance agreement … in lieu of board discipline," where such agreements "shall be a public record." § 338.140.6.

67.     Thus, as with all rules and regulations of the pharmaceutical profession in Missouri, the Board will have authority to investigate putative violations of § 338.055.7 and the authority to prosecute or cause the prosecution of enforcement actions against Missouri-licensed pharmacists whom the Board believes to be in violation of the rule.

68.     In furthering its functions of enforcing and investigating alleged violations of disciplinary rules, the Board receives and investigates complaints lodged by any person, including any member of the public, 20 CSR 2220-2.050(1), with either knowledge of the alleged violation or who may make the complaint based on information and belief, 20 CSR 2220-2.050(2).

69.     Submitting a complaint requires only filling out a simple single page form available on the Board's website and submitting it to the Board by email, fax, or mail.

70.     Upon receiving a complaint, the Board sends notice to the pharmacist accused of misconduct. § 338.055.1.

71.     The Board then "may cause a complaint to be filed with the administrative hearing commission as provided by chapter 621." § 338.055.2.

72.     The administrative hearing commission will hold a hearing and convey its record and findings, along with its non-binding recommendation regarding discipline. § 621.110

73.     Within thirty days after receipt of the record of the proceedings before the commission and the findings of fact, conclusions of law, and recommendations, if any, of

the commission, the Board will set the matter for hearing and notify the respondent-pharmacist of the time and place of the hearing. § 621.110

74.     At or after the hearing, the Board may issue the disciplinary measure it sees fit, including censure, suspension, or revocation of the respondent-pharmacist or his or her license.

## Injury

75.     Stock plans to continue working as a retail pharmacist in Missouri.

76.     Through the course of her work, Stock will likely again confront a prescription for either hydroxychloroquine or ivermectin as a COVID-19 treatment.

77.     Should she receive either such prescription, she intends, consistent with her past practice, to contact the prescriber to discuss, debate, or dispute the efficacy of the drugs, both generally and relative to current alternatives and to counsel the patient about efficacy and alternatives.

78.     Stock does not wish to be subjected to a disciplinary investigation by the Board.

79.     Stock does not wish to be subjected to disciplinary proceedings in front of the Board or an administrative hearing commission.

80.     Stock does not wish to be subjected to disciplinary sanctions by the Board.

81.     A disciplinary investigation would harm Stock's professional reputation, available job opportunities, and ability to earn a living in her chosen profession.

82.     Disciplinary sanctions would harm Stock's professional reputation, available job opportunities, and ability to earn a living in her chosen profession.

83.     Stock will be forced to censor herself, and act against her professional judgment of the possible best course of treatment for a patient to protect herself from potential Board sanction.

84.     But for § 338.055.7, Stock would be able to freely fulfill her professional duties and protect patients by communicating her concerns without the fear of disciplinary consequences for expressing her professional opinion.

85.     Even if the Defendants were to attempt to assure Stock that they would not enforce § 338.055.7 as written, Stock's speech would be chilled, in that she would not feel comfortable speaking freely with prescribing physicians and patients about the drugs and would still reasonably fear the effects of complaints or other professional liability.

## CAUSE OF ACTION

### Claim I: Unconstitutional infringement of free speech

86.     Stock reasserts and realleges paragraph 1 through 85 as if fully set forth therein.

87.     According to the First Amendment to the United States Constitution, "Congress shall make no law … abridging the freedom of speech."

88.     The First Amendment has been incorporated to apply to the states through the Fourteenth Amendment.

89.     Stock's speech, as described above in paragraphs 19 through 24 and paragraphs 75 through 85, is fully protected by the First Amendment.

90.     § 338.055.7 chills such speech and, based on content and viewpoint of the speech, imposes professional liability in contravention of the First Amendment.

91.     § 338.055.7 is overly extensive and unduly burdensome.

92.     § 338.055.7 does not serve a compelling interest.

93.     § 338.055.7 is not appropriately tailored to any government interest.

94.     § 338.055.7 invites arbitrary, subjective, and viewpoint discriminatory enforcement.

95.     To the extent that § 338.055.7 is constitutional in any of its applications, it is nonetheless substantially overbroad in relation to any legitimate sweep and is facially unconstitutional for that reason.

96. On its face and as applied to speech like Stock's, § 338.055.7 violates the right to free speech guaranteed by the First Amendment.

97. Unless Defendants are enjoined from enforcing, prosecuting, and adjudicating pharmacist liability under § 338.055.7, Stock will suffer irreparable harm.

## REQUEST FOR RELIEF

Therefore, Stock respectfully requests the following relief:

A. A declaratory judgment that that the second sentence of § 338.055.7 facially violates the First and Fourteenth Amendments to the United States Constitution.

B. A permanent injunction prohibiting Defendants and their agents from enforcing the second sentence of § 338.055.7.

C. An award of attorney's fees, costs, and expenses in this action; and

D. Any other legal or equitable relief to which Stock may show herself to be justly entitled.

19

Dated: July 6, 2022                    Respectfully submitted,

/s/ Jonathan R. Whitehead
Jonathan R. Whitehead, Mo. Bar. 56848
LAW OFFICES OF JONATHAN R. WHITEHEAD LLC
229 SE Douglas, Suite 210
Lee's Summit, MO 64063
Phone: (816) 398-8305
Email: jon@whiteheadlawllc.com

Adam E. Schulman (*pro hac vice* forthcoming)
HAMILTON LINCOLN LAW INSTITUTE
1629 K Street NW, Suite 300
Washington, DC 20006
adam.schulman@hlli.org
(610) 457-0856

*Attorneys for Plaintiff Ashley Stock*

**VERIFICATION**

Pursuant to 28 U.S.C. § 1746, I, Ashley Stock have personal knowledge of the matters alleged in the foregoing Verified Complaint concerning myself, my activities and my intentions. I verify under the penalty of perjury that the statements made therein are true and correct.

Executed on July **6**, 2022

_____

Ashley Stock