# UNITED STATE DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
## WESTERN DISTRICT

ASHLEY STOCK,

                Plaintiff,

v.

              Case No. 22-CV-04104-DGK

JAMES L. GRAY, *et. al.*,

              Hon. David Gregory Kays

                Defendants,

## SUGGESTIONS IN SUPPORT OF PLAINTIFF ASHLEY STOCK'S MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

Table of Contents ...............................................................................................................ii

Table of Authorities .......................................................................................................... iii

Introduction...........................................................................................................................1

Factual Background................................................................................................................2

Legal Standard for Preliminary Injunction ..........................................................................2

Argument................................................................................................................................3

I.     Plaintiffs are likely to succeed on the merits because Section 338.055.7 infringes the free speech rights of Missouri pharmacists by threatening to impose liability based on the content and viewpoint of their ideas..................................................................3

     A.     Viewpoint discrimination is impermissible, even when carried out under the guise of regulating professional conduct. ..............................................6

     B.     Section 338.055.7 is also unconstitutional because it is substantially overbroad and cannot satisfy strict scrutiny. ..............................................9

II.     Stock will suffer irreparable harm if the defendants are not enjoined from enforcing Section 338.055.7. ..................................................................................................14

III.     The balance of equities and public interest also support granting preliminary relief. ...................................................................................................................14

Conclusion............................................................................................................................15

Certificate of Service ..........................................................................................................17

**TABLE OF AUTHORITIES**

**<u>Cases</u>**

*281 Care Comm. v. Arneson,*
766 F.3d 774 (8th Cir. 2014) ....................................................................................... 13

*Animal Legal Defense Fund v. Kelly,*
9 F.4th 1219 (10th Cir. 2022) ........................................................................................ 4

*Baribeau v. City of Minneapolis,*
596 F.3d 465 (8th Cir. 2010) ....................................................................................... 10

*Bolger v. Youngs Drug Prods. Corp.,*
463 U.S. 60 (1983) ....................................................................................................... 11

*Brandt v. Rutledge,*
551 F. Supp. 3d 882 (E.D. Ark. 2021) ........................................................................ 15

*Brown v. Entm't Merchs. Ass'n,*
564 U.S. 786 (2011) ..................................................................................................... 12

*Child Evangelism Fellowship of Minn. v. Minneapolis Special Sch. Dist. No. 1,*
690 F.3d 996 (8th Cir. 2012) ....................................................................................... 15

*Conant v. Walters,*
309 F.3d 629 (9th Cir. 2002) ...................................................................................... 4-5

*Doe v. S. Iron R-1 Sch. Dist.,*
498 F.3d 878 (8th Cir. 2007) ......................................................................................... 3

*Elrod v. Burns,*
427 U.S. 347 (1976) ..................................................................................................... 14

*Garcia v. City of New Hope,*
984 F.3d 655 (8th Cir. 2021) ....................................................................................... 10

*Gerlich v. Leath,*
861 F.3d 697 (8th Cir. 2017) ................................................................................. 3, 4, 9

iii

*Gooding v. Wilson,*
  405 U.S. 518 (1972) ................................................................................................. 10

*Hines v. Quillivan,*
  2021 WL 6618658, 2021 U.S. Dist. LEXIS 236801 (S.D. Tex. Jul. 29, 2021) ............................. 7

*Holder v. Humanitarian Law Project,*
  561 U.S. 1 (2010) ......................................................................................................... 7

*Hustler Magazine, Inc. v. Falwell,*
  485 U.S. 46 (1988) ...................................................................................................... 11

*Iancu v. Brunetti,*
  139 S. Ct. 2294 (2019) ........................................................................................... 3, 9, 14

*Intervarsity Christian Fellowship/USA v. Univ. of Iowa,*
  5 F.4th 855 (8th Cir. 2021) ....................................................................................... 9, 12

*Jones v. Jegley,*
  947 F.3d 1100 (8th Cir. 2020) ..................................................................................... 2-3

*Klein v. City of San Clemente,*
  584 F.3d 1196 (9th Cir. 2009) ..................................................................................... 15

*Little Rock Family Planning Services v. Rutledge,*
  397 F. Supp. 3d 1213 (E.D. Ark. 2019) ........................................................................ 15

*Matal v. Tam,*
  137 S. Ct. 1744 (2017) ......................................................................................... 3, 4, 5, 9

*McCullen v. Coakley,*
  573 U.S. 454 (2014) ............................................................................................... 6, 12

*Minnesota Voters Alliance v. Mansky,*
  138 S. Ct. 1876 (2018) .................................................................................................. 3

*Mo. Broadcasters Ass'n v. Lacy,*
  846 F.3d 295 (8th Cir. 2017) .................................................................................... 11, 12

*Movie Sys., Inc. v. MAD Minneapolis Audio Distribs.,*
  717 F.2d 427 (8th Cir. 1983) ......................................................................................... 3

iv

*NAACP v. Button,*
    371 U.S. 415 (1963) ........................................................................................................ 6, 9-10

