UNITED STATE DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DISTRICT

ASHLEY STOCK,

        Plaintiff,

v.

        Case No. 22-CV-4104-DGK

JAMES L. GRAY, et al.,

        Hon. David Gregory Kays

        Defendants,

**REPLY SUGGESTIONS IN SUPPORT OF PLAINTIFF ASHLEY STOCK'S
MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

Table of Contents..........................................................................................................ii

Table of Authorities....................................................................................................iii

Introduction...................................................................................................................1

Argument.......................................................................................................................1

I.  Stock has standing to pursue a pre-enforcement facial challenge to the pharmacist speech ban because her intended speech is reasonably chilled by the ban. ................1

II. Stock is likely to succeed on the merits of her First Amendment challenge. .....4

   A. The First Amendment fully protects pharmacists' rights to contact patients or physicians and dispute the drugs' efficacy for human use......................4

   B. Section 338.055.7 is unconstitutional because it is a viewpoint-based restriction on speech. In any event, it cannot satisfy strict scrutiny. .............6

III. Because Stock has shown a likelihood of success in a free-speech case, the other preliminary injunction factors follow, and the Court should enjoin defendants from enforcing the challenged provision...............................................................11

Conclusion................................................................................................................... 12

Certificate of Service ................................................................................................. 13

# Table of Authorities

**Cases**

*281 Care Comm. v. Arneson*,
   766 F.3d 774 (8th Cir. 2014) ...................................................................................9

*Ams. For Prosperity Found. v. Bonta*,
   141 S. Ct. 2373 (2021) .............................................................................................7

*Animal Legal Defense Fund v. Vaught*,
   8 F.4th 714 (8th Cir. 2021) .....................................................................................2

*Citizens United v. FEC*,
   558 U.S. 310 (2010) .......................................................................................... 11-12

*Bruni v. City of Pittsburgh*,
   941 F.3d 73 (3d Cir. 2019) .......................................................................................7

*Brown v. Entm't Merchs. Ass'n*,
   564 U.S. 786 (2011) ................................................................................................10

*Caranchini v. Nationstar Mortg., LLC*,
   2022 WL 1156543, 2022 U.S. Dist. LEXIS 71390 (W.D. Mo. Apr. 19, 2022) ..............7

*Conant v. Walters*,
   309 F.3d 629 (9th Cir. 2002) ...................................................................................1

*Cramp v. Bd. of Pub. Instruction*,
   368 U.S. 278 (1961) ................................................................................................11

*Greenberg v. Goodrich*,
   __F. Supp. 3d__, 2022 WL 874953 (E.D. Pa. Mar. 24, 2022) .................................11

*Harris v. Quinn*,
   573 U.S. 616 (2014) ..................................................................................................5

*Horner v. Spalitto*,
   1 S.W.3d 519 (Mo.App.W.D. 1999) .........................................................................8

*Iancu v. Brunetti*,
　　139 S. Ct. 2294 (2019) ................................................................................................ 1, 7

*Kennedy v. Bremerton Sch. Dist.*,
　　142 S. Ct. 2407 (2022) ....................................................................................................9

*Matal v. Tam*,
　　137 S. Ct. 1744 (2017) ....................................................................................................7

*Musser v. Mapes*,
　　718 F.3d 996 (8th Cir. 2013) ..........................................................................................7

*NAACP v. Button*,
　　371 U.S. 415 (1963) ......................................................................................................11

*Nat'l Gay Task Force v. Bd. of Educ.*,
　　729 F.2d 1270 (10th Cir. 1984) ....................................................................................11

*Nat'l Institute of Family & Life Advocates v. Becerra*,
　　138 S. Ct. 2361 (2018) ...........................................................................................*passim*

*Otto v. City of Boca Raton*,
　　981 F.3d 854 (11th Cir. 2020) .................................................................................... 1, 5

*Picard v. Magliano*,
　　__F.4th__, 2022 WL 2962548, 2022 U.S. App. LEXIS 20722 (2d Cir. Jul. 27, 2022) ..2

