IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | | |
|---|---|---|
| ASHLEY STOCK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:22-CV-04104-DGK |
| | ) | |
| JAMES L. GRAY, III, et al., | ) | |
| in their official capacities as officers or | ) | |
| members of the Missouri Board of Pharmacy, | ) | |
| | ) | |
| Defendants. | ) | |

## **ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

This lawsuit arises from the State of Missouri enacting a law forbidding pharmacists from contacting a prescribing doctor or patient "to *dispute the efficacy* of ivermectin tablets or hydroxychloroquine sulfate tablets for human use" unless the doctor or patient asks the pharmacist about these drugs' efficacy first. Mo. Rev. Stat. § 338.055.7 (2022) (emphasis added). Under the law, a pharmacist who violates the statute—for example, by on her own initiative alerting a doctor or patient that the FDA has not approved either drug to treat a particular disease—may face disciplinary action, including the potential loss of her license. On the other hand, a pharmacist who on her own initiative contacts a doctor or patient to *tout* the efficacy of either drug for a purpose the FDA has not approved faces no such sanction. Plaintiff, a pharmacist, contends the statute violates the First Amendment.

Now before the Court is Plaintiff's Motion for a Preliminary Injunction. ECF No. 7. Holding the law unconstitutionally restricts Plaintiff and other pharmacists' speech on the basis of their viewpoint the motion is GRANTED. The Court enjoins Defendants in their official capacities as officers or members of the Missouri Board of Pharmacy from reviewing,

investigating, prosecuting, adjudicating, or enforcing violations of the second sentence of Missouri Revised Statute § 338.055.7.[1]  Defendants' 12(b)(6) motion to dismiss, ECF No. 19, is also DENIED.

## Background

The relevant facts are set forth in the Verified Complaint, ECF No. 1, and are not in dispute.[2]  These facts are as follows.

Defendants are officers or members of the Missouri Board of Pharmacy (the "Board"), each of whom is being sued in his or her official capacity. Created in 1909, the Board is a creature of Missouri statute, governed principally by the Missouri Pharmacy Practice Act. Among the Board's primary duties are "[i]nvestigating complaints . . . against any licensee or registrant," and "[d]isciplining licensees which may include, public censure, probation, suspension or revocation of a licensee/registrant . . . ."  Board investigations "may be based on public complaints, information from other state and/or federal agencies, or violations discovered by the Board."  Public complaints "may be based upon personal knowledge or upon information and belief." 20 CSR 2220-2.050(2).

Plaintiff Ashley Stock ("Stock") is a Missouri-licensed pharmacist in good standing subject to oversight and discipline by the Board.  Stock is employed by a pharmacy in St. Louis, Missouri.  She is a citizen of Missouri who is domiciled in Fenton, Missouri.

---

[1] The second sentence states, "A pharmacist shall not contact the prescribing physician or the patient to dispute the efficacy of ivermectin tablets or hydroxychloroquine sulfate tablets for human use unless the physician or patient inquires of the pharmacist about the efficacy of ivermectin tablets or hydroxychloroquine sulfate tablets." Mo. Rev. Stat. § 338.055.7 (2022).

[2] The Court has ruled on the motion without holding an evidentiary hearing because Plaintiff has filed a verified complaint, neither party has requested an evidentiary hearing, and there do not appear to be any disputes of fact relevant to the legal issues here.  Further, in the course of briefing both the motion for a preliminary injunction and the motion to dismiss, both parties have been given a fair opportunity to present their views.  *See Kaepa, Inc. v Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996).

Stock's job responsibilities include dispensing prescription medications and counseling patients on the safe use of such medications based on her professional expertise. Since March 2020, in her job as a retail pharmacist, Stock has received prescriptions from physicians for hydroxychloroquine and ivermectin for her to fill and dispense to patients at the pharmacy. Since that time, she has had conversations with various doctors and patients during which she disputed the efficacy of both hydroxychloroquine and ivermectin for human use as a COVID-19 treatment. She has also contacted the prescribing physicians to discuss, debate, and dispute the efficacy of hydroxychloroquine and ivermectin for human use as a COVID-19 treatment and the dosage amounts of the prescriptions.