*Nat'l Institute of Family & Life Advocates v. Becerra,*
    138 S. Ct. 2361 (2018) .................................................................................................... *passim*

*Ness v. City of Bloomington,*
    11 F.4th 914 (8th Cir. 2021) ................................................................................................ 12

*Otto v. City of Boca Raton,*
    981 F.3d 854 (11th Cir. 2020) ............................................................................................ 5, 7

*Phelps-Roper v. Koster,*
    713 F.3d 942 (8th Cir. 2013) ............................................................................................... 11

*Phelps-Roper v. Nixon,*
    545 F.3d 685 (8th Cir. 2008) .............................................................................................. 14

*Reed v. Town of Gilbert,*
    576 U.S. 155 (2015) ............................................................................................................. 3

*Rodgers v. Bryant,*
    942 F.3d 451 (8th Cir. 2019) ......................................................................................... 2, 3, 15

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
    515 U.S. 819 (1995) ............................................................................................................. 3

*Snider v. City of Cape Girardeau,*
    752 F.3d 1149 (8th Cir. 2014) .............................................................................................. 5

*Snyder v. Phelps,*
    562 U.S. 443 (2011) ........................................................................................................... 11

*Sorrell v. IMS Health, Inc.,*
    564 U.S. 552 (2011) ....................................................................................................... 11, 15

*Stenberg v. Carhart,*
    530 U.S. 914 (2000) ........................................................................................................... 13

*Telescope Media Group v. Lucero,*
    936 F.3d 740 (8th Cir. 2019) ................................................................................................ 7

*Thomas v. Collins*,
    323 U.S. 516 (1945) ................................................................................................................7

*United States v. Caronia*,
    703 F.3d 149 (2d Cir. 2012) ............................................................................... 10-11

*United States v. Stevens*,
    559 U.S. 460 (2010) .......................................................................................... 10, 13

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*,
    425 U.S. 748 (1976) .........................................................................................1, 10, 15

*Wollschlaeger v. Governor*,
    848 F.3d 1293 (11th Cir. 2017) (*en banc*) ..................................................7-8, 10, 11, 12

## Constitutional Provisions

U.S. CONST. amend. I...................................................................................................*passim*

## Rules and Statutes

Fed. R. Civ. P. 65(c) ...........................................................................................................15

Mo. Rev. Stat. § 338.055.7.............................................................................................*passim*

Mo. Rev. Stat. § 565.056...................................................................................................12

Mo. Rev. Stat. § 565.090...................................................................................................12

Mo. Rev. Stat. § 565.225...................................................................................................12

Mo. Rev. Stat. § 574.010...................................................................................................12

Mo. Rev. Stat. § 579.090...................................................................................................12

## Other Authorities

11A Wright & Miller,
      FEDERAL PRACTICE AND PROCEDURE. § 2948.1 (3d ed. 2020) ..................................................14

11A Wright & Miller,
      FEDERAL PRACTICE AND PROCEDURE. § 2954 (3d ed. 2020) ......................................................17

Mill, John Stuart,
      ON LIBERTY (4th ed. 1869) ............................................................................................1

# INTRODUCTION

"[G]overnments have no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra,* 138 S. Ct. 2361, 2371 (2018) ("*NIFLA*") (internal quotations omitted). But Missouri has passed a new law that does just that.

Missouri is free to proclaim its own full-throated support for the use of ivermectin and hydroxychloroquine to treat COVID-19. It is free to immunize physicians and pharmacists who prescribe and dispense those drugs from civil or professional liability. It is free to subsidize private use of those drugs. But the First Amendment says Missouri is not free to stifle the views of private individuals, even if those individuals are licensed professionals. *Id.* Mo. Rev. Stat. § 338.055.7 does just that when it prohibits pharmacists from contacting a prescribing physician or patient "to dispute the efficacy" of ivermectin or hydroxychloroquine for human use. The marketplace of ideas can only function when the government acts "to open the channels of communication rather than to close them." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 770 (1976). But the choice whether to open or close the channels of communication is not the Missouri General Assembly's choice to make: "the First Amendment makes [the choice] for us." *Id.* Otherwise, the state would possess the intolerable authority to grind the dialectic processes of knowledge development to a halt. Then truth itself, "so much a question of the reconciling and combining of opposites," and "made by the rough process of a struggle between combatants fighting under hostile banners," would be lost. John Stuart Mill, ON LIBERTY, 86 (4th ed. 1869).[1] Missouri's law is unconstitutional under the First Amendment and Supreme Court precedent.

---

1 *Available at* https://en.wikisource.org/wiki/On_Liberty/Chapter_2.