*Rodgers v. Bryant*,
　　942 F.3d 451 (8th Cir. 2019) ............................................................................. 1, 10, 11

*St. Paul Area Chamber of Commerce v. Gaertner*,
　　439 F.3d 481 (8th Cir. 2006) ..........................................................................................3

*Susan B. Anthony List v. Driehaus*,
　　573 U.S. 149 (2014) .................................................................................................. 1-2

*Turtle Island Foods, SPC v. Thompson*,
　　992 F.3d 694 (8th Cir. 2021) ..........................................................................................2

*United States v. Alvarez*,
　　567 U.S. 709 (2012) ................................................................................................. 4-5

*United States v. Stevens*,
    559 U.S. 460 (2010) ........................................................................................................4

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*,
    425 U.S. 748 (1976) .....................................................................................................4, 5

*Wollschlaeger v. Governor*,
    848 F.3d 1293 (11th Cir. 2017) (*en banc*) .....................................................................1, 11

**Constitutional Provisions**

U.S. CONST. amend. I ............................................................................................................ *passim*

**Rules and Statutes**

Mo. Rev. Stat. § 338.055.7 ..................................................................................................... *passim*

**Other Authorities**

Scalia, Antonin,
    *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17
    SUFFOLK U. L. REV. 881 (1983) ...................................................................................3

**INTRODUCTION**

The word "viewpoint" does not appear one time in defendant's entire, overlength opposition. There is no discussion of any of the leading appellate cases at the intersection of professional speech regulations and viewpoint discrimination. *See* Plaintiff's Motion (Dkt. 8) at 4-5, 7-8 (citing *Conant v. Walters*, 309 F.3d 629 (9th Cir. 2002); *Otto v. City of Boca Raton*, 981 F.3d 854 (11th Cir. 2020); *Wollschlaeger v. Governor*, 848 F.3d 1293 (11th Cir. 2017) (*en banc*)). "Finding … viewpoint bias" "end[s] the matter" notwithstanding defendants' attempts to balance "permissible and impermissible applications" under an overbreadth analysis. *Compare Iancu v. Brunetti*, 139 S. Ct. 2294, 2302 (2019), *with* Def. Resp (Dkt. 17-1) at 8-11. It matters not that the Missouri legislature could have "captured" certain speech that amounts to unprotected fraud "through a viewpoint-neutral statute." *Iancu*, 139 S. Ct. at 2302. It didn't pass that bill. Instead, it passed a facially infirm, viewpoint-discriminatory law.

As a result, this Court should enjoin the defendants from enforcing the unconstitutional provision of that law: the second sentence of Section 338.055.7. That is the "appropriate" relief here, well-tailored to remedy the constitutional violation and the First Amendment harm visited on all pharmacists in the state. *Rodgers v. Bryant*, 942 F.3d 451, 458 (8th Cir. 2019).

**ARGUMENT**

**I. Stock has standing to pursue a pre-enforcement facial challenge to the pharmacist speech ban because her intended speech is reasonably chilled by the ban.**

To challenge to a state statute that violates the First Amendment, a plaintiff need not wait for "an actual arrest, prosecution, or other enforcement action." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). Rather, a plaintiff may pursue a pre-enforcement challenge when she has (1) declared "an intention to engage in a course of conduct arguably affected with a constitutional interest"; (2) her "intended future conduct is arguably proscribed by the statute they wish to challenge"; and (3) there is a credible

1

Case 2:22-cv-04104-DGK   Document 25-1   Filed 08/17/22   Page 6 of 18

threat of future enforcement. *Id.* at 161–65. This is a "forgiving standard." *Turtle Island Foods, SPC v. Thompson*, 992 F.3d 694, 699 (8th Cir. 2021).