According to the American Pharmacists Association's Code of Ethics for Pharmacists, pharmacists must "help individuals achieve optimum benefit from their medications"; they must "place[] concern for the well-being of the patient at the center of professional practice"; they must "tell the truth and . . . act with conviction of conscience"; they must "maintain knowledge and abilities as new medications, devices, and technologies become available and as health information advances"; and they should "encourag[e] patients to participate in decisions about their health." American Pharmacists Association, Code of Ethics, https://aphanet. pharmacist.com/code-ethics [https://web.archive.org/web/20220313062553/https://aphanet. pharmacist.com/code-ethics].

Stock believes that counseling patients and doctors to the best of her professional judgment is required as a matter of professional ethics, even when that means contacting the patient or doctor to dispute the efficacy of a given medication.

Patients and doctors have previously thanked Stock after she initiates contact with them to provide guidance or to suggest alterative pharmaceutical options that are more effective.

3

Case 2:22-cv-04104-DGK    Document 26    Filed 03/22/23    Page 3 of 16

**The drugs at issue: Hydroxychloroquine and Ivermectin.**

Hydroxychloroquine is a structural analog to chloroquine, an antimalarial drug. Hydroxychloroquine was developed in the 1940s for human consumption as an antimalarial medication. The Food and Drug Administration ("FDA") has indicated use of the drug for the treatment of malaria, certain drug-resistant parasites uncommon in the United States, rheumatoid arthritis, and lupus. It is not approved by the FDA for the treatment of COVID-19. The FDA has not approved any animal drug product that contains hydroxychloroquine. The FDA cautions against the use of hydroxychloroquine for the treatment of COVID-19 outside of a hospital setting or clinical trials.

Early in the COVID-19 pandemic, as doctors were experimenting with treatments for the novel coronavirus, health authorities in India, China, South Korea, and Italy recommended chloroquine for the treatment of COVID-19. On March 18, 2020, the World Health Organization announced that chloroquine and hydroxychloroquine would be among the four drugs studied as part of the multinational solidarity clinical trial.

On March 19, 2020, then President Trump encouraged the use of hydroxychloroquine during a national press conference. Subsequently, there was a massive increase in demand for the drug, and speculative procurement of hydroxychloroquine occurred across the country.

On April 24, 2020, the FDA cautioned against using hydroxychloroquine outside a hospital setting or clinical trial after reviewing case reports of adverse effects including ventricular tachycardia, ventricular fibrillation, and in some cases death. On June 15, 2020, the FDA revoked the emergency use authorization, citing consultation with the Biomedical Advanced Research and Development Authority that led them to conclude that "it is no longer reasonable to believe that oral formulations of hydroxychloroquine (HCQ) and chloroquine (CQ)

may be effective in treating COVID-19." *Coronavirus (COVID-19) Update: FDA Revokes Emergency Use Authorization for Chloroquine and Hydroxychloroquine*, Food and Drug Admin., https://www.fda.gov/news-events/press-announcements/coronavirus-covid-19-update-fda-revokes-emergency-use-authorization-chloroquine-and [https://web.archive.org/web/20220624134111/https://www.fda.gov/news-events/press-announcements/coronavirus-covid-19-update-fda-revokes-emergency-use-authorization-chloroquine-and]. Moreover, because of "ongoing serious cardiac adverse events and other potential serious side effects, the known and potential benefits of chloroquine and hydroxychloroquine no longer outweigh the known and potential risks for the authorized use." *Id.*

In November 2020, a U.S. National Institutes of Health clinical trial evaluating the safety and effectiveness of hydroxychloroquine for the treatment of adults with COVID-19 formally concluded that the drug provided no clinical benefit for COVID-19 treatment and recommended against its use. But telehealth organizations have prescribed hydroxychloroquine, frequently doing so across state lines.