Last month, Governor Parson signed into law HB 2149. Among several provisions relating to professional licensing, one provision of the bill adds a new subsection 7 to Missouri Revised Statute § 338.055 regulating the profession of pharmacy. That subsection designates it as professional misconduct for pharmacists to "contact the prescribing physician or the patient to dispute the efficacy of ivermectin tablets or hydroxychloroquine sulfate tablets for human use unless the physician or patient inquires of the pharmacist about the efficacy of ivermectin tablets or hydroxychloroquine sulfate tablets." Complaint (Dkt. 1) ¶ 51. This pharmacist gag rule becomes effective on August 28, 2022. *Id.* at ¶ 52.

Plaintiff Ashley Stock filed the complaint here, seeking declaratory and injunctive relief against enforcement of this pharmacist speech ban. Stock is a Missouri-licensed pharmacist who has had discussions with both prescribing doctors and patients disputing the efficacy of both hydroxychloroquine and ivermectin for human use as COVID-19 treatments and intends to do so again. *Id.* at ¶¶ 18-24, 75-77. By the threat of professional liability or other repercussions, the pharmacist speech ban will deter Stock from speaking as she would like to. *Id.* at ¶¶ 78-85. She brings this action to vindicate her First Amendment rights and those of Missouri pharmacists that are chilled by an overbroad disciplinary standard. With the effective date of the law fast approaching, Stock now moves for a preliminary injunction against enforcement of the pharmacist speech ban.

## LEGAL STANDARD FOR PRELIMINARY INJUNCTION

Four factors determine whether a court should issue a preliminary injunction: (1) whether the plaintiff is likely to succeed in the litigation; (2) whether the plaintiff will suffer irreparable harm absent the injunction; (3) the balance of equities; and (4) the public interest. *Rodgers v. Bryant*, 942 F.3d 451, 455 (8th Cir. 2019). In the context of a First Amendment claim, the test generally turns on the first factor. *Jones v. Jegley*, 947 F.3d 1100, 1105 (8th Cir. 2020). If a

plaintiff has "established that the law likely violates the First Amendment," the three remaining factors are generally satisfied as well. *Rodgers*, 942 F.3d at 457 (internal citation omitted).

To determine whether a First Amendment plaintiff can demonstrate a likelihood of success, the Eighth Circuit first considers whether the plaintiff seeks to engage in protected speech. If so, the court then assesses if the state can "establish" that the speech restriction satisfies the relevant standard of scrutiny. *Rodgers*, 942 F.3d at 456; *accord Jones*, 947 F.3d at 1105-06 (affirming conclusion of probable success). In adjudicating a preliminary injunction motion, a court may rely on the verified complaint's averments or other affidavits as evidence. *Doe v. S. Iron R-1 Sch. Dist.*, 498 F.3d 878, 880 (8th Cir. 2007) (verified complaint); *Movie Sys., Inc. v. MAD Minneapolis Audio Distribs.*, 717 F.2d 427, 432 (8th Cir. 1983) (declaration).

ARGUMENT

I.    **Plaintiffs are likely to succeed on the merits because Section 338.055.7 infringes the free speech rights of Missouri pharmacists by threatening to impose liability based on the content and viewpoint of their ideas.**

If a government entity chooses to regulate or restrict speech, it may not do so in a way that discriminates against certain viewpoints. If a law is "viewpoint-based, it is unconstitutional." *Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019); *accord Minnesota Voters Alliance v. Mansky*, 138 S. Ct. 1876, 1885 (2018) ("restrictions…based on viewpoint are prohibited"); *Matal v. Tam*, 137 S. Ct. 1744, 1763 (2017) ("viewpoint discrimination is forbidden").

"The state engages in viewpoint discrimination when the rationale for its regulation of speech is the specific motivating ideology or the opinion or perspective of the speaker." *Gerlich v. Leath*, 861 F.3d 697, 705 (8th Cir. 2017) (internal quotation omitted). Viewpoint discrimination constitutes a more "egregious" and "blatant" offense to the First Amendment than does an ordinary content-based restriction—"a law that singles out specific subject matter for differential treatment." *Reed v. Town of Gilbert*, 576 U.S. 155, 156 (2015); *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).

3

"At its most basic, the test for viewpoint discrimination is whether—within the relevant subject category—the government has singled out a subset of messages for disfavor based on the views expressed." *Matal*, 137 S. Ct. at 1766 (Kennedy, J., concurring). For example, in *Gerlich*, Iowa State University discriminated against a student organization because of the organization's endorsement and advocacy of marijuana legalization. 861 F.3d at 706-07. This ideological viewpoint discrimination was not only unconstitutional, it had long been clearly established as such. *Id.* at 708-09.