Although the defendants do not expressly contest Stock's standing to bring suit, they hint that Stock's intended speech is not actually proscribed in Section 338.055.7 and say it is "speculative" that she will sustain harm in the future. Def. Resp. 7, 12, 20. While acknowledging that Stock intends to "contact[] … prescribing physician[s] to dispute the efficacy of [ivermectin and hydroxychloroquine] for human use for COVID-19," they suggest that the "not entirely clear" statute might somehow only ban "contact[] to tell physicians that these drugs are only used for animals." Def. Resp. 12. This defies logic; why would pharmacists contact physicians to argue that hydroxychloroquine is "only used for animals" when in fact it has no apparent animal use at all? Complaint (Dkt. 1) ¶ 25. The natural and plain reading of the language, especially given context of the entire bill and the statements of legislators and others about its public meaning (Complaint ¶¶56-74), is that pharmacists are banned from disputing the efficacy of the drugs for any prescription for human use, not merely disputing that the drugs' efficacy for *every* human use.

At the very least, the speech Stock intends to engage in is "arguably proscribed" by the law. That is the test of *SBA List*; not "certainly proscribed," "definitely proscribed," or even just "proscribed." 579 U.S. at 162. *Accord Animal Legal Def. Fund v. Vaught*, 8 F.4th 714, 718-19 (8th Cir. 2021); *Turtle Island Foods*, 992 F.3d at 699-700. Stock has standing whether her speech is "proscribed under the best interpretation of the statute or under the government's own interpretation of the statute." *Picard v. Magliano*, __F.4th__, 2022 WL 2962548, 2022 U.S. App. LEXIS 20722, at *14 (2d Cir. Jul. 27, 2022). Indeed, the defendants admit that the law could "potentially cover such instances" of Stock's intended speech. Def. Resp. 9.

Defendants also suggest that it is "entirely speculative" that Stock will again confront prescriptions for ivermectin or hydroxychloroquine for COVID-19 treatment, because of newer treatments and the wide availability of vaccines. Of course, COVID-19 vaccines were fully available when prescriptions for the drugs surged in August 2021. Defendants offer no evidence that the demand for such prescriptions is waning; they ignore Stock's averment that telehealth companies still forcefully advertise the drugs. Complaint ¶ 47. Indeed, defendants' supposition is undermined by the very fact that the Missouri legislature considered the particular prescriptions ivermectin and hydroxychloroquine to be a matter worthy of their time and interest just three months ago. Stock has received such prescriptions (Complaint ¶ 18), there is no reason to think she will not again.

Beyond these arguments, defendants do not appear to suggest a lack of a "credible threat of enforcement." For good reason: "When dealing with pre-enforcement challenges to recently enacted … statutes that facially restrict expressive activity by the class to which the plaintiff belongs, courts will assume a credible threat of prosecution in the absence of compelling contrary evidence." *St. Paul Area Chamber of Commerce v. Gaertner*, 439 F.3d 481, 486 (8th Cir. 2006) (internal quotation omitted). Nor is there any dispute about the first element of *SBA List*: Stock's intended course of conduct—communicating with physicians and patients—is affected with a constitutional interest.

Stock and other retail pharmacists are the "very *object*" of the regulation; she has standing to challenge it. Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 SUFFOLK U. L. REV. 881, 894 (1983).

## II. Stock is likely to succeed on the merits of her First Amendment challenge.

### A. The First Amendment fully protects pharmacists' rights to contact patients or physicians and dispute the drugs' efficacy for human use.

Governments may not employ "ad hoc balancing" tests to create novel exceptions to the First Amendment's protection for freedom of speech; they are limited to "historically unprotected categories." *United States v. Stevens*, 559 U.S. 460, 470 (2010). Defendants' three arguments for why the pharmacist speech here is unprotected amount to undue expansions of the historically recognized categories.