Stock does not believe hydroxychloroquine is an effective treatment for COVID-19 compared to available alternatives.

Ivermectin is an antiparasitic drug originally marketed by Merck that has been used in humans and animals since the 1970s. Ivermectin is not approved by the FDA for the treatment of COVID-19.

Scientists studied ivermectin as a potential COVID-19-inhibiting drug. Some in vitro drug screening studies early in the pandemic showed that ivermectin has an antiviral effect on certain positive-sense single-strand RNA viruses, including SARS-CoV-2, the virus that causes

5

COVID-19. Follow up studies concluded that while ivermectin could inhibit replication of SARS-CoV-2, the doses needed would be significantly greater than humans could safely ingest.

Nevertheless, in December of 2020, Dr. Pierre Kory testified before the Senate Homeland Security and Government Affairs Committee that ivermectin is a "miracle drug" for the treatment of COVID-19. Numerous lawmakers also endorsed Dr. Kory's testimony and promoted ivermectin as a COVID-19 drug. Subsequently, in January of 2021, the National Institutes of Health released Treatment Guidelines that suggest there is insufficient evidence of ivermectin's effects to recommend for or against it.

A variety of reputable sources advise against using ivermectin to prevent or treat COVID-19. For example, in early 2021, the European Medicines Agency ("EMA") recommended against using ivermectin for the prevention or treatment of COVID-19 outside randomized clinical trials. Also in early 2021, Merck issued a statement that attempting to use ivermectin to treat COVID-19 may be unsafe. In March of 2021, the World Health Organization ("WHO") stated that ivermectin should not be used for the treatment of COVID-19. WHO advises that ivermectin only be used to treat COVID-19 within clinical trials.

Despite these warnings, prescriptions for ivermectin ballooned, reaching 88,000 prescriptions dispensed during the week of August 13, 2021 compared to an average of 3,600 weekly prescriptions before 2020. Telehealth companies now have dedicated pages for ivermectin that advertise the ease of obtaining a prescription of the drug. These prescriptions are off-label, and many patients refuse to divulge what the prescriptions are for.

Many pharmacists who are skeptical of ivermectin's effectiveness as a COVID-19 cure try to consult with patients about why they were prescribed ivermectin and/or refuse to fill the

6

Case 2:22-cv-04104-DGK   Document 26   Filed 03/22/23   Page 6 of 16

prescriptions. Stock does not believe that ivermectin is an effective treatment for COVID-19 compared to available alternatives.

**Mo. Rev. Stat. § 338.055.7**

Last year the State of Missouri enacted a statute which provided that:

> The [Missouri Board of Pharmacy] shall not deny, revoke, or suspend, or otherwise take any disciplinary action against, a certificate of registration or authority, permit, or license required by this chapter for any person due to the lawful dispensing, distributing, or selling of ivermectin tablets or hydroxychloroquine sulfate tablets for human use in accordance with prescriber directions. *A pharmacist shall not contact the prescribing physician or the patient to dispute the efficacy of ivermectin tablets or hydroxychloroquine sulfate tablets for human use unless the physician or patient inquires of the pharmacist about the efficacy of ivermectin tablets or hydroxychloroquine sulfate tablets.*

Mo. Rev. Stat. § 338.055.7 (2022) (second sentence italicized for emphasis).

**Violating this statute would subject Stock to professional discipline.**

Missouri Revised Statute § 338.140.1 vests the Board with its rulemaking power and the "power to employ an attorney to conduct prosecutions or to assist in the conduct of prosecutions pursuant to sections [of § 338, including § 338.055.7]." It also empowers the Board to "issue letters of reprimand, censure or warning . . . for any violations that could result in disciplinary action," and, at its sole discretion, "enter into a voluntary compliance agreement . . . in lieu of board discipline," where such agreements "shall be a public record." Mo. Rev. Stat. § 338.140.6. Thus, as with all rules and regulations of the pharmaceutical profession in Missouri, the Board will have authority to investigate putative violations of § 338.055.7 and the authority to prosecute or cause the prosecution of enforcement actions against Missouri-licensed pharmacists whom the Board believes to be in violation of the rule.