As a general rule, when a law takes one side of a public debate and suppresses speech to the contrary, that law is unconstitutionally viewpoint-based. In *Animal Legal Def. Fund v. Kelly*, for instance, a Kansas law prohibited anyone from deceptively gaining access to an animal facility to damage the enterprise by exposing wrongdoing or otherwise. 9 F.4th 1219, 1233 (10th Cir. 2022). At the same time, however, that law did not forbid deceptively gaining access to make a video "intending to laud the facility or for neutral reasons." *Id.* By effectively taking one side of a disputed political issue (the ethics of certain animal husbandry practices in that case), a law becomes "impermissibly viewpoint discriminatory." *Id.*

The same principle applies, perhaps even more so, when the public debate is about medical issues. For example, in *Conant v. Walters*, the federal government threatened to revoke physicians' DEA registration if doctors, based on their professional judgment, recommended the use of marijuana. 309 F.3d 629, 632-33 (9th Cir. 2002). *Conant* recognizes the "core First Amendment values of the doctor-patient relationship." *Id.* at 637. Candid, open, and honest conversation is paramount "in order to identify and treat disease; barriers to full disclosure would impair diagnosis and treatment." *Id.* at 636 (quoting *Trammel v. United States*, 445 U.S. 40, 51 (1980)). And so, naturally, the doctors did not "surrender" their First Amendment rights simply by "[b]eing a member of a regulated profession." *Id.* at 637; *see also infra* Section I.A. In applying First Amendment scrutiny, the Ninth Circuit found that the government's policy did

"not merely prohibit the discussion of marijuana" (itself a "presumptively invalid"[2] content-based restriction), it "condemn[ed] expression of a particular viewpoint, i.e., that medical marijuana would likely help a specific patient" (a viewpoint-based restriction). *Id.* Worse still, this viewpoint-based restriction "altered the traditional role of medical professionals by prohibiting speech necessary to the proper functioning of those systems." *Id.* at 638 (simplified).

Similarly, a municipal ordinance banned therapists from offering any counseling with the goal of changing a minor's sexual orientation. *Otto v. City of Boca Raton*, 981 F.3d 854 (11th Cir. 2020). On review, the Eleventh Circuit concluded that the ordinance was an unconstitutional viewpoint-based restriction on speech: though the city could promote its own "viewpoint about sex, gender, and sexual ethics," it had no right to "engage in bias, censorship, or preference regarding another speaker's point of view." *Id.* at 864 (simplified). And that's what its law did: speech affirming one's sexual orientation was permitted; speech disaffirming it, and promoting sexual orientation change was not.

Section 338.055.7 is cut from the same cloth as these unconstitutionally viewpoint-based laws. It prohibits pharmacists from "contact[ing] the prescribing physician or the patient to dispute the efficacy of ivermectin tablets or hydroxychloroquine sulfate tablets for human use" unless the patient or physician asks first. In other words, speech educating the patient or consumer in a way that disputes the effectiveness of ivermectin or hydroxychloroquine is forbidden, while speech endorsing, promoting, touting or affirming the effectiveness of the drugs is permitted. That is a restriction on the basis of viewpoint. Missouri "has singled out a subset of messages" about ivermectin and hydroxychloroquine "for disfavor based on the views expressed." *Matal*, 137 S. Ct. at 1766 (Kennedy, J., concurring).

"[V]iewpoint discrimination is inherent in the design and structure of this Act. This law is a paradigmatic example of the serious threat presented when government seeks to impose its

---

2 *Snider v. City of Cape Girardeau*, 752 F.3d 1149, 1157 (8th Cir. 2014).

own message in the place of individual speech, thought, and expression." *NIFLA*, 138 S. Ct. at 2379 (Kennedy, J, concurring). Section 338.055.7 muzzles speech based on viewpoint and therefore Stock is near-certain to succeed in having the statute declared unconstitutional.

> **A.** **Viewpoint discrimination is impermissible, even when carried out under the guise of regulating professional conduct.**

Section 338.055.7's attempt to tilt the scientific, medical, and pharmacological discourse in favor of ivermectin and hydroxychloroquine does not become constitutional just because it only restricts the speech of licensed pharmacists. Courts have long recognized that "it is no answer to say that the purpose of the regulation is merely to insure high professional standards and not to curtail free expression. For a state may not, under the guise of prohibiting professional misconduct, ignore constitutional rights." *NAACP v. Button*, 371 U.S. 415, 438–39 (1963) (simplified). Indeed, one major function of the First Amendment is to serve as an "uninhibited marketplace of ideas," in which the considered independent judgment of medical professionals is of utmost value. *E.g.*, *McCullen v. Coakley*, 573 U.S. 464, 476 (2014).

If there were any lingering doubt about this proposition, the Supreme Court reaffirmed just two years ago that "professional speech" is not "a separate category of speech." *NIFLA*, 138 S. Ct. at 2371. "Speech is not unprotected merely because it is uttered by 'professionals.'" *Id.* at 2371–72. "As with other kinds of speech, regulating the content of professionals' speech poses the inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas or information." *Id.* at 2374 (internal quotations and alterations omitted). *NIFLA* singles out "two circumstances" in which professional speech may be afforded less than full protection. *Id.* at 2372. First, courts may apply "more deferential review to some laws that require professionals to disclose factual, noncontroversial information in their 'commercial speech.'" *Id.* Second, "[s]tates may regulate professional conduct, even though that conduct incidentally involves speech." *Id.*