First, quoting *Va. State Bd of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748 (1976), defendants note that "untruthful speech, commercial or otherwise, has never been protected for its own sake." Def. Resp. 15. In the same vein, defendants refer to spreading "scientific misinformation," communicating a "scientifically incorrect judgment" or contradicting "scientific fact established by the FDA" to be unprotected speech. *Id.* at 15, 19, 22. They misread *Va. State Bd. of Pharmacy*, and are wrong that "scientific misinformation" is a historically unprotected category of speech. As *United States v. Alvarez* explains, *Va. State Bd*'s statement applies within the context of speech perpetrating a fraud (*i.e.,* lying about the cost of prescription medication). 567 U.S. 709, 718 (2012). It does not endorse a "categorical rule" making all false speech unprotected. 567 U.S. at 718-19. Indeed, even under the less-speech-solicitous views of the *Alvarez* concurrence and dissent, "scientific misinformation" is protected. Justice Alito explains:

> "There are broad areas in which any attempt by the state to penalized purportedly false speech would present a grave and unacceptable danger of suppressing truthful speech. Laws restricting false statements about philosophy, religion, history, the social sciences, the arts, and other matters of public concern would present such a threat. The point is not there is no such thing as truth or falsity in these areas or that the truth is always impossible to ascertain, but rather that it is perilous to permit the state to be the arbiter of truth."

*Id.* at 751-52 (Alito J., dissenting). Justice Breyer, concurring, echoes Justice Alito's concerns. *Id.* at 731-32. But the defendants here have no such compunction. They wholeheartedly endorse the idea that the State of Missouri can and has appointed the FDA as the arbiter of truth. Putting to the side the fact that plenty of speech proscribed by Section 338.055.7 does not contradict the FDA's opinion, the notion that the FDA should serve as a Ministry of Truth is a frightening proposition.

*National Inst. for Family & Life Advocates v. Becerra*, clarifies that the First Amendment protects scientific and medical opinions just the same when professionals are speaking. 138 S. Ct. 2361, 2371 (2018) ("*NIFLA*"). The First Amendment demands that the government "preserve an inhibited marketplace of ideas" in which professionals can freely air "a host of good-faith disagreements" "on many topics in their respective fields." *Id.* at 2374-75 (internal quotation omitted). No one suggests that professionals have greater speech rights than ordinary citizens. *Contra* Def. Resp. 13-14 (hypothesizing a doctor engaging in unprotected defamation). But aside from two discrete exceptions in which a state has greater leeway to regulate professionals, *NIFLA* recognizes that licensed professionals have equal rights. Neither exception is satisfied. Mot. 6-7. Defendants disagree; they posit that both exceptions are satisfied. Def. Resp. 15-17.

First, they attempt to shoehorn 338.055.7 into *NIFLA*'s allowance for restrictions on commercial advertising because "the Court provided no reason why the exception would apply to advertisements only, rather than to all commercial speech." Def. Resp. 16. But the speech restricted by the pharmacist speech ban is not only not advertising, it's not even commercial speech. Commercial speech "does no more than propose a commercial transaction." *Va State Bd. of Pharmacy*, 425 U.S. at 762 (internal quotation and citation omitted); *Harris v. Quinn*, 573 U.S. 616, 648 (2014) (same). Regulating pharmacists' communication of their views on a professional and scientific question "do[es] not regulate commercial speech." *Otto*, 981 F.3d at 865.

Second, defendants try to stretch those regulations of professional conduct "long familiar to the bar" to cover Missouri's unprecedented regulation of pharmacist speech. *Contrast NIFLA*,

Case 2:22-cv-04104-DGK   Document 25-1   Filed 09/17/22   Page 10 of 18

138 S. Ct. at 2373, *with* Def. Resp. 17. But Section 338.055.7 does not resemble, for example, a regulation on speech that is rooted in professional tradition such as a rule against divulging privileged information, (Def. Resp. 14), or a rule ensuring that patients give informed consent to medical treatments, (Def. Resp. 17). Informed consent laws would never prevent discussion between two professionals, as Section 338.055.7 does. As to patient-directed speech, Section 338.055.7 doesn't oblige pharmacists to provide any information that would enhance informed consent of patients. In this sense, the invocation of informed consent here is even weaker than the dissent's invocation of the concept in *NIFLA*. *Compare* 138 S. Ct. at 2888 (Breyer, J., dissenting). Here, ironically, the pharmacist speech ban itself *hinders* informed consent by impeding the flow of information from pharmacist to patient. Mot. 10-11.