7

Case 2:22-cv-04104-DGK   Document 26   Filed 03/22/23   Page 7 of 16

In furthering its functions of enforcing and investigating alleged violations of disciplinary rules, the Board receives and investigates complaints lodged by any person, including any member of the public, 20 CSR 2220-2.050(1), with either knowledge of the alleged violation or who may make the complaint based on information and belief, 20 CSR 2220-2.050(2). Submitting a complaint requires only filling out a simple single-page form available on the Board's website and submitting it to the Board by email, fax, or mail. Upon receiving a complaint, the Board sends notice to the pharmacist accused of misconduct. Mo. Rev. Stat. § 338.055.1. The Board then "may cause a complaint to be filed with the administrative hearing commission as provided by chapter 621." Mo. Rev. Stat. § 338.055.2. The administrative hearing commission will hold a hearing and convey its record and findings, along with its non-binding recommendation regarding discipline. Mo. Rev. Stat. § 621.110. Within thirty days after receipt of the record of the proceedings before the commission and the findings of fact, conclusions of law, and recommendations, if any, of the commission, the Board will set the matter for hearing and notify the respondent-pharmacist of the time and place of the hearing. *Id*. At or after the hearing, the Board may issue the disciplinary measure it sees fit, including censure, suspension, or revocation of the respondent-pharmacist or his or her license.

Stock plans to continue working as a retail pharmacist in Missouri, and through her work, she will likely again confront a prescription for either hydroxychloroquine or ivermectin as a COVID-19 treatment. Should she receive either such prescription, she intends, consistent with her past practice, to contact the prescriber to discuss, debate, or dispute the efficacy of the drugs, both generally and relative to current alternatives and to counsel the patient about efficacy and alternatives.

Stock does not wish to be subjected to a disciplinary investigation by the Board or to disciplinary proceedings in front of the Board or an administrative hearing commission. Stock also does not wish to be subjected to disciplinary sanctions by the Board. A disciplinary investigation would harm Stock's professional reputation, available job opportunities, and ability to earn a living in her chosen profession. Stock will be forced to censor herself, and act against her professional judgment of the best possible course of treatment for a patient to protect herself from potential Board sanction.

But for § 338.055.7, Stock would be able to freely fulfill her professional duties and protect patients by communicating her concerns without the fear of disciplinary consequences for expressing her professional opinion. Even if Defendants were to attempt to assure Stock that they would not enforce § 338.055.7 as written, Stock's speech would be chilled, in that she would not feel comfortable speaking freely with prescribing physicians and patients about the drugs and would still reasonably fear the effects of complaints or other professional liability.

Stock filed this lawsuit under 42 U.S.C. § 1983 arguing the statute violates the First Amendment as incorporated and applied to the states by the Fourteenth Amendment. The Verified Complaint brings a single claim for unconstitutional infringement of free speech.

## Discussion

**I.  Stock possesses standing to seek an injunction against all enforcement of the second sentence of § 338.055.7.**

Defendants contend that Stock lacks standing to seek an injunction against enforcement of § 338.055.7 against other Missouri-licensed pharmacists because the Verified Complaint: (1) does not plead any injuries to pharmacists other than herself; and (2) pleads an as-applied challenge (as opposed to a facial challenge) to the statute under § 1983.