Section 338.055.7 fits neither exception. Rather, it directly regulates the expressed opinions, views, and beliefs of pharmacists licensed in Missouri. A pharmacist expressing his views about a particular drug to a physician or a patient is pure speech. "Speech is not conduct just because the government says it is." *Telescope Media Group v. Lucero*, 936 F.3d 740, 752 (8th Cir. 2019). "Speech is speech, and it must be analyzed as such for purposes of the First Amendment." *Otto*, 981 F.3d at 864 (internal quotations omitted); *Hines v. Quillivan*, 2021 WL 6618658, 2021 U.S. Dist. LEXIS 236801, *26 (S.D. Tex. Jul. 29, 2021) (veterinarian "engaging in phone calls and emails with animal owners to give them specific medical advice" is speech; whereas "prescribing medication or otherwise treating the animals" would be conduct). The government regulates speech when the "conduct triggering coverage under the statute consists of communicating a message." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010). "[I]f professional speech were not protected under normal First Amendment principles, the government might easily tell architects that they cannot propose buildings in the style of I.M. Pei, or general contractors that they cannot suggest the use of cheaper foreign steel in construction projects, or accountants that they cannot discuss legal tax avoidance techniques." *Otto*, 981 F.3d at 867 (internal quotations omitted).

Professionals might disagree "on many topics in their respective fields[,]" including matters of ethics, policy, or their craft itself. *NIFLA*, 138 S. Ct. at 2375. That is healthy. "[T]he best test of truth is the power of the thought to get itself accepted in the competition of the market, and the people lose when the government is deciding which ideas should prevail." *NIFLA*, 138 S. Ct. at 2375 (internal quotation omitted). "The very purpose of the First Amendment is to foreclose public authority from assuming a guardianship of the public mind through regulating the press, speech, and religion." *Thomas v. Collins*, 323 U.S. 516, 545 (1945) (Jackson, J., concurring).

A free market for ideas is all the more necessary "[i]n the fields of medicine and public health" where "information can save lives." *NIFLA*, 138 S. Ct. at 2374 (internal quotation omitted). Medical professionals, "therefore, 'must be able to speak frankly and openly to

patients.'" *Wollschlaeger v. Governor*, 848 F.3d 1293, 1313 (11th Cir. 2017) (*en banc*) (quoting *Conant*, 309 F.3d at 636). History brims with cautionary examples of governments "'manipulat[ing] the content of doctor-patient discourse' to increase state power and suppress minorities." *NIFLA*, 138 S. Ct. at 2374 (citing examples and quoting Paula Berg, *Toward a First Amendment Theory of Doctor-Patient Discourse and the Right to Receive Unbiased Medical Advice*, 74 B.U. L. REV. 201, 201-02 (1994)).

*Wollschlaeger* is instructive. There, Florida passed a law that, among other provisions, generally prohibited medical professionals "from making a written inquiry or asking questions concerning the ownership of a firearm or ammunition by the patient or by a family member of the patient" 848 F.3d at 1303. Florida asserted that its law did not implicate the First Amendment "because any effect on speech" was "merely incidental to the regulation of professional conduct." *Id.* at 1308. The Eleventh Circuit disagreed, finding the law to be a textbook case of "ignor[ing] constitutional rights" "under the guise of prohibiting professional misconduct." *Id.* at 1310. And the law could not be sustained under any form of heightened scrutiny. *Id.* at 1311-1317. Even by comparison to Florida's infirm law, Section 338.055.7 fares poorly. Whereas Florida imposed a content-based distinction on the face of the statute (no inquiries about the subject matter of firearms), Section 338.055.7 carries a viewpoint-based distinction on its face: no disparagement about the subject matter of certain drugs. And the "power imbalance" rationale declaring that the law is necessary to protect "vulnerable" patients—a rationale that *Wollschlaeger* discredits, 838 F.3d at 1315—has no application to speech from one professional (a pharmacist) to another (a doctor).

In the end, "[t]hat the Act focuses on [pharmacists] is irrelevant. The need to prevent the government from picking ideological winners and losers is as important in medicine as it is in any other context." *Wollschlaeger*, 838 F.3d at 1328 (Pryor, J., concurring).

**B.     Section 338.055.7 is also unconstitutional because it is substantially overbroad and cannot satisfy strict scrutiny.**