An informed consent theory of the law makes even less sense when one considers the carve-out for pharmacist speech after "the physician or patient inquires of the pharmacist about the efficacy" of the drugs. Does the state have no interest that patients **who specifically ask about the efficacy of the drugs** "not be misinformed by their pharmacists?" Def. Resp. 17. It makes zero sense, and belies any notion that Section 338.055.7 operates as an informed consent law. Instead, the carve-out demonstrates that the law is about protecting the sensibilities of doctors and patients who may not appreciate an alternative view. Mot. 10.

Precedent distinguishes between speech and conduct. Mot. 6. The communication of ideas restricted by Section 338.055.7 is pure speech protected by the First Amendment.

### B. Section 338.055.7 is unconstitutional because it is a viewpoint-based restriction on speech. In any event, it cannot satisfy strict scrutiny.

As Stock has spelled out, Section 338.055.7 is viewpoint discriminatory on its face. Mot. 3-6. In their response in opposition to Stock's motion, the defendants do not address, let alone defend, this facet of the law. Thus, they have forfeited any argument that the law is viewpoint neutral or that its viewpoint discrimination can be justified. An argument not made "has been

Case 2:22-cv-04104-DGK   Document 25-1   Filed 09/17/22   Page 11 of 18

waived." *Caranchini v. Nationstar Mortg., LLC*, 2022 WL 1156543, 2022 U.S. Dist. LEXIS 71390, *7 (W.D. Mo. Apr. 19, 2022) (Kays, J.).

There is "just one narrow situation in which viewpoint discrimination is permissible: where the government itself is speaking or recruiting others to communicate a message on its behalf." *Matal v. Tam*, 137 S. Ct. 1744, 1768 (2017) (Kennedy, J., concurring). Because Section 338.055.7 is a restriction on private viewpoints, not an exercise of government speech, that "end[s] the matter" and "renders unnecessary any extended treatment of other questions." *Iancu*, 139 S. Ct. at 2302; *Matal*, 137 S. Ct. at 1765 (Kennedy, J., concurring). The law "must be invalidated"—and a preliminary injunction granted—even without considering the statute's "permissible applications." *Iancu*, 139 S. Ct. at 2302.

Even then, the defendants misstate the test for facial overbreadth analysis they would deploy. A First Amendment plaintiff need not show that the speech-restraining provision is invalid in all its applications or that "there is no set circumstances under which the law is valid." *Contra* Def. Resp. 8-11. In the First Amendment context, a "second type of facial challenge governs": overbreadth. *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2387 (2021). Under the overbreadth doctrine "a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Id.* (quoting *Stevens*, 559 U.S. at 473). "[T]he overbreadth doctrine permits the facial invalidation of laws that inhibit the exercise of First Amendment rights if the impermissible applications of the law are substantial when 'judged in relation to the statute's plainly legitimate sweep.'" *Musser v. Mapes*, 718 F.3d 996, 1001 (8th Cir. 2013). This is a "more forgiving" standard than an ordinary facial challenge. *Bruni v. City of Pittsburgh*, 941 F.3d 73, 83 (3d Cir. 2019). And this standard is met here.

The core applications of this the law involve pharmacists, like Ms. Stock, who wish to dispute the efficacy of ivermectin or hydroxychloroquine for certain prescribed human uses, such as COVID-19 treatment. Defendants concede that the law could "potentially cover such

instances" but argue that the more core applications would be a pharmacist contacting a patient to dispute that the drug has any effective human use. Def. Resp. 9-10. It seems odd however to imagine a pharmacist receiving a specific prescription, and then contacting a doctor or patient to make an abstract across-the-board statement about the drugs in all their human applications. It also seems odd that a pharmacist would deny that hydroxychloroquine has any effective human use, when it has no apparent non-human use at all. And, as for the carve-out, why would a doctor or a patient ask about the drugs' efficacy in all their applications, rather than the particular human use at issue?