These arguments are unpersuasive. First, the Verified Complaint does plead that other Missouri pharmacists face the same injury to their First Amendment rights as Stock. *See, e.g.*, Compl. ¶ 3 (stating the statute "forbids *pharmacists* [not just Plaintiff] from 'contact[ing] the prescribing physician or the patient to dispute the efficacy of ivermectin tablets or hydroxychloroquine sulfate tablets for human use'" even though "*pharmacists* in Missouri are as entitled as every other citizen to express their viewpoints on the efficacy of certain drugs;" and "Section 338.055.7 threatens Missouri *pharmacists* with professional liability if they communicate views that the state disagrees with"); ¶ 51 (asserting the statute "seeks to advance one side of the debate by both protecting *pharmacists* from Board sanction for filling prescriptions for hydroxychloroquine and ivermectin, and forbidding *pharmacists* from communicating any professional opinion against the efficacy of the drugs"); ¶ 53 ("While *pharmacists* will now be protected from disciplinary action for dispensing ivermectin tablets or hydroxychloroquine sulfate tablets, under the new law, *pharmacists* such as Stock face disciplinary action, including the potential loss of their license for communicating with prescribers and counseling patients about either drug in certain ways."); ¶ 54 ("Stock, and all *pharmacists* in Missouri, now face the impossible—and constitutionally impermissible— conundrum of deciding whether to endanger their livelihood when choosing whether to speak in a manner that is both vital to their professional duties to patients and protected by the First Amendment"); ¶ 67 (noting the Board has the authority to prosecute "Missouri-license *pharmacists* whom the Board believes to be in violation of the rule") (emphasis added throughout).

Second, as the Eighth Circuit has held in the context of another First Amendment case, "the distinction between facial and as-applied challenges is not so well defined that it has some

automatic effect or that it must always control the pleadings or disposition in every case involving a constitutional challenge." *Free the Nipple – Springfield Residents Promoting Equal. v. City of Springfield*, 923 F.3d 508, 509 n.2 (2019) (quoting *Citizens United v. FEC*, 558 U.S. 310, 331 (2010)). Where, as here, the complaint seeks a declaration that the statute is unconstitutional,[3] "[t]he important inquiry is whether 'the claim and the relief that would follow . . . reach beyond the particular circumstances'" of the plaintiff. *Id.* (quoting *Doe v. Reed*, 561 U.S. 186, 194 (2010)). In this case, it is plain that the claim and relief sought by Stock goes beyond her and extends to all Missouri-licensed pharmacists, so the challenge raised by the Verified Complaint is a facial challenge.

Third, even if it were not a facial challenge, Plaintiff would still have standing to seek an injunction against all enforcement of the second sentence of § 338.055.7. While "the usual rule is that a party may assert only a violation of its own rights . . . in the First Amendment context, litigants . . . are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392-93 (1988) (cleaned up) (allowing two Virginia booksellers to raise the First Amendment claims of Virginia bookbuyers). The exception applies to this case as well. On the existing record, the Court can safely predict that § 338.055.7 may cause other Missouri-licensed pharmacists who are not before the Court to refrain from engaging in constitutionally protected speech, namely reaching out to patients and disputing the efficacy of these medicines for use in treating or preventing COVID-19, for fear of receiving professional discipline from Defendants.

---

[3] The Complaint seeks "[a] declaratory judgment that the second sentence of § 338.055.7 facially violates the First and Fourteenth Amendments to the United States Constitution." Request for Relief ¶ A.

11

Case 2:22-cv-04104-DGK   Document 26   Filed 03/22/23   Page 11 of 16

## II. The motion for a preliminary injunction is granted.

In determining whether to grant a preliminary injunction, the Court typically considers: (1) the threat of irreparable harm to the movant; (2) the balance between this harm and any injury that granting the injunction will inflict on the non-moving party; (3) the probability the moving party will succeed on the merits; and (4) the public interest. *Rodgers v. Bryant*, 942 F.3d 451, 455 (8th Cir. 2019). A party seeking to enjoin a duly enacted state statute, however, must demonstrate that they are "*likely* to prevail on the merits." *Id*. (quoting *Planned Parenthood Minn. v. Rounds*, 530 F.3d 724, 731–32 (8th Cir. 2008) (en banc) (emphasis added). This is more than the "fair chance" of success that is typically required for a preliminary injunction. *Id*. "The higher bar reflects the idea that governmental policies implemented through legislation and developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly." *Id*. at 455–56 (cleaned up). Finally, "if a party shows a likely violation of his or her First Amendment rights, the other requirements for obtaining a preliminary injunction are deemed to have been satisfied." *Id*. at 456.[4]