Because Section 338.055.7 is viewpoint discriminatory on its face, that "end[s] the matter" and "renders unnecessary any extended treatment of other questions." *Iancu*, 139 S. Ct. at 2302; *Matal*, 137 S. Ct. at 1765 (Kennedy, J., concurring). The law "must be invalidated"—and a preliminary injunction granted—even without considering the statute's "permissible applications." *Iancu*, 139 S. Ct. at 2302; *cf. also Intervarsity Christian Fellowship/USA v. Univ. of Iowa*, 5 F.4th 855, 865 (8th Cir. 2021) (concluding defendants were "wise" not to argue that their viewpoint discrimination could survive strict scrutiny). But there is some Eighth Circuit law subjecting viewpoint-discriminatory laws to the same strict-scrutiny analysis due a content-based restriction. Under this analysis, the government must "demonstrate[] that its regulation is narrowly drawn and is necessary to effectuate a compelling state interest. *Gerlich*, 861 F.3d at 705 (internal quotation omitted). Assessing Missouri's justifications for banning pharmacists' speech, one has to stretch to even find a "broad prophylactic rule[]" that lacks the "touchstone" "[p]recision of regulation." *NAACP v. Button*, 371 U.S. at 438. Because "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep," the law is unconstitutionally overbroad. *United States v. Stevens*, 559 U.S. 460, 473 (2010) (internal quotation omitted)

Although it did not appear in the legislative history, the defendants might argue that Section 338.055.7 is necessary to protect the integrity of personal medical decisions of patients and their physicians. Whether that interest is compelling in the abstract, banning pharmacists from disputing the effectiveness of certain drugs is not narrowly tailored to any interest in maintaining the integrity of patients' and doctors' medical decisions.  Missouri could engage in regulation, consistent with the First Amendment's Speech clause at least, designed to ensure the availability of certain drugs.  But the state has no power to restrict speech and thus abridge the informational process about available drugs. That is not safeguarding medical decisions; it's short-circuiting the deliberative decision-making process. In doing that, Section 338.055.7 tells

9

fully competent adults (both patients and doctors) that they are too sensitive to hear a contrary opinion; this exceeds the government's authority. "[T]he Constitution does not permit government to decide which types of otherwise protected speech are sufficiently offensive to require protection for the unwilling listener or viewer." *Wollschlaeger*, 848 F.3d at 1315 (quoting *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 210 (1975)).

Missouri simply has no legitimate interest in protecting the sensibilities of either doctors or patients from hearing speech simply because it presents an alternative, unsolicited, or even offensive view. As a general matter, fractious speech is fully protected by the First Amendment. *See Gooding v. Wilson*, 405 U.S. 518 (1972) (invalidating a statute prohibiting targeted use of "opprobrious words or abusive language"); *Garcia v. City of New Hope*, 984 F.3d 655 (8th Cir. 2021) (rude and vulgar hand gesture to police officer is protected speech); *Baribeau v. City of Minneapolis*, 596 F.3d 465, 471 (8th Cir. 2010) (anti-consumerism protest, by dressing as zombies, then approaching and frightening passersby, is protected speech). It is protected even when the speech amounts to a "brutalization" of a grieving family at its most vulnerable. *See Snyder v. Phelps*, 562 U.S. 443, 466 (2011); *accord Phelps-Roper v. Koster*, 713 F.3d 942, 947-49 (8th Cir. 2013). "Indeed, if it is the speaker's opinion that gives offense, that consequence is a reason for according it constitutional protection." *Hustler Magazine, Inc v. Falwell*, 485 U.S. 46, 55 (1988). So too for purely commercial speech: "the fact that protected speech may be offensive to some does not justify its suppression." *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 68, 71 (1983). Beyond offense, even if there are a few such patients who have "felt coerced and harassed," this cannot "sustain…broad content-based regulations"; that some people "must endure speech they do not like" "is a necessary cost of freedom." *Wollschlaeger*, 848 F.3d at 1315-16 (quoting with alteration *Sorell v. IMS Health, Inc.*, 564 U.S. 552 , 575 (2011)).

Section 338.055.7 actually violates patients' and doctors' rights to receive information from a pharmacist who would otherwise be a willing speaker. *See, e.g., Va. State Bd. of Pharm.*, 425 U.S. at 756. "Paternalistic[] interfere[nce] with the ability of physicians and patients to receive

potentially relevant treatment information…could inhibit, to the public's detriment, informed and intelligent treatment decisions." *United States v. Caronia*, 703 F.3d 149, 166 (2d Cir. 2012). The First Amendment will not countenance "regulations that seek to keep people in the dark for what the government perceives to be their own good." *Sorrell*, 564 U.S. at 577 (quoting *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 503 (1996) (opinion of Stevens, J.)). Missouri's law interferes with the integrity of medical decisions.

Making matters worse, there is no legislative record or other evidence of any significant problem with pharmacists engaging in speech disputing the efficaciousness of ivermectin or hydroxychloroquine. Complaint ¶ 63. In the First Amendment analysis, the government bears the burden of proffering such evidence. *See Mo. Broadcasters Ass'n v. Lacy*, 846 F.3d 295, 301 (8th Cir. 2017) (rebuffing reliance on a "commonsense link" between the challenged provision and the government's stated interest). "When the state defends a regulation on speech as a means to redress past harms or prevent anticipated harms, it must do more than simply posit the existence of the disease to be cured." *Wollschlaeger*, 848 F.3d at 1316 (internal quotations and alterations omitted). Everyone can agree that issues surrounding COVID treatment have become "politicized." Complaint ¶¶ 59-62. But suppressing private speech on the opposite side of an issue only aggravates that problem. As far as the real problem was specifically "weaponization of the board of healing arts," Complaint ¶ 61, that rationale, of course, has nothing to do with the private speech of pharmacists.