Even under this most unusual scenario however, speech from a pharmacist to a physician expressing the pharmacist's good-faith view that the drugs are ineffective for any human use is protected speech. This is one of the "host of good-faith disagreements" that professionals might have "both with each other and with the government, on many topics in their respective fields." *NIFLA*, 138 S. Ct. at 2374-75. Of course, we can imagine discrete applications of the law that do not depend on viewpoint: a pharmacist might intentionally lie about the effectiveness of the drugs to sell a higher price drug (*i.e.,* engage in fraud), a pharmacist may dispute the effectiveness in an unlawfully harassing manner (*see* Mot. 12), the pharmacists' statements disputing the effectiveness may be so far outside the practice of a "reasonably careful and prudent pharmacist"[1] that the pharmacist would be liable for malpractice if the patient incurred harm as a result. But these applications are not the core of Section 338.055.7. That core is when pharmacists contact patients or doctors to suggest more effective treatment alternatives for a given prescription that they receive.

Contrary to the defendants' position, (Def. Resp. 17-19), Section 338.055.7 cannot survive strict scrutiny review. Defendants offer a hodgepodge of interests purportedly justifying the law, mostly at a very general level—"ensuring licensed professions promote public health,"

---

[1] *Horner v. Spalitto*, 1 S.W.3d 519, 522 (Mo.App.W.D. 1999).

8

"protecting the physician-patient relationship," preventing the "ero[sion] [of] trust in the physician-patient relationship," protecting the "sick and credulous from ignorant and incompetent practitioners," addressing the danger of "undue politicization" of hydroxychloroquine and ivermectin. Def. Resp. 18-19.

First, the only inkling of these concerns in the legislative record is the concern about the politicization of the drugs. Complaint ¶¶ 59-62. And the provision of Section 338.055.7 that squelches one side of the scientific debate "only aggravates that problem." Mot. 11. "Scientific misinformation" owing to politicization is no less deleterious if it comes from the perspective of "hydroxychloroquine is a miracle medicine good for **every** human use" rather than "hydroxychloroquine is an animal medicine good for **no** human use."

The rest of the asserted "interests" are unsatisfactory, *post hoc* rationalizations for the speech restriction. "Government justifications for interfering with First Amendment rights must be genuine, not hypothesized or invented *post hoc* in response to litigation." *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2432 n.8 (2022) (internal quotations and alterations omitted). Even if these interests can be legitimately inferred from HB 2149, and even if they constitute "compelling" interests for strict scrutiny purposes, Section 338.055.7 is not narrowly tailored to serve them, let alone the least restrictive way to serve them. *See 281 Care Comm. v. Arneson*, 766 F.3d 774, 793-94 (8th Cir. 2014) (discussing the least restrictive means requirement).

Consider the claimed concerns about the physician-patient relationship or patient-physician trust. Section 338.055.7 is simultaneously over and underinclusive with respect to these aims. It is overinclusive because it covers communications from a pharmacist to the prescribing physician, to which the patient is not privy, and so would have no way of "seed[ing] doubt into the physician-patient relationship" and "convinc[ing] some patients not to take their medication." On the other hand, the purported "erosion of trust" interest also proves too much because pharmacists regularly and appropriately raise

Case 2:22-cv-04104-DGK   Document 25-1   Filed 08/17/22   Page 14 of 18

concerns with patients that "cast doubt" on their physician's proficiency. They question the dosage prescribed, or observe that the drugs are contra-indicated with other prescriptions, or recommend a better more cost-effective substitute that the patient should consider. Although these actions erode the unquestioning trust defendants envision for the physician-patient relationship, all fall within the core competency of the pharmacy profession and none are expressly outlawed by Section 338.055.7. Section 338.055.7 is underinclusive in a second respect: it captures disputes only about two drugs used for COVID-19 treatment, thus the law "leaves significant influence bearing on the interest unregulated." *Rodgers*, 942 F.3d at 457 (internal quotation omitted). From all appearances, the government is not pursuing the rationale it invokes, rather it is "disfavoring a particular … viewpoint." *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 802 (2011).