In this case, the Court holds Plaintiff is likely to succeed on the merits because the second sentence of § 338.055.7 infringes the free speech rights of Plaintiff and other Missouri-licensed pharmacists by threatening to impose liability based on the viewpoint of their speech. The statute prohibits pharmacists from initiating contact to express a particular view, namely, a view disputing the efficacy of the drugs. It does not prohibit pharmacists from initiating contact to tout, endorse, or acclaim the drugs, thus it is taking sides in a politically charged debate about the drugs efficacy. This is viewpoint discrimination, which is fatal to the statute's constitutionality.

---

[4] The Court notes Defendants' brief fails to cite *Rodgers v. Bryant*, the controlling caselaw on the preliminary injunction standard applicable here. The Court reminds counsel for Defendants to ensure he is citing relevant controlling caselaw to the Court.

Defendants' arguments that the statute does not engage in viewpoint discrimination is thoroughly unpersuasive. Defendants suggest the second sentence of the statute is not viewpoint discrimination because it regulates conduct, not speech. Suggestions in Supp. of Mot. to Dismiss at 10–11, ECF No. 19–1. This argument is unavailing because the statute does not prohibit initiating contact with patients or doctors (a regulation of conduct). Nor does it prohibit initiating contact with patients or doctors to speak on any matter at all (a content-neutral regulation of speech). Nor does it prohibit initiating contact with patients or doctors to talk about a particular subject matter, such as any discussion of either drug (a content-based regulation of speech). Rather, the provision bans initiating contact only if the contact is to express the viewpoint that the drugs are not effective for human use. Hence, it is viewpoint discrimination.

Defendants' other claim—that the statute's ban on contacting a patient to "dispute the efficacy" of the drugs is not a ban on a viewpoint doubting effectiveness, but rather a ban on pharmacists engaging in arguments about the effectiveness of these drugs generally—is even less persuasive. Defendants argue "[d]isputing the efficacy of these drugs can involve either promoting or discouraging use of these drugs." Reply Suggestions in Supp. of Mot. to Dismiss at 7, ECF No. 23. Thus, according to Defendants, "the statute says pharmacists cannot initiate an argument with patients and physicians." *Id*.

As a threshold matter, this argument defies common sense. A pharmacist calls a patient or prescribing doctor to alert them to a potential problem with a prescription. For example, a pharmacist may call the prescribing doctor to alert him that a widely used drug is no longer recommended because of new information about side effects, or he may call a patient to warn about a potential drug interaction. A pharmacist does not call to applaud a doctor for prescribing a drug or congratulate a patient for taking one. This being the case, Defendants' claim that the

13

Case 2:22-cv-04104-DGK   Document 26   Filed 03/22/23   Page 13 of 16

legislature has enacted a law barring a pharmacist from calling a doctor or patient to tout a drug is hard to swallow.

More importantly, Defendants' argument is inconsistent with the plain meaning of the statute. When interpreting a state statute, a federal court applies that state's rules of statutory construction. *Behlmann v. Century Sur. Co.*, 794 F.3d 960, 963 (8th Cir. 2015). "Under Missouri law, 'the seminal rule of statutory construction is to ascertain the intent of the legislature from the language used and to consider the words used in their plain and ordinary meaning.'" *Missouri Beverage Co., Inc. v. Shelton Bros., Inc.*, 669 F.3d 873, 877 (8th Cir. 2012) (quoting *St. Louis Cnty. v. Prestige Travel, Inc.*, 344 S.W.3d 708, 713–14 (Mo. banc 2011)). Missouri courts interpret statutes "in a way that is not hyper-technical, but instead, is reasonable and logical and gives meaning to the statute." *Ben Hur Steel Worx, LLC v. Dir. of Revenue*, 452 S.W.3d 624, 626 (Mo. banc 2015). When the language is clear, courts must give effect to its plain meaning. *Id*.