Assuming that there are isolated cases of pharmacists engaging in belligerent harassment of physicians or patients—and it would be less likely such speech escalates into unprotected "fighting words" in a world of telemedicine and prescriptions of ivermectin or hydroxychloroquine that often originate out-of-state[3]—a blanket ban on speech disputing the efficacy of the drugs is vastly broader than the problem demands.

_____

3 Complaint ¶ 34.

"[S]ome patients [and doctors] do not object to [pharmacists' disputing the efficacy of their prescribed drugs], and some even express gratitude for their [pharmacists'] discussion of the topic." *Wollschlaeger*, 848 F.3d at 1313; *see* Complaint ¶ 24. Such overinclusiveness dooms the Missouri law under strict-scrutiny review. *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 804 (2011); *see also Ness v. City of Bloomington*, 11 F.4th 914, 924 (8th Cir. 2021).

On the other hand, Section 338.055.7 is also underinclusive because it singles out two drugs even though a patient or doctor has an equal interest in being free from vexatious speech about any drug or any prescription. The state doesn't serve a compelling interest "by picking and choosing what kind of [provocation] [is] okay." *Intervarsity Christian Fellowship/USA*, 5 F.4th at 865; *see also Mo. Broadcasters Ass'n*, 846 F.3d at 302. And "selective application" "cannot survive strict scrutiny." *Id.* Indeed, it "raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Brown*, 564 U.S. at 802.

Lastly, the novelty of the law suggests that the law lacks precise tailoring. "No other state" has imposed a drug-specific speech ban like Missouri seeks to do here. *McCullen*, 573 U.S. at 490. When a regulation is unprecedented, as Section 338.055.7's ban on certain pharmacist speech is, that "raise[s] concern" that the government "has too readily forgone options that could serve its interests just as well, without substantially burdening the kind of speech in which petitioners wish to engage." *Id.* And, as in *McCullen*, there are myriad other options available for Missouri to combat the problem of pharmacist speech that escalates into harassment. There are any number of state and local ordinances already in place that can address problems without burdening protected speech. *See, e.g.,* Mo. Rev. Stat. § 565.090 (proscribing harassment); Mo. Rev. Stat § 565.225 (proscribing stalking); Mo. Rev. Stat § 565.056 (proscribing assault in the fourth degree); Mo. Rev. Stat § 574.010-.020 (proscribing peace disturbance); Mo. Rev. Stat. § 579.090 (proscribing tampering with a prescription).

If, as is probable, Missouri's goal is signaling its own opinion that ivermectin and hydroxychloroquine are indisputably the gold standard for effective treatment of COVID-19, the way to do that is to engage in public awareness campaigns or other government speech; it is not to shut down speakers with an opposing view. To let "the citizenry…discern for themselves what the truth is", the "preferred First Amendment remedy" is "more speech, not enforced silence." *281 Care Comm. v. Arneson*, 766 F.3d 774, 793 (8th Cir. 2014).

Section 338.055.7 sets a dangerous precedent. If a state can ban criticism of ivermectin and hydroxychloroquine today, it can ban criticism of puberty-blocking drugs tomorrow, and it can ban criticism of opiates next week. While Purdue Pharma or other large pharmaceutical companies may like a rule that allows them to control the marketplace of ideas if they can capture the correct government officials, the First Amendment does not allow it.

Stock expects the defendants will offer their assurances that they will only apply the law to extreme circumstances, but this cannot save the overbroad statute. "[T]he First Amendment protects against the Government; it does not leave us at the mercy of noblesse oblige." *Stevens*, 559 U.S. at 480. Courts may not uphold an unconstitutional rule just because defendants "promise[] to use it responsibly." *Id*. Nor may they "write nonbinding limits into a silent state statute" or "rewrite a law to conform it to constitutional requirements." *Iancu*, 139 S. Ct. at 2301 (quoting *Stevens*, 559 U.S. at 481). They are "without power to adopt a narrowing construction of a state statute unless such a construction is reasonable and readily apparent." *Stenberg v. Carhart*, 530 U.S. 914, 944 (2000). There is no reasonable and readily apparent construction that can salvage Section 338.055.7.

Section 338.055.7 is fundamentally incompatible with the First Amendment. As a viewpoint-based restriction of protected speech, it is automatically infirm. Interpreted as a subject matter/content-based restriction, it is fatally overbroad. State regulators may not anoint themselves gatekeepers of the marketplace of ideas. Pharmacists have no monopoly on the truth,

but they are every bit as entitled as any other citizen to share their opinions. Stock readily meets the burden of showing she is likely to prevail in this case.