Likewise, the rationales about protecting the sick and promoting public health suffer from the same lack of tailoring. They cannot justify a blanket ban on disputing the efficacy of the drugs for any given prescribed human use. Defendants do not once suggest that pharmacists disputing the effectiveness of the drugs for human use as a COVID-19 treatment, and instead recommending alternatives like Paxlovid, could be considered acting contrary to the promotion of public health. Def. Resp. 20. The way that the medical profession functions, and has always functioned, is through free discussion and sharing of opinions. Pharmacists have a role to play in that scientific discourse. Again, on the other hand, Section 338.055.7 is also underinclusive here: it permits a pharmacist to tell any patient that the drugs have no human use, as long as the patient has first made an inquiry. This "inquiry" carve-out suggests that the real reason for the speech ban is to shield patients and doctors from unwanted alternative views. And that rationale is anathema to the First Amendment. Mot. 10. Malpractice liability addresses defendants' concern, and it does so without indulging in viewpoint bias.

Section 338.055.7, unlike malpractice liability, has no constitutional pedigree. On those few occasions when states have attempted to use professional licensing schemes to slant the public debate in favor of the state's preferred view on certain political or social issues, courts have ruled such efforts unconstitutional. California tried to deter health counselors with pro-life views. *NIFLA*. Florida tried to dissuade doctors with pro-gun-control views. *Wollschlaeger*. Most recently, Pennsylvania tried to chill attorneys with views counter to prevailing progressive orthodoxy. *Greenberg v. Goodrich*, __ F. Supp. 3d __, 2022 WL 874953 (E.D. Pa. Mar. 24, 2022). This isn't a new playbook either; decades ago states targeted teachers with pro-LGBT views. *Nat'l Gay Task Force v. Bd. of Educ.*, 729 F.2d 1270, 1274 (10th Cir. 1984), *aff'd by equally divided court Bd. of Educ. v. Nat'l Gay Task Force*, 470 U.S. 903 (1985). They targeted attorneys litigating against racial segregation. *NAACP v. Button*, 371 U.S. 415 (1963). At the height of the Red Scare, there were those "among us always ready to affix a Communist label upon those whose ideas they violently oppose." *Cramp v. Bd. of Pub. Instruction*, 368 U.S. 278, 286–87 (1961). Political winds shift, but the First Amendment always shuts down this playbook.

**III. Because Stock has shown a likelihood of success in a free-speech case, the other preliminary injunction factors follow, and the Court should enjoin defendants from enforcing the challenged provision.**

Because Stock has shown a likelihood of success on her First Amendment claims, the other preliminary injunction factors follow. Mot. 14-15. There is no injury to the state when it is enjoined from enforcement an unconstitutional provision. *Rodgers,* 942 F.3d at 458. The "appropriate" relief when considering a meritorious facial challenge is a "statewide preliminary injunction" to prevent First Amendment harm that "extends beyond the parties." *Id.* at 458-459. Defendants' suggestion that such relief is unavailable because Stock must plead a class action "cannot be the law." *Contrast* Def. Resp. 7 *with Rodgers*, 942 F.3d at 458. "[A] statute which chills

11

speech can and must be invalidated where its facial invalidity has been demonstrated." *Citizens United v. FEC*, 558 U.S. 310, 336 (2010).

## CONCLUSION

For these reasons, the Court should grant Stock's motion for a preliminary injunction.

Dated: August 17, 2022

/s/ Jonathan R. Whitehead
Jonathan R. Whitehead, Mo. Bar. 56848
LAW OFFICES OF JONATHAN R. WHITEHEAD LLC
229 SE Douglas, Suite 210
Lee's Summit, MO 64063
Phone: (816) 398-8305
Email: jon@whiteheadlawllc.com

Adam E. Schulman (*pro hac vice*)
HAMILTON LINCOLN LAW INSTITUTE
1629 K Street, NW Suite 300
Washington, DC 20006
Phone: (610) 457-0856
Email: adam.schulman@hlli.org

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of August, 2022, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court using CM/ECF system, which will send notifications of such filing to the CM/ECF participants registered to receive service in this matter.

/s/ Jonathan R. Whitehead