The relevant part of the statute at issue here reads: "A pharmacist shall not contact the prescribing physician or the patient to dispute the efficacy of ivermectin tablets or hydroxychloroquine sulfate tablets for human use unless the physician or patient inquires of the pharmacist about the efficacy of ivermectin tablets or hydroxychloroquine sulfate tablets." The plain and ordinary meaning of this sentence is that a pharmacist cannot initiate contact with a doctor or patient to tell them that ivermectin or hydroxychloroquine does not work in humans unless the doctor or patient first asks the pharmacist whether it works. This interpretation is confirmed by a common definition of "dispute," which is "to question the truth or validity of; doubt." *Dispute*, The American Heritage Dictionary (5th ed. 2018). It also dovetails with the

purpose of the prior sentence[5] (which the legislature enacted at the same time) which prohibits the Board from taking any action against a pharmacist who dispenses ivermectin or hydroxychloroquine. Finally, this reading is consistent with the legislature's apparent purpose in enacting § 338.055.7 as a whole: to insulate ivermectin or hydroxychloroquine from criticism.

Thus, the Court concludes "to dispute the efficacy" means to question the validity of, or doubt, the drugs' effectiveness. And because the statute only prohibits criticizing the efficacy of the drugs, it engages in viewpoint restriction.

Since the statute engages in viewpoint discrimination, that is the end of the matter.[6] *Iancu v. Brunetti*, 139 S. Ct. 2294, 2302 (2019) (holding the Lanham Act's bar on the registration of "immoral" or "scandalous" trademarks discriminates on the basis of viewpoint and so violates the First Amendment, noting "[t]he Court's finding of viewpoint bias end[s] the matter."). "The government may not discriminate against speech based on the ideas or opinions it conveys." *Id*. "Discrimination against speech because of its message is presumed to be unconstitutional." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995). Government restrictions "based on viewpoint are prohibited." *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1885 (2018).

---

[5] It states:

> The [Missouri Board of Pharmacy] shall not deny, revoke, or suspend, or otherwise take any disciplinary action against, a certificate of registration or authority, permit, or license required by this chapter for any person due to the lawful dispensing, distributing, or selling of ivermectin tablets or hydroxychloroquine sulfate tablets for human use in accordance with prescriber directions.

Mo. Rev. Stat. § 338.055.7.

[6] The Court recognizes both parties have raised additional First Amendment arguments, but the Court need not consider them because its holding that the statute engages in viewpoint discrimination is dispositive. *See Rodger*, 942 F.3d at 454 n.2 (affirming issuance of a statewide preliminary injunction of a law banning certain kinds of begging and declining to address the plaintiffs' additional argument that the law was also void for vagueness).

The Court concludes Stock is likely to demonstrate that the statute is unconstitutional. Because Stock has demonstrated a likelihood of success on her First Amendment claim, the other requirements for obtaining a preliminary injunction are deemed satisfied. *Rodgers*, 942 F.3d at 456.

## Conclusion

For the reasons discussed above, Plaintiff's motion for a preliminary injunction is GRANTED. Defendants are prohibited from reviewing, investigating, prosecuting, adjudicating, or enforcing violations of the second sentence of Missouri Revised Statute § 338.055.7 until after a final order is entered.

Additionally, for the reasons discussed above, Defendants' motion to dismiss is DENIED. The Court holds the Verified Complaint states a claim that the second sentence of § 338.055.7 is unconstitutional; the Verified Complaint pleads sufficient factual matter showing Plaintiff's claim for relief is plausible on its face; and Plaintiff has standing to seek an injunction prohibiting all enforcement of the second sentence of § 338.055.7.

**IT IS SO ORDERED.**

Date:  March 22, 2023  /s/ Greg Kays
GREG KAYS, JUDGE
UNITED STATES DISTRICT COURT