## II.     Stock will suffer irreparable harm if the defendants are not enjoined from enforcing Section 338.055.7.

"When an alleged deprivation of a constitutional right is involved, such as the right to free speech or freedom of religion, most courts hold that no further showing of irreparable injury is necessary." 11A Wright & Miller, FEDERAL PRACTICE AND PROCEDURE § 2948.1 (3d ed. Apr. 2020 update). "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373–74 (1976).

Here, Section 338.055.7 is scheduled to go into effect on August 28, 2022. Compl. ¶ 52. If the statute's enforcement is not enjoined, Stock will be chilled in the exercise of her First Amendment rights in her occupation. Compl.  ¶ 83. Even if the defendants wield their powers responsibly, Stock and other pharmacists will be deterred by the statute's overbroad standards and the fact that any member of the public can register a disciplinary complaint. *Id.* at ¶ 68.

Because Stock has above "establish[ed] a sufficient likelihood of success on the merits of her First Amendment claim," she has "also…established irreparable harm as a result of the deprivation." *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008), *overruled in part on other grounds by Phelps-Roper v. City of Manchester*, 697 F.3d 678 (8th Cir. 2012) (*en banc*).[4]

## III.     The balance of equities and public interest also support granting preliminary relief.

The remaining two factors—the public interest and whether other interested persons would be benefited or harmed by an injunction—also favor granting relief given the "likely First

---

4 Because the summary judgment process would overtake this relatively short timetable, this preliminary injunction motion is necessary to prevent the constitutional harm that will occur beginning on the effective date. *See generally* 11A Wright & Miller, FEDERAL PRACTICE AND PROCEDURE § 2948.1 ("If a trial on the merits can be conducted before the injury would occur there is no need for interlocutory relief.").

Amendment violation." *Child Evangelism Fellowship of Minn. v. Minneapolis Special Sch. Dist. No. 1*, 690 F.3d 996, 1004 (8th Cir. 2012). Fundamentally, Missouri "has no interest in enforcing laws that are unconstitutional…[and] an injunction preventing the State from enforcing [the challenged statute] does not irreparably harm the State." *Little Rock Fam. Planning Services v. Rutledge*, 397 F. Supp. 3d 1213, 1322 (E.D. Ark. 2019) (citation omitted). Any "remote chance" that a state may later prove the law constitutional "cannot be held sufficient to overcome the public's interest in protecting freedom of expression." *Rodgers*, 942 F.3d at 458 (citation omitted).

Because the Rule deters not only Stock's speech, but that of all Missouri pharmacists, "the balance of equities and the public interest thus tip sharply in favor of enjoining the [statute]." *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009). A pharmacist's opinion "could mean the alleviation of physical pain or the enjoyment of basic necessities"; it can even "save lives." *Va. State Bd. of Pharm.*, 425 U.S. at 764; *Sorrell*, 564 U.S. at 566.

If § 338.055.7 is permitted to go into effect, it will mean that states have the power to tinker with the processes of medical, scientific, and pharmacological development. That power would be unprecedented and dangerous.

Where, as here, the statutory provision is facially unconstitutional, the proper remedy is an injunction prohibiting the defendants from enforcing it. *Rodgers*, 942 F.3d at 458; *see also Brandt v. Rutledge*, 551 F. Supp. 3d 882, 894 (E.D. Ark. 2021) (enjoining defendants from enforcing an unconstitutional speech-restraining state statute during the litigation).[5]

## CONCLUSION

For these reasons, the Court should grant Stock's motion for a preliminary injunction.

---

5 A Fed. R. Civ. P. 65(c) bond is not required here because this is a public-interest case seeking only declaratory and injunctive relief and there is no risk of monetary loss to the defendants. *See* 11A Charles Alan Wright, et al., FEDERAL PRACTICE AND PROCEDURE § 2954 n.13 (3d ed. 2020) (collecting cases, including *Doctor John's, Inc. v. City of Sioux City, Iowa*, 305 F. Supp. 2d 1022, 1043-44 (N.D. Iowa 2004)).

Dated: July 22, 2022

/s/ Jonathan R. Whitehead
Jonathan R. Whitehead, Mo. Bar. 56848
LAW OFFICES OF JONATHAN R. WHITEHEAD LLC
229 SE Douglas, Suite 210
Lee's Summit, MO 64063
Phone: (816) 398-8305
Email: jon@whiteheadlawllc.com


Adam E. Schulman (*pro hac vice*)
HAMILTON LINCOLN LAW INSTITUTE
1629 K Street, NW Suite 300
Washington, DC 20006
Phone: (610) 457-0856
Email: adam.schulman@hlli.org

16

CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of July, 2022, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court using CM/ECF system. Additionally, I have caused the defendants to be personally served a copy of this motion and the accompany suggestions, by mail to the Defendants and their Executive Director, Kimberly Grinston, at the Board's offices, 3605 Missouri Blvd., Jefferson City, MO 65109, as well as by email to kimberly.grinston@pr.mo.gov, as Ms. Grinston represents that the Board has authorized her to accept service of process in this matter.

/s/ Jonathan Whitehead