# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF MISSOURI
# WESTERN DISTRICT

| | |
|---|---|
| ASHLEY STOCK, | |
| Plaintiff, | |
| v. | Case No. 22-CV-04104-DGK |
| JAMES L. GRAY, *et al.*, | Hon. David Gregory Kays |
| Defendants, | |

## SUGGESTIONS IN SUPPORT OF PLAINTIFF ASHLEY STOCK'S
## MOTION FOR SUMMARY JUDGMENT AND PERMANENT INJUNCTION

Case 2:22-cv-04104-DGK    Document 60    Filed 06/28/24    Page 1 of 50

# TABLE OF CONTENTS

Table of Contents.................................................................................................................ii

Table of Authorities...........................................................................................................iii

Introduction........................................................................................................................ 1

Statement of Material Facts .............................................................................................. 1

Legal Standard for Summary Judgment ........................................................................ 22

Argument .......................................................................................................................... 23

I.      Section 338.055.7, RSMo., infringes the free speech rights of Missouri pharmacists by threatening to impose liability based on the content and viewpoint of their ideas.........23

      A.     Viewpoint discrimination is impermissible, even when carried out under the guise of regulating professional conduct......................................................25

      B.     Section 338.055.7 is also unconstitutional because it is substantially overbroad and cannot satisfy strict scrutiny......................................................28

II.     Stock will suffer irreparable harm if Defendants are not enjoined from enforcing § 338.055.7...................................................................................................................34

III.    The balance of equities and public interest also support permanent relief. ...................35

Conclusion........................................................................................................................ 36

Certificate of Service ....................................................................................................... 37

Case 2:22-cv-04104-DGK    Document 60    Filed 06/28/24    Page 2 of 50

**Cases**

*281 Care Comm. v. Arneson,*
766 F.3d 774 (8th Cir. 2014) ........................................................................................29, 33

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) ............................................................................................................22

*Animal Legal Def. Fund v. Kelly,*
9 F.4th 1219 (10th Cir. 2022) ...........................................................................................24

*Bank One, N.A. v. Guttau,*
190 F.3d 844 (8th Cir. 1999) ............................................................................................35

*Brown v. Entm't Merchs. Ass'n,*
564 U.S. 786 (2011) ...........................................................................................................30

*Conant v. Walters,*
309 F.3d 629 (9th Cir. 2002) ............................................................................................24

*Elrod v. Burns,*
427 U.S. 347 (1976) ...........................................................................................................34

*Gerlich v. Leath,*
861 F.3d 697 (8th Cir. 2017) .......................................................................................23, 28

*Hines v. Quillivan,*
2021 WL 6618658, 2021 U.S. Dist. LEXIS 236801 (S.D. Tex. Jul. 29, 2021)......................26-27

*Holder v. Humanitarian Law Project,*
561 U.S. 1 (2010) ................................................................................................................27

*Iancu v. Brunetti,*
139 S. Ct. 2294 (2019) .................................................................................................28, 33

*Intervarsity Christian Fellowship/USA v. Univ. of Iowa,*
5 F.4th 855 (8th Cir. 2021) ............................................................................................31-32

*Kennedy v. Bremerton Sch. Dist.*,
    142 S. Ct. 2407 (2022) .................................................................................................29

*Klein v. City of San Clemente*,
    584 F.3d 1196 (9th Cir. 2009) ...............................................................................35

*Lowry v. Watson Chapel Sch. Dist.*,
    540 F.3d 752 (8th Cir. 2008) ..........................................................................23, 35

*Matal v. Tam*,
    582 U.S. 218 (2017) ............................................................................... 23, 25, 28

*McCullen v. Coakley*,
    573 U.S. 454 (2014) ........................................................................................26, 32

*McDonald v. Lawson*,
    94 F.4th 864 (9th Cir. 2024) ....................................................................................1

*Minnesota Majority v. Mansky*,
    849 F.3d 749 (8th Cir. 2017) ................................................................................22

*Minnesota Voters Alliance v. Mansky*,
    585 U.S. 1 (2018) ...................................................................................................23

*Missouri Broadcasters Ass'n v. Lacy*,
    846 F.3d 295 (2017) ..............................................................................................32

*NAACP v. Button*,
    371 U.S. 415 (1963) ..............................................................................................26

*Nat'l Inst. of Family & Life Advocates v. Becerra*,
    138 S. Ct. 2361 (2018) .................................................................................. *passim*

*Nat'l Rifle Ass'n v. Vullo*,
    144 S. Ct. 1316 (2024) ..........................................................................................23

*Oglala Sioux Tribe v. C & W Enters.*,
    542 F.3d 224 (8th Cir. 2008) ...........................................................................22-23

*Otto v. City of Boca Raton*,
    981 F.3d 854 (11th Cir. 2020) ..................................................................25, 26, 27

*Parents Defending Educ. v. Linn Mar Cmty. Sch. Dist.,*
83 F.4th 658 (8th Cir. 2023) .................................................................................26

*PETA v. N. Carolina Farm Bureau Fed'n, Inc..,*
60 F.4th 815 (4th Cir. 2023) .................................................................................24

*Presson v. Reed,*
65 F.4th 357 (8th Cir. 2023) .................................................................................22

*R.A.V. v. St. Paul,*
505 U.S. 377 (1992) .........................................................................................30, 33

*Reed v. Town of Gilbert,*
576 U.S. 155 (2015) ...............................................................................................23

*Rodgers v. Bryant,*
942 F.3d 451 (8th Cir. 2019) ...........................................................................30, 35

*Snider v. City of Cape Girardeau,*
752 F.3d 1149 (8th Cir. 2014) ...............................................................................24

*Sorrell v. IMS Health, Inc.,*
564 U.S. 552 (2011) ...............................................................................................35

*Stenberg v. Carhart,*
530 U.S. 914 (2000) ...............................................................................................33

*Stock v. Gray,*
663 F. Supp. 3d 1044 (W.D. Mo. 2023) ........................................................ *passim*

*Telescope Media Group v. Lucero,*
936 F.3d 740 (8th Cir. 2019) .................................................................................26

*Thomas v. Collins,*
323 U.S. 516 (1945) ...............................................................................................27

*Turtle Island Foods SPC v. Soman,*
632 F. Supp. 3d 909 (E.D. Ark. 2022)....................................................................35

*United States v. Alvarez,*
567 U.S. 709 (2012) ...................................................................................32, 34, 35

*United States v. Caronia,*
    703 F.3d 149 (2d Cir. 2012) ............................................................................................31

*United States v. Stevens,*
    559 U.S. 460 (2010) ................................................................................................29, 33

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council,*
    425 U.S. 748 (1976) ............................................................................................2, 31, 35

*Wollschlaeger v. Governor,*
    848 F.3d 1293 (11th Cir. 2017) (*en banc*) ..................................................27, 28, 29, 31

**Constitutional Provisions**

U.S. CONST. amend. I...............................................................................................*passim*

**Rules and Statutes**

20 CSR 2220-2.050...............................................................................................5

Mo. Rev. Stat. § 338.010.1(7)...............................................................................3

Mo. Rev. Stat. § 338.055.2...............................................................6, 16, 19-20, 32

Mo. Rev. Stat. § 338.055.7...............................................................................*passim*

Mo. Rev. Stat. § 338.140.1...............................................................................5

Mo. Rev. Stat. § 338.140.6...............................................................................5

Mo. Rev. Stat. § 338.255...............................................................................3

Mo. Rev. Stat. § 338.285...............................................................................6

Mo. Rev. Stat. § 621.110...............................................................................6, 7

**Other Authorities**

10A Wright & Miller, *et al.*
    FEDERAL PRACTICE AND PROCEDURE. § 2727.1 (4th ed. 2021)...................................22

American Pharmacists Association,
    Code of Ethics, https://aphanet.pharmacist.com/code-ethics .......................................2-3

Bayless, Kacen,
    *Missouri bill bars pharmacists from questioning ivermectin effectiveness*, THE KANSAS
    CITY STAR (May 19, 2022), *available at* https://www.kansascity.com/news/politics-
    government/article261400142.html ...............................................................................18

Bergengruen, Vera,
    *How 'America's Fronline Doctors' Sold Access to Bogus COVID-19 Treatments—and Left Patients in the Lurch*, TIME (Aug. 26, 2021), *available at* https://time.com/6092368/americas-frontline-doctors-covid-19-misinformation/ ............10

Board of Pharmacy, Missouri Division of Professional Registration,
    *About the Board*, https://pr.mo.gov/pharmacists-about-the-board.asp .......................4

Bray, Mike, *et al.*,
    *Ivermecting and COVID-19: A report in Antiviral Research, widespread interest, an FDA warning, two letters to the editor and the authors' responses*, ANTIVIRAL RESEARCH (2020)....................................................................................................................12

Chua, K., *et al.*,
    *US Insurer Spending on Ivermectin Prescriptions for COVID-19*, JAMA (Jan. 13, 2022), https://jamanetwork.com/journals/jama/fullarticle/2788253 .....................................14

Collins, Ben & Brancy Zadronzy,
    *Clamoring for ivermectin, some turn to a pro-Trump telemedicine website*, CNBC (Aug. 27, 2021), https://www.cnbc.com/2021/08/27/clamoring-for-ivermectin-some-turn-to-pro-trump-telemedicine-website.html ...............................................12

Devlin, Hannah & Ian Sample,
    *What are the prospects for a Covid-19 treatment?*, THE GUARDIAN (Mar. 19, 2020), *available at* https://www.theguardian.com/science/2020/mar/19/prospects-treatment-coronavirus-drugs-vaccines .........................................................................8

European Medicines Agency,
    *EMA advises against use of ivermectin for the prevention or treatment of COVID-19 outside randomized clinical trials* (Mar. 22, 2021) https://www.ema.europa.eu/en/news/ema-advises-against-use-ivermectin-prevention-treatment-covid-19-outside-randomised-clinical-trials......................................................................................................................13

Food and Drug Admin,
    *Coronavirus (COVID-19) Update: FDA Revokes Emergency Use Authorization for Chloroquine and Hydroxychloroquine*, https://www.fda.gov/news-events/press-announcements/coronavirus-covid-19-update-fda-revokes-emergency-use-authorization-chloroquine-and..................................................9

Food and Drug Admin,
  *FAQ: COVID-19 and Ivermectin Intended for Animals*,
  https://www.fda.gov/animal-veterinary/product-safety-information/faq-
  covid-19-and-ivermectin-intended-animals..........................................................................11

Food and Drug Admin,
  *Hydroxychloroquine or chloroquine for COVID-19: Drug Safety Communication
  - FDA Cautions Against Use Outside of the Hospital Setting or a Clinical Trial
  Due to Risk of Heart Rhythm Problems*, https://www.fda.gov/safety/medical-
  product-safety-information/hydroxychloroquine-or-chloroquine-covid-19-
  drug-safety-communication-fda-cautions-against-use ...................................................7-8

Faith Hope Love Medical,
  https://faithhopelovemedical.com/...................................................................................14

Front Line Covid-19 Critical Care Alliance,
  *How to get Ivermectin*, https://covid19criticalcare.com/guide-for-this-
  website/how-to-get-ivermectin/.......................................................................................14

Heidary, Fatemeh & Reza Gharebaghi,
  *Ivermectin: a systematic review from antiviral effects to COVID-19 complementary
  regimen*, NATURE PUBLIC HEALTH EMERGENCY COLLECTION (2020)................................11-12

Liu, Michael, *et al.*,
  *Internet Searches for Unproven COVID-19 Therapies in the United States*, JAMA
  INTERNAL MEDICINE (2020).................................................................................................8

McCreary, Joedy,
  *Viral claim misrepresents Mayo Clinic guidance on hydroxycholoroquine*, USA TODAY
  (Sept. 28, 2023), *available at*
  https://www.usatoday.com/story/news/factcheck/2023/09/28/post-
  misrepresents-mayo-clinic-hydroxychloroquine-stance-hcq-fact-
  check/70980831007/ .......................................................................................................10

Merck,
  *Merck Statement on Ivermectin use During the COVID-19 Pandemic* (Feb. 4,
  2021), https://www.merck.com/news/merck-statement-on-ivermectin-use-
  during-the-covid-19-pandemic/.......................................................................................13

Missouri Board of Pharmacy,
    *COVID-19 Guidance*, https://pr.mo.gov/boards/pharmacy/covid-
    19/GuidanceStatements(9-3-21).pdf ....................................................................10-11, 15, 20

National Institutes of Health,
    *Hydroxychloroquine does not benefit adults hospitalized with COVID-19* (Nov. 9,
    2020), https://www.nih.gov/news-events/news-
    releases/hydroxychloroquine-does-not-benefit-adults-hospitalized-covid-
    19 .............................................................................................................................. 9-10

National Institutes of Health,
    *Ivermectin*,
    https://www.covid19treatmentguidelines.nih.gov/therapies/antiviral-
    therapy/ivermectin/ ................................................................................................... 12-13

Sung-sun, Kwak,
    *Physicians work out treatment guidelines for coronavirus*, KOREAN BIOMEDICAL
    REVIEW (Feb. 13, 2020), *available at*
    http://www.koreabiomed.com/news/articleView.html?idxno=7428.................................8

Testimony of Pierre Kory, MD, Homeland Security Committee Meeting: Focus on
    Early Treatment of COVID-19
    *Focus on Early Treatment of COVID-19 before the Homeland Security Comm.*, 116th
    Congress (2020), *available at*
    https://www.hsgac.senate.gov/imo/media/doc/Testimony-Kory-2020-12-
    08.pdf .............................................................................................................................12

Weber, Lauren,
    *Doctors who touted ivermectin as covid fix now pushing it for flu, RSV*, WASH. POST
    (Feb. 26, 2023),
    https://www.washingtonpost.com/health/2023/02/26/ivermectin-use-
    covid-flu-rsv/ .................................................................................................................15

Whitaker, John T.,
    *Italy's Seven Secrets*, SATURDAY EVENING POST, Dec. 23, 1939 ....................................................1

World Health Organization,
    *WHO advises that ivermectin only be used to treat COVID-19 within clinical
    trials*, https://www.who.int/news-room/feature-stories/detail/who-advises-
    that-ivermectin-only-be-used-to-treat-covid-19-within-clinical-trials ................ 13-14

Zhang, Marina,
   *Ivermectin Could Be a 'Powerful Drug' for Fighting Cancer—Here's Why*, THE
   EPOCH TIMES (Mar. 21, 2024),
   https://www.theepochtimes.com/health/ivermectin-could-be-a-powerful-
   drug-for-fighting-cancer-heres-why-5585682.....................................................................18

Last year, this Court determined that § 338.055.7, RSMo., pierced constitutional bedrock by prohibiting pharmacists from expressing certain viewpoints about the effectiveness of two politically polarizing drugs, ivermectin and hydroxychloroquine. *Stock v. Gray*, 663 F. Supp. 3d 1044, 1053-55 (W.D. Mo. 2023). If governments have the power to dictate the professional views of private healthcare providers during contentious times, every view will be either banned or mandated, prohibited or required, compulsory or forbidden. *See, e.g.*, John T. Whitaker, *Italy's Seven Secrets*, SATURDAY EVENING POST, Dec. 23, 1939, at 53 (depicting the totalitarian principle at work in fascist Italy). That world leaves no room for free thought or independent judgment. In Missouri, a patient cannot hear his pharmacist's unsolicited second opinion that ivermectin is *ineffective* for treating COVID. But if he stepped off a plane in California just last year, he could not hear his physician's opinion that ivermectin is *effective* for treating COVID. *See McDonald v. Lawson*, 94 F.4th 864 (9th Cir. 2024) (holding moot challenge to California's COVID misinformation law after statute's repeal). Government's "truth"—or "misinformation"—varies by time zone, and it seems to move in lockstep with the political whims of the faction dominating each state legislature.

Missouri, in other notable litigation, has recognized that "[o]ur constitutional tradition stands against the idea that we need Oceania's Ministry of Truth." Complaint ¶¶ 5, 37, *Missouri v. Biden*, No. 22-cv-01213, Dkt. 1 (W.D. La. May 5, 2022) (internal quotation omitted). For that Orwellian idea "impoverishes the national conversation." Response to Application for Stay of Injunction 21, *Murthy v. Missouri*, No. 23A243 (U.S. Sept. 20, 2023). When the state thinks misinformation is flourishing, the solution is not to "radically tilt[] the playing field against those opposing or endorsing certain policies, based solely on viewpoint." Brief for Plaintiffs-Appellees at 30, *Missouri v. Biden*, No. 23-30445 (5th Cir. Aug. 4, 2023), *cert granted sub nom. Murthy v. Missouri*, No. 23-411. The solution is the government's own "counterspeech, not censorship."

Complaint ¶¶ 39-42, *Missouri v. Biden*, No. 23-30445 (5th Cir. Aug. 4, 2023). "This distinction is not hard to grasp, and it imposes no novel or extraordinary burden." Brief for Plaintiffs-Appellees at 54-55, *Missouri v. Biden*, No. 23-30445 (5th Cir. Aug. 4, 2023).

Missouri had the right idea in *Murthy*, but the wrong one here. Public access "to a multiplicity of information sources," "diverse and antagonistic" is "a governmental purpose of the highest order" "essential to the welfare of the public." Complaint ¶ 46, *Missouri v. Biden*. States do not possess the power to deny admission to the marketplace of ideas for those ideas it disapproves: "the First Amendment makes [the choice] for us." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 770 (1976). And professionals like Ms. Stock have just as much right to participate in that free exchange of views. *Nat'l Institute for Fam. and Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371 (2018) (internal quotations omitted) ("*NIFLA*"). Missouri's law is incompatible with the First Amendment.

## STATEMENT OF MATERIAL FACTS

1.      Plaintiff Ashley Stock is a citizen of Missouri domiciled in Fenton, MO. Complaint (Dkt. 1) ¶9.

2.      Stock graduated with a Doctorate in Pharmacy from the St. Louis College of Pharmacy at University of Health Sciences and Pharmacy in St. Louis in 2012. Complaint ¶12.

3.      Stock sat for and passed the North American Pharmacist Licensure Examination and the Multistate Pharmacy Jurisprudence Examination in July 2012, and was licensed to practice as a pharmacist by the State of Missouri in July 2012. Complaint ¶13.

4.      Stock is a licensed pharmacist in good standing in Missouri subject to oversight and discipline by the Missouri Board of Pharmacy. Complaint ¶14.

5.      When she filed her Complaint, Stock worked full time as a retail pharmacist for Van's Delivery Pharmacy in St. Louis, Missouri, beginning her work there in January 2022. Complaint ¶15.

6.      In late 2022, Stock left Van's and accepted a position as pharmacist-in-charge at ReadyMed Pharmacy in St. Louis, Missouri. *See* Ex C. to Declaration of Adam Schulman in Support of Plaintiff Ashley Stock's Motion for Summary Judgment,  Plaintiff Ashley Stock's Responses and Objections to Defendants' Interrogatories at 3.

7.      In August 2023, Stock left ReadyMed and accepted a position as a retail staff pharmacist with Walgreens, in St. Louis, Missouri. Stock Interrogatory Responses at 3.

8.      Stock had worked for Walgreens in the same capacity before joining Van's. Complaint ¶16.

9.      Stock's job responsibilities include dispensing prescription medications and counseling patients on the safe use of such medications based on her professional

1

expertise. Stock regularly interacts with prescribers and patients, consulting and counseling both regarding pharmaceutical efficacy and possible available alternatives to prescribed drugs and dosages. Such communication includes, but is not limited to, consulting, inquiring, debating, disputing the efficacy of, or otherwise discussing her professional opinions with prescribers and patients about prescriptions for hydroxychloroquine and ivermectin. Complaint ¶17.

10.  Since March 2020, in her job as a retail pharmacist, Stock has received prescriptions from physicians for hydroxychloroquine and ivermectin for her to fill and dispense to patients at the pharmacy. Complaint ¶18.

11.  Since March 2020, Stock has had conversations with doctors and patients during which she disputed the efficacy of both hydroxychloroquine and ivermectin for human use as a COVID-19 treatment. Complaint ¶19.

12.  Since March 2020, Stock has contacted prescribing physicians from which she received prescriptions for hydroxychloroquine and ivermectin, to discuss, debate, and dispute the efficacy of both hydroxychloroquine and ivermectin for human use as a COVID-19 treatment and the dosage amounts of the prescription. Complaint ¶20.

13.  If, after Stock's discussions, the prescribing physicians or patients insisted on seeking hydroxychloroquine or ivermectin to treat COVID-19, Stock would refuse to fill those prescriptions. Complaint ¶21.

14.  According to the Code of Ethics for Pharmacists, adopted by the membership of the American Pharmacists Association in 1994, pharmacists must "help individuals achieve optimum benefit from their medications"; they must "place[] concern for the well-being of the patient at the center of professional practice"; they must "tell the truth and … act with conviction of conscience"; they must "maintain knowledge and abilities as new medications, devices, and technologies become available and as health information advances"; and they should "encourag[e] patients to participate in decisions

about their health." American Pharmacists Association, Code of Ethics, https://aphanet.pharmacist.com/code-ethics [https://web.archive.org/web/20220313062553/https://aphanet.pharmacist.com/code-ethics].

15. Under state law, the practice of pharmacy includes "consultation with patients and other health care practitioners … about the safe and effective use of drugs and devices…" § 338.010.1(7), RSMo.

16. Stock and all Missouri pharmacists are permitted under Missouri law to decline to fill a prescription if they so object. McAllister Depo Tr. vol. 2 (Dkt. 53-4) 156:20-25.

17. All Missouri pharmacies are permitted under Missouri law to decline to carry drugs if they so choose. § 338.255, RSMo.

18. Stock believes that counseling patients and doctors to the best of her professional judgment is required as a matter of professional ethics, even when that means contacting the patient or doctor to dispute the efficacy of a given medication. Complaint ¶23.

19. Stock exercises her judgment regarding the efficacy or not of drugs in the context of a given patient and a given prescription. Stock Interrogatory Responses at 5, 9.

20. Patients and doctors have thanked Stock when she contacted them to provide guidance or to suggest alterative pharmaceutical options that are more effective. Complaint ¶24.

21. Free, frank, and full discussion of controversial medications and treatments is essential to the proper practice of pharmacy. McAllister Depo Tr. vol. 1 (Dkt. 53-3) 83:7-84:14.

22. Pharmaceutical knowledge changes over time. As professionals discard once prevailing opinions, other opinions, once unorthodox, may become mainstream. For

example, FDA-approved drugs phenylephrine, Fen-Phen, and Vioxx were, after approval, discovered to be either unsafe or ineffective. McAllister Depo. Tr. vol. 2 117-18, 140-42, 145-47.

23.    Stock brings this lawsuit to vindicate the right of herself and other Missouri pharmacists to participate in the scientific debate about hydroxychloroquine and ivermectin without risking professional liability. Complaint ¶¶1-5.

24.    Stock is also a patient who receives medical prescriptions from a personal doctor. Declaration of Ashley Stock in Support of Plaintiff's Motion for Summary Judgment ¶10.

25.    Stock also brings this lawsuit to vindicate the right of patients to receive information from pharmacists relating to their prescriptions. Stock Decl. ¶11.

## DEFENDANTS AND THE DISCIPLINARY PROCESS

26.    Defendants James L. Gray III, Christian S. Tadrus, Douglas R. Lang, Anita L. Parran, Christina M. Lindsay, Colby Grove, and Pamela L. Marshall, are the members of the Missouri Board of Pharmacy ("Board"), each of whom is being sued in his or her official capacity. Created in 1909, the Board is a creature of statute, governed mainly by the Missouri Pharmacy Practice Act contained in § 338, RSMo.  Among its primary duties are "[i]nvestigating complaints … against any licensee or registrant," and "[d]isciplining licensees which may include, [sic] public censure, probation, suspension or revocation of a licensee/registrant …." Investigations, which may result in disciplinary action, "may be based on public complaints, information from other state and/or federal agencies, or violations discovered by the Board." Board of Pharmacy, Missouri Division of Professional Registration, About the Board, https://pr.mo.gov/pharmacists-about-the-board.asp [https://web.archive.org/web/20201206185331/https://pr.mo.gov/pharmacists-about-the-board.asp].

27.     The Board of Pharmacy's address is 3605 Missouri Blvd., Jefferson City, Missouri 65109. Complaint ¶11.

28.     Section 338.140, RSMo., vests the Board with its rulemaking power and the "power to employ an attorney to conduct prosecutions or to assist in the conduct of prosecutions pursuant to sections [of § 338, including § 338.055.7]." § 338.140.1, RSMo.

29.     Additionally, the Board "may issue letters of reprimand, censure or warning … for any violations that could result in disciplinary action," and, at its sole discretion, "enter into a voluntary compliance agreement … in lieu of board discipline," where such agreements "shall be a public record." § 338.140.6, RSMo.

30.     Thus, as with all rules and regulations of the pharmaceutical profession in Missouri, the Board will have authority to investigate putative violations of § 338.055.7, RSMo., and the authority to prosecute or cause the prosecution of enforcement actions against Missouri-licensed pharmacists whom the Board believes to violate the rule.

31.     In furthering its functions of enforcing and investigating alleged violations of disciplinary rules, the Board receives and investigates complaints lodged by any person, including any member of the public, 20 CSR 2220-2.050(1), either with knowledge of the alleged violation or information and belief, 20 CSR 2220-2.050(2).

32.     Submitting a complaint requires only filling out a simple single page form available on the Board's website and submitting it to the Board by fax or mail. Complaint ¶69.

33.     Public complaints "may be based upon personal knowledge or upon information and belief." 20 CSR 2220-2.050(2).

34.     Any individual who files a complaint with the Board may publicize the complaint's filing, its substance, or the details and facts of any subsequent investigation (as much as he is aware of it), whether the Board would otherwise do so. U.S. CONST. AMEND. I.

35. Upon receiving a complaint, if the Board office determines that it has jurisdiction, it will forward the complaint to an inspector for an investigation or inquiry. An investigation report will be forwarded to the Board after the investigation is finished. Complaint ¶70; *What Happens After I File A Complaint?*, Missouri Board of Pharmacy Website, https://pr.mo.gov/pharmacists-file-a-complaint2.asp [https://web.archive.org/web/20240608120659/https://pr.mo.gov/pharmacists-file-a-complaint2.asp].

36. Although the Board may elect not to prosecute after an investigation, and a finding of jurisdiction, the Board does not have a process for filtering out frivolous complaints before the investigation or inquiry process. *What Happens After I File A Complaint?*, Missouri Board of Pharmacy Website, https://pr.mo.gov/pharmacists-file-a-complaint2.asp [https://web.archive.org/web/20240608120659/https://pr.mo.gov/pharmacists-file-a-complaint2.asp].

37. If the Board determines a violation has been established, the Board may issue an administrative letter of concern or letter of warning that becomes part of the pharmacist's permanent file. *What Kind of Action May Be Taken By The Board?*, Missouri Board of Pharmacy Website, https://pr.mo.gov/pharmacists-file-a-complaint2.asp [https://web.archive.org/web/20240608120659/https://pr.mo.gov/pharmacists-file-a-complaint2.asp].

38. With or without a public complaint, the Board "may cause a complaint to be filed with the administrative hearing commission as provided by chapter 621." § 338.055.2, RSMo.; *accord* § 338.285, RSMo.

39. The administrative hearing commission will hold a hearing and convey its record and findings, along with its non-binding recommendation regarding discipline. § 621.110, RSMo.

40.     Within thirty days after receipt of the record of the proceedings before the commission and the findings of fact, conclusions of law, and recommendations, if any, of the commission, the Board will set the matter for hearing and notify the respondent-pharmacist of the time and place of the hearing. § 621.110, RSMo.

41.     At or after the hearing, the Board may issue the disciplinary measure it sees fit, including censure, suspension, or revocation of the respondent-pharmacist or his or her license. Complaint ¶74.

## HYDROXYCHLOROQUINE

42.     Hydroxychloroquine is a structural analog to chloroquine, an antimalarial drug. Hydroxychloroquine was developed in the 1940s for human consumption as an anti-malarial medication. The Food and Drug Administration ("FDA") has indicated use of the drug for the treatment of malaria, certain drug-resistant parasites uncommon in the United States, rheumatoid arthritis, and lupus. https://www.accessdata.fda.gov/drugsatfda_docs/label/2022/009768s056lbl.pdf [https://web.archive.org/web/20220701002208/https://www.accessdata.fda.gov/drugsatf da_docs/label/2022/009768s056lbl.pdf]. Hydroxychloroquine is not approved by the FDA for the treatment of COVID-19. Complaint ¶25.

43.     The FDA has approved no animal drug product that contains hydroxychloroquine. Complaint ¶25.

44.     The FDA cautions against the use of hydroxychloroquine for the treatment of COVID-19 outside the hospital setting or clinical trials. *Hydroxychloroquine or chloroquine for COVID-19: Drug Safety Communication - FDA Cautions Against Use Outside of the Hospital Setting or a Clinical Trial Due to Risk of Heart Rhythm Problems*, Food and Drug Admin. https://www.fda.gov/safety/medical-product-safety-information/hydroxychloroquine-or-chloroquine-covid-19-drug-safety-communication-

fda-cautions-against-use

[https://web.archive.org/web/20220630043551/https://www.fda.gov/safety/medical-product-safety-information/hydroxychloroquine-or-chloroquine-covid-19-drug-safety-communication-fda-cautions-against-use]; Complaint ¶26.

45.     Early in the pandemic, as doctors were experimenting with treatments for the novel coronavirus, health authorities in India, China, South Korea and Italy recommended chloroquine for the treatment of COVID-19. Kwak Sung-sun, *Physicians work out treatment guidelines for coronavirus*, KOREAN BIOMEDICAL REVIEW (Feb. 13, 2020), *available at* http://www.koreabiomed.com/news/articleView.html?idxno=7428 [https://web.archive.org/web/20220510120153/http://www.koreabiomed.com/news/articleView.html?idxno=7428]; Complaint ¶27.

46.     On March 18, 2020, the World Health Organization announced that chloroquine and hydroxychloroquine would be among the four drugs studied as part of the multinational solidarity clinical trial. Hannah Devlin, Ian Sample, *What are the prospects for a Covid-19 treatment?*, THE GUARDIAN (Mar. 19, 2020), *available at* https://www.theguardian.com/science/2020/mar/19/prospects-treatment-coronavirus-drugs-vaccines [https://web.archive.org/web/20220529233438/https://www.theguardian.com/science/2020/mar/19/prospects-treatment-coronavirus-drugs-vaccines]; Complaint ¶28.

47.     On March 19, 2020, then-President Trump encouraged the use of hydroxychloroquine during a national press conference, leading to a massive increase in demand for the drug. Michael Liu *et al.*, *Internet Searches for Unproven COVID-19 Therapies in the United* States 180, JAMA Internal Medicine, 1116-1118 (2020); Complaint ¶29.

48.     Speculative procurement of hydroxychloroquine occurred across the country. For example, on March 20, 2020, the Board sanctioned a pharmacist who, among other improprieties, used a false prescription to obtain hydroxychloroquine.

https://pr.mo.gov/boards/pharmacy/orders/PHA-2019010826.pdf

[https://web.archive.org/web/20220308153118/https://pr.mo.gov/boards/pharmacy/orde
rs/PHA-2019010826.pdf]. The clinic that the pharmacist falsely attributed the
prescriptions to alerted the Board that it had not written the prescription. *Id.* Subsequent
investigation revealed a string of fraudulent prescriptions spanning years, ultimately
resulting in criminal convictions. *Id.*; Complaint ¶30.

49.     On April 24, 2020, the FDA cautioned against using hydroxychloroquine
outside a hospital setting or clinical trial after reviewing case reports of adverse effects
including ventricular tachycardia, ventricular fibrillation, and in some cases death. Food
and Drug Admin., *supra*; Complaint ¶31.

50.     On June 15, 2020, the FDA revoked the emergency use authorization, citing
consultation with the Biomedical Advanced Research and Development Authority that
led them to conclude that "it is no longer reasonable to believe that oral formulations of
hydroxychloroquine (HCQ) and chloroquine (CQ) may be effective in treating
COVID-19." Moreover, because of "ongoing serious cardiac adverse events and other
potential serious side effects, the known and potential benefits of chloroquine and
hydroxychloroquine no longer outweigh the known and potential risks for the
authorized use." *Coronavirus (COVID-19) Update: FDA Revokes Emergency Use
Authorization for Chloroquine and Hydroxychloroquine*, Food and Drug Admin.,
https://www.fda.gov/news-events/press-announcements/coronavirus-covid-19-update-
fda-revokes-emergency-use-authorization-chloroquine-and

[https://web.archive.org/web/20220624134111/https://www.fda.gov/news-events/press-
announcements/coronavirus-covid-19-update-fda-revokes-emergency-use-
authorization-chloroquine-and]; Complaint ¶32.

51.     In November 2020, a U.S. National Institutes of Health clinical trial
evaluating the safety and effectiveness of hydroxychloroquine for the treatment of adults

with COVID-19 formally concluded that the drug provided no clinical benefit for COVID-19 treatment and recommended against its use. *Hydroxychloroquine does not benefit adults hospitalized with COVID-19*, National Institutes of Health (Nov. 9, 2020), https://www.nih.gov/news-events/news-releases/hydroxychloroquine-does-not-benefit-adults-hospitalized-covid-19 [https://web.archive.org/web/20220630054406/https://www.nih.gov/news-events/news-releases/hydroxychloroquine-does-not-benefit-adults-hospitalized-covid-19]; Complaint ¶33.

52. But telehealth organizations, often across state lines, have prescribed hydroxychloroquine. See Vera Bergengruen, *How 'America's Frontline Doctors' Sold Access to Bogus COVID-19 Treatments—and Left Patients in the Lurch*, TIME (Aug. 26, 2021), https://time.com/6092368/americas-frontline-doctors-covid-19-misinformation/ [https://web.archive.org/web/20220630002441/https://time.com/6092368/americas-frontline-doctors-covid-19-misinformation/]; Complaint ¶34.

53. Claims about hydroxychloroquine for human use as a COVID-19 treatment continue to persist on social media. *See* Joedy McCreary, *Viral claim misrepresents Mayo Clinic guidance on hydroxychloroquine*, USA TODAY (Sept. 28, 2023), https://www.usatoday.com/story/news/factcheck/2023/09/28/post-misrepresents-mayo-clinic-hydroxychloroquine-stance-hcq-fact-check/70980831007/ [https://web.archive.org/web/20230929150757/https://www.usatoday.com/story/news/factcheck/2023/09/28/post-misrepresents-mayo-clinic-hydroxychloroquine-stance-hcq-fact-check/70980831007/]; Stock Decl. ¶¶5-6.

54. The efficacy of hydroxychloroquine for human use to treat COVID-19 is a highly controversial and politicized subject. Complaint ¶¶59-62.

55. The Board's September 3, 2021, COVID-19 guidance document contains its joint statement with the Missouri Board of Healing Arts. The statement advises that

"[p]rescribing hydroxychloroquine, chloroquine and azithromycin for COVID-19 prophylactic use is discouraged and not recommended by the Board," that "[p]harmacists should use their professional judgment and take appropriate steps to verify that newly issued prescriptions for hydroxychloroquine, chloroquine and azithromycin are issued for a legitimate medical purpose," and, overall, that "the Board is recommending that pharmacies use caution" when determining whether to fill prescriptions for hydroxychloroquine. Missouri Board of Pharmacy COVID-19 Guidance at 6-7 [https://pr.mo.gov/boards/pharmacy/covid-19/GuidanceStatements(9-3-21).pdf].

56.    Stock does not believe hydroxychloroquine is an effective human use treatment for COVID-19 compared to available alternatives. Complaint ¶35.

**IVERMECTIN**

57.    Ivermectin is an anti-parasitic drug originally marketed by Merck that has been used in humans and animals since the 1970s. Complaint ¶36.

58.    Ivermectin is not approved by the FDA for the treatment of COVID-19. *FAQ: COVID-19 and Ivermectin Intended for Animals*, Food and Drug Admin., https://www.fda.gov/animal-veterinary/product-safety-information/faq-covid-19-and-ivermectin-intended-animals [https://web.archive.org/web/20220627144217/https://www.fda.gov/animal-veterinary/product-safety-information/faq-covid-19-and-ivermectin-intended-animals]; Complaint ¶37.

59.    Scientists studied ivermectin as a potential COVID-19-inhibiting drug. Some in-vitro drug screening studies early in the pandemic showed that ivermectin has an antiviral effect on certain positive-sense single-strand RNA viruses, including SARS-CoV-2, the virus that causes COVID-19. Fatemeh Heidary, Reza Gharebaghi, *Ivermectin: a systematic review from antiviral effects to COVID-19 complementary regimen*, NATURE PUBLIC

HEALTH EMERGENCY COLLECTION, 593-602 (2020) (discussing prior COVID-19 ivermectin studies); Complaint ¶38.

60.     Follow-up studies concluded that, while ivermectin could inhibit replication of SARS-CoV-2, the doses needed would be significantly greater than humans could safely ingest. Mike Bray *et al.*, *Ivermectin and COVID-19: A report in Antiviral Research, widespread interest, an FDA warning, two letters to the editor and the authors' responses*, 178 ANTIVIRAL RESEARCH (2020); Complaint ¶39.

61.     Even so, in December 2020, Dr. Pierre Kory testified before the Senate Homeland Security and Government Affairs Committee that ivermectin is a "miracle drug" for the treatment of COVID-19. Testimony of Pierre Kory, MD, Homeland Security Committee Meeting: Focus on Early Treatment of COVID-19. *Focus on Early Treatment of COVID-19 before the Homeland Security Comm.*, 116th Congress (2020) (Testimony of Dr. Pierre Kory, President, Front Line COVID-19 Critical Care Alliance) *available at* https://www.hsgac.senate.gov/imo/media/doc/Testimony-Kory-2020-12-08.pdf [https://web.archive.org/web/20220629192128/https://www.hsgac.senate.gov/imo/media/doc/Testimony-Kory-2020-12-08.pdf]; Complaint ¶40.

62.     Many lawmakers, as well as then-President Trump, endorsed Dr. Kory's testimony, and promoted ivermectin as a COVID-19 drug. Ben Collins, Brancy Zadronzy, *Clamoring for ivermectin, some turn to a pro-Trump telemedicine website*, CNBC (Aug. 27, 2021), https://www.cnbc.com/2021/08/27/clamoring-for-ivermectin-some-turn-to-pro-trump-telemedicine-website.html [https://web.archive.org/web/20211118081346/https://www.cnbc.com/2021/08/27/clamoring-for-ivermectin-some-turn-to-pro-trump-telemedicine-website.html]; Complaint ¶41.

63.     Subsequently, in January 2021 the National Institutes of Health released Treatment Guidelines that suggest there is insufficient evidence of ivermectin's effects against COVID-19 to recommend for or against it. *Ivermectin*, National Institutes of

Health, https://www.covid19treatmentguidelines.nih.gov/therapies/antiviral-therapy/ivermectin/

[https://web.archive.org/web/20220618222625/https://www.covid19treatmentguidelines.nih.gov/therapies/antiviral-therapy/ivermectin/]; Complaint ¶42.

64. In early 2021, the European Medicines Agency recommended against ivermectin's use for the prevention of COVID-19. *EMA advises against use of ivermectin for the prevention or treatment of COVID-19 outside randomized clinical trials*, European Medicines Agency (Mar. 22, 2021), https://www.ema.europa.eu/en/news/ema-advises-against-use-ivermectin-prevention-treatment-covid-19-outside-randomised-clinical-trials

[https://web.archive.org/web/20220623053101/https://www.ema.europa.eu/en/news/ema-advises-against-use-ivermectin-prevention-treatment-covid-19-outside-randomised-clinical-trials]; Complaint ¶43.

65. Also in early 2021, Merck—the branded manufacturer of FDA-approved ivermectin tablets for human use in the United States—issued a statement that attempting to use ivermectin to treat COVID-19 may be unsafe. *Merck Statement on Ivermectin use During the COVID-19 Pandemic*, Merck (Feb. 4, 2021), https://www.merck.com/news/merck-statement-on-ivermectin-use-during-the-covid-19-pandemic/

[https://web.archive.org/web/20220612153613/https://www.merck.com/news/merck-statement-on-ivermectin-use-during-the-covid-19-pandemic/]; Complaint ¶44.

66. In March 2021, the World Health Organization stated that ivermectin should not be used for the treatment of COVID-19. *WHO advises that ivermectin only be used to treat COVID-19 within clinical trials*, World Health Organization, https://www.who.int/news-room/feature-stories/detail/who-advises-that-ivermectin-only-be-used-to-treat-covid-19-within-clinical-trials

[https://web.archive.org/web/20220621004825/https://www.who.int/news-room/feature-stories/detail/who-advises-that-ivermectin-only-be-used-to-treat-covid-19-within-clinical-trials]; Complaint ¶45.

67.     Despite these warnings, prescriptions for ivermectin ballooned, reaching 88,000 prescriptions dispensed during the week of August 13, 2021 compared to an average of 3600 weekly prescriptions before 2020. Chua K, Conti RM, Becker NV. *US Insurer Spending on Ivermectin Prescriptions for COVID-19*. JAMA. 2022;327(6):584–587 (Jan. 13, 2022), https://jamanetwork.com/journals/jama/fullarticle/2788253 [https://web.archive.org/web/20220630002453/https://jamanetwork.com/journals/jama/fullarticle/2788253]; Complaint ¶46.

68.     Telehealth companies dedicated pages advertising the ease of obtaining a prescription of ivermectin. *How to get Ivermectin*, Front Line Covid-19 Critical Care Alliance, https://covid19criticalcare.com/guide-for-this-website/how-to-get-ivermectin/ [https://web.archive.org/web/20220615173409/https://covid19criticalcare.com/guide-for-this-website/how-to-get-ivermectin/]; Faith Hope Love Medical, https://faithhopelovemedical.com/ [https://web.archive.org/web/20220701013306/https://faithhopelovemedical.com/]; Complaint ¶47.

69.     These prescriptions are off-label, and many patients refuse to divulge what the prescriptions are for. Complaint ¶48.

70.     There are Missouri pharmacists who, skeptical of ivermectin's effectiveness as a COVID-19 cure, try to consult and counsel patients about why they were prescribed ivermectin, dispute the efficacy of the drug, and refuse to fill the prescriptions. Complaint ¶49.

71.     The efficacy of ivermectin for human use to treat COVID-19 is a highly controversial and politicized subject. Complaint ¶¶59-62.

72.     The Board's September 3, 2021, COVID-19 guidance document states it "does not have a position on ivermectin at this time," but recommends pharmacists "use their discretion when asked to fill any prescription they believe is questionable/not issued for a legitimate medical purpose." *Id.* at 7. [https://pr.mo.gov/boards/pharmacy/covid-19/GuidanceStatements(9-3-21).pdf]. The Board's guidance also notes "the FDA has not approved ivermectin for use in treating or preventing COVID-19 in humans." *Id.*

73.     Stock does not believe that ivermectin is an effective human use treatment for COVID-19 compared to available alternatives. Complaint ¶50.

74.     In 2022 and 2023, groups such as Front Line Covid-19 Critical Care Alliance began to tout ivermectin as a human use treatment for influenza and RSV (Respiratory Syncytial Virus). Lauren Weber, *Doctors who touted ivermectin as covid fix now pushing it for flu, RSV*, WASH. POST (Feb. 26, 2023), https://www.washingtonpost.com/health/2023/02/26/ivermectin-use-covid-flu-rsv/ [https://web.archive.org/web/20230228010921/https://www.washingtonpost.com/health/2023/02/26/ivermectin-use-covid-flu-rsv/]; Stock Decl. ¶7.

75.     By 2024, certain doctors began to tout ivermectin as a human use treatment for cancer. Marina Zhang, *Ivermectin Could Be a 'Powerful Drug' for Fighting Cancer—Here's Why*, THE EPOCH TIMES (Mar. 21, 2024), https://www.theepochtimes.com/health/ivermectin-could-be-a-powerful-drug-for-fighting-cancer-heres-why-5585682 [https://web.archive.org/web/20240424114127/https://www.theepochtimes.com/health/ivermectin-could-be-a-powerful-drug-for-fighting-cancer-heres-why-5585682]; Stock Decl. ¶7.

76.     Stock does not believe that ivermectin is an effective human use treatment for influenza, RSV, or cancer compared to available alternatives. Stock Decl. ¶7

77.     A product of COVID culture wars, § 338.055.7, RSMo., seeks to advance one side of the debate by both protecting pharmacists from Board sanction for filling prescriptions for hydroxychloroquine and ivermectin, and forbidding pharmacists from communicating any professional opinion against the efficacy of the drugs to either prescribers or patients:

> "The board shall not deny, revoke, or suspend, or otherwise take any disciplinary action against, a certificate of registration or authority, permit, or license required by this chapter for any person due to the lawful dispensing, distributing, or selling of ivermectin tablets or hydroxychloroquine sulfate tablets for human use in accordance with prescriber directions. **A pharmacist shall not contact the prescribing physician or the patient to dispute the efficacy of ivermectin tablets or hydroxychloroquine sulfate tablets for human use unless the physician or patient inquires of the pharmacist about the efficacy of ivermectin tablets or hydroxychloroquine sulfate tablets**."

§ 338.055.7, RSMo. (emphasis added); Complaint ¶51.

78.     While pharmacists would be *protected* from disciplinary action for dispensing ivermectin tablets or hydroxychloroquine sulfate tablets, under the new law, pharmacists such as Stock face disciplinary action, including the potential loss of their license for communicating with prescribers and counseling patients about either drug in certain ways. Complaint ¶53.

79.     Even before the enactment of § 338.055.7, RSMo., the Board possessed power under § 338.055.2(5), RSMo., to file a disciplinary complaint against a pharmacist for "[i]ncompetence, misconduct, gross negligence, fraud, misrepresentation or dishonesty in the performance of the functions or duties" of her licensed profession.

80.     Section 338.055.7, RSMo. is "unique" in its attempt to target supposed misinformation about two specific drugs; in Defendants' expert Mr. McAllister's decades

of experience he has "not seen it in any other format" or "any other arena" . McAllister Depo Tr. vol. 1 86:6.

81.     Section 338.055.7, RSMo., does not prohibit pharmacists from refusing to fill prescriptions for ivermectin tablets or hydroxychloroquine sulfate tablets.

82.     Section 338.055.7, RSMo., became effective on August 28, 2022. Complaint ¶52.

83.     The Honorable Judge David Gregory Kays preliminarily enjoined enforcement of § 338.055.7, RSMo., by order on March 22, 2023. Dkt.26.

*Legislative History*

84.     Legislators introduced Missouri House Bill No. 2149 to repeal §§ 334.530 and 334.655, RSMo., to improve retention of physical therapy graduates from Missouri universities. Mo. Sen., Forty-Seventh Day, Second Session 57:00-57:20 (Apr. 12, 2022); Mo. House., First Day, One Hundred First Assembly, Second Session (Jan. 5, 2022); Complaint ¶56.

85.     The bill evolved to be a general bill dealing with professional licensing requirements in the state of Missouri. Complaint ¶57.

86.     Senate Amendment 4028S04.19S, introduced as an amendment to House Bill No. 2149 on February 12, 2022, added the following relevant text to the Missouri Pharmacy Practice Act:

> "The board shall not deny, revoke, or suspend, or otherwise take any disciplinary action against, a certificate of registration or authority, permit, or license required by this chapter for any person due to the lawful dispensing, distributing, or selling of ivermectin tablets or hydroxychloroquine sulfate tablets for human use in accordance with prescriber directions. No person licensed under this chapter who dispenses, distributes, or sells ivermectin tablets or hydroxychloroquine sulfate tablets for human use shall ask the

patient or prescriber, or otherwise require of the patient or prescriber, the reason or purpose for which the medications shall be used, except in circumstances in which it is necessary for purposes of the patient's health insurance or to clarify dosage for the health and safety of the patient."

Complaint ¶58.

87. During a debate on the Senate floor, Senator Rick Brattin, in support of the amendment, focused his attention entirely on the provision of the amendment that insulates doctors from professional liability. He responded that it was "true" to a fellow Senator's statement that "[the choice of ivermectin and hydroxychloroquine] is very political." Mo. Sen., Forty-Seventh Day, Second Session 1:48:46-1:48:56 (Apr. 12, 2022); Complaint ¶59.

88. During the same debate, Senator Brattin acknowledged that "[ivermectin and hydroxychloroquine have] been the most politicized medication ever." Mo. Sen., Forty-Seventh Day, Second Session 1:54:04-1:54:09 (Apr. 12, 2022); Complaint ¶60.

89. In response to another allegation that the bill was politically motivated, Senator Brattin alleged that the Board of Registration for the Healing Arts was itself "weaponized." Mo. Sen., Forty-Seventh Day, Second Session 1:56:22 (Apr. 12, 2022); Complaint ¶61.

90. In an interview with the Kansas City Star, Senator Brattin again stated that he wanted to protect doctors from "the politicization of those two drugs." Kacen Bayless, *Missouri bill bars pharmacists from questioning ivermectin effectiveness*, THE KANSAS CITY STAR (May 19, 2022), *available at* https://www.kansascity.com/news/politics-government/article261400142.html [https://web.archive.org/web/20220519210354/https://www.kansascity.com/news/politics-government/article261400142.html]; Complaint ¶62.

91.     There was no public legislative debate about any significant burden to the state or citizens caused by pharmacists engaging in speech disputing or questioning the efficaciousness of ivermectin or hydroxychloroquine. Complaint ¶63.

92.     The amendment passed unanimously later that afternoon with minor language changes:

> "The board shall not deny, revoke, or suspend, or otherwise take any disciplinary action against, a certificate of registration or authority, permit, or license required by this chapter for any person due to the lawful dispensing, distributing, or selling of ivermectin tablets or hydroxychloroquine sulfate tablets for human use in accordance with prescriber directions. A pharmacist shall not contact the prescribing physician or the patient to dispute the efficacy of ivermectin tablets or hydroxychloroquine sulfate tablets for human use unless the physician or patient inquires of the pharmacist about the efficacy of ivermectin tablets or hydroxychloroquine sulfate tablets." Mo. Sen. Amend. 4028H.06S, (Mo. 2022).

Complaint ¶64.

93.     The Board has not promulgated, drafted, conveyed, or proposed internal written policy guidance or training specifically related to enforcement of § 338.055.7, RSMo. Declaration of Adam Schulman in Support of Plaintiff Ashley Stock's Motion for Summary Judgment ¶4(a).

94.     The Board has not promulgated, drafted, conveyed, or proposed internal verbal policy guidance or training specifically related to enforcement of § 338.055.7, RSMo. Schulman Decl.¶4(b).

95.     On June 26, 2024, two days before summary judgment motions were due in this matter, the Board issued a public "Guidance Statement on Section 338.055.7." Mo. Bd. of Pharmacy Guidance Statement on Section 338.055.7 [https://pr.mo.gov/boards/pharmacy/3380557.pdf]. The Guidance Statement argues that at least some violations of § 338.055.7, RSMo., already fall within the Board's enforcement

purview under § 338.055.2(5), RSMo. And the guidance states that § 338.055.7, RSMo., "does not prohibit a pharmacist from sharing truthful and accurate medical/drug information with prescribers or patients, consistent with the standard of care, current FDA guidance, or evidence-based scientific data/research."

96. Prior to June 26, 2024, the Board had not issued any external written policy guidance to pharmacists specifically related to enforcement of § 338.055.7, RSMo. in the approximately two years since the statute was signed into law. Schulman Decl. ¶4(c).

97. Previously, the Board's September 3, 2021 and April 13, 2021 COVID-19 guidance documents were the only form of official written guidance for Missouri-licensed pharmacists with respect to the Board's views on hydroxychloroquine and ivermectin. Schulman Decl. ¶4(d).

## PLAINTIFF'S PLANS

98. Stock plans to continue working as a retail pharmacist in Missouri. Stock Decl. ¶3; Complaint ¶75.

99. Through the course of her work, Stock will likely again confront a prescription for either hydroxychloroquine or ivermectin as a COVID-19 treatment. Stock Decl. ¶4; Complaint ¶76.

100. Should she receive either such prescription, she intends, consistent with her past practice, to contact the prescriber to discuss, debate, or dispute the efficacy of the drugs, both generally and relative to current alternatives and to counsel the patient about efficacy and alternatives. Complaint ¶77.

101. Stock does not wish to face a disciplinary investigation by the Board. Complaint ¶78.

102. Stock does not wish to face disciplinary proceedings in front of the Board or an administrative hearing commission. Complaint ¶79.

103. Stock does not wish to face disciplinary sanctions by the Board. Complaint ¶80.

104. A disciplinary investigation would harm Stock's professional reputation, available job opportunities, and ability to earn a living in her chosen profession. Complaint ¶81.

105. Disciplinary sanctions would harm Stock's professional reputation, available job opportunities, and ability to earn a living in her chosen profession. Complaint ¶82.

106. Stock will be forced to censor herself, and act against her professional judgment of the possible best course of treatment for a patient to protect herself from potential Board sanction. Complaint ¶83.

107. But for § 338.055.7, RSMo., Stock could freely fulfill her professional duties and protect patients by communicating her concerns without the fear of disciplinary consequences for expressing her professional opinion. Complaint ¶84.

108. Even if Defendants were to attempt to assure Stock that they would not enforce § 338.055.7, RSMo., as written, Stock's speech would be chilled, in that she would not feel comfortable speaking freely with prescribing physicians and patients about the drugs and would still reasonably fear the effects of complaints or other professional liability. Complaint ¶85.

## LEGAL STANDARD FOR SUMMARY JUDGMENT

"Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Minn. Majority v. Mansky*, 849 F.3d 749, 752 (8th Cir. 2017), *rev'd on other grounds sub. nom Minn. Voters Alliance v. Mansky*, 585 U.S. 1 (2018). A Verified Complaint such as Stock's (Dkt. 1) is treated as an affidavit in the summary judgment posture. *E.g., Presson v. Reed*, 65 F.4th 357, 361 n.2 (8th Cir. 2023). Such affidavits, including Stock's accompanying declaration in support of summary judgment, "must be accepted as true on a summary-judgment motion when the party opposing the motion does not offer counter-affidavits or other evidentiary material supporting the opposing contention that an issue of fact remains." 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, FEDERAL PRACTICE & PROCEDURE § 2727.1 (4th ed. 2021).

"[T]he mere existence of *some* alleged factual dispute" "will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Only "genuine" disputes about "material" facts matter. A dispute is "genuine" if there is a sufficient evidentiary basis for a reasonable jury to find for the non-moving party. *Id.* at 248. And a fact is "material" if it might affect the outcome of the action under the operative law. *Id*. For the reasons discussed below, there are no genuine issues of material fact and Stock is entitled to judgment as a matter of law.

Because Stock is entitled to summary judgment, this Court should convert its preliminary injunction (Dkt. 26) into a permanent injunction and issue a judgment declaring the unconstitutionality of the second sentence of § 338.055.7, RSMo. The standard for a permanent injunction differs only slightly from a preliminary one: "A permanent injunction requires the moving party to show actual success on the merits, rather than the fair chance of prevailing on the merits required for a standard preliminary injunction." *Oglala Sioux Tribe v. C & W Enters.*,

542 F.3d 224, 229 (8th Cir. 2008). Again, in the context of a First Amendment claims, the remaining factors—(2) whether she will suffer irreparable harm absent the injunction; (3) the balance of equities; and (4) the public interest—will generally follow from the finding of actual success on the merits. *Lowry v. Watson Chapel Sch. Dist.*, 540 F.3d 752, 762 (8th Cir. 2008).

ARGUMENT

## I. Section 338.055.7, RSMo., infringes the free speech rights of Missouri pharmacists by threatening to impose liability based on the content and viewpoint of their ideas.

If a government entity chooses to regulate or restrict speech, it may not do so in a way that discriminates against certain viewpoints. *Stock*, 663 F. Supp. 3d at 1055. Viewpoint discrimination is "uniquely harmful to a free and democratic society." *Nat'l Rifle Ass'n v. Vullo*, 144 S. Ct. 1316 , 1326 (2024). Thus, if a law is "viewpoint-based, it is unconstitutional." *Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019); *accord Minn. Voters Alliance*, 585 U.S. at 11 ("prohibited"); *Matal v. Tam*, 582 U.S. 218, 243 (2017) ("forbidden").

"The state engages in viewpoint discrimination when the rationale for its regulation of speech is the specific motivating ideology or the opinion or perspective of the speaker." *Gerlich v. Leath*, 861 F.3d 697, 705 (8th Cir. 2017) (internal quotation omitted). Viewpoint discrimination constitutes a more "egregious" and "blatant" offense to the First Amendment than does an ordinary content-based restriction—"a law that singles out specific subject matter for differential treatment." *Reed v. Town of Gilbert*, 576 U.S. 155, 156 (2015).

"At its most basic, the test for viewpoint discrimination is whether—within the relevant subject category—the government has singled out a subset of messages for disfavor based on the views expressed." *Matal*, 582 U.S. at 248 (Kennedy, J., concurring). For example, in *Gerlich*, Iowa State University discriminated against a student organization because of the organization's endorsement and advocacy of marijuana legalization. 861 F.3d at 706-07. Ideological viewpoint discrimination has long been clearly established as unconstitutional. *Id.* at 708-09.

When a law takes one side of a public debate and suppresses speech to the contrary, the law is unconstitutionally viewpoint-based. *Stock*, 663 F. Supp. 3d at 1053. In *Animal Legal Def. Fund v. Kelly*, for instance, a Kansas law prohibited anyone from deceptively gaining access to an animal facility to damage the enterprise by exposing wrongdoing or otherwise. 9 F.4th 1219, 1233 (10th Cir. 2022). At the same time, that law did not forbid deceptively gaining access to make a video "intending to laud the facility or for neutral reasons." *Id.* By effectively taking one side of a disputed political issue (the ethics of certain animal husbandry practices there), a law becomes "impermissibly viewpoint discriminatory." *Id.*; *accord PETA v. North Carolina Farm Bureau Fed'n, Inc.*, 60 F. 4th 815, 823 (4th Cir. 2023).

The same principle applies even more so when the public debate is about medical issues. For example, in *Conant v. Walters*, the federal government threatened to revoke physicians' DEA registrations if doctors, based on their professional judgment, recommended the use of marijuana. 309 F.3d 629, 632-33 (9th Cir. 2002). *Conant* recognizes the "core First Amendment values of the doctor-patient relationship." *Id.* at 637. Candid, open, and honest conversation is paramount "in order to identify and treat disease; barriers to full disclosure would impair diagnosis and treatment." *Id.* at 636 (quoting *Trammel v. United States*, 445 U.S. 40, 51 (1980)). And so, naturally, doctors do not "surrender" their First Amendment rights simply by "[b]eing a member of a regulated profession." *Id.* at 637; *see also infra* Section I.A. In applying First Amendment scrutiny, the Ninth Circuit found that the government's policy did "not merely prohibit the discussion of marijuana" generally (a "presumptively invalid"[1] content-based restriction), it "condemn[ed] expression of a particular viewpoint, i.e., that medical marijuana would likely help a specific patient" (a viewpoint-based restriction). *Id.* Worse still, this viewpoint-based restriction "altered the traditional role of medical professionals by prohibiting speech necessary to the proper functioning of those systems." *Id.* at 638 (simplified).

---

[1] *Snider v. City of Cape Girardeau*, 752 F.3d 1149, 1157 (8th Cir. 2014).

Similarly, a municipal ordinance banned therapists from offering any counseling hoping to change a minor's sexual orientation. *Otto v. City of Boca Raton*, 981 F.3d 854 (11th Cir. 2020). On review, the Eleventh Circuit concluded that the ordinance was an unconstitutional viewpoint-based restriction on speech. Though the city could promote its own "viewpoint about sex, gender, and sexual ethics," it had no right to "engage in bias, censorship, or preference regarding another speaker's point of view." *Id.* at 864 (simplified). And that's what its law did: speech affirming one's sexual orientation was permitted; disaffirming speech promoting sexual orientation change was not.

Section 338.055.7, RSMo., is cut from the same cloth as these unconstitutionally viewpoint-based laws. It prohibits pharmacists from "contact[ing] the prescribing physician or the patient to dispute the efficacy of ivermectin tablets or hydroxychloroquine sulfate tablets for human use" unless the patient or physician asks first. In other words, speech educating the patient or prescriber in a way that disputes the effectiveness of ivermectin or hydroxychloroquine is forbidden, while speech endorsing, promoting, touting or affirming the effectiveness of the drugs is permitted. That is viewpoint based. *Stock*, 663 F. Supp. 3d at 1053. Missouri "has singled out a subset of messages" about ivermectin and hydroxychloroquine "for disfavor based on the views expressed." *Matal*, 582 U.S. at 248 (Kennedy, J., concurring).

"[V]iewpoint discrimination is inherent in the design and structure of this Act. This law is a paradigmatic example of the serious threat presented when government seeks to impose its own message in the place of individual speech, thought, and expression." *NIFLA*, 138 S. Ct. at 2379 (Kennedy, J, concurring). Because § 338.055.7 muzzles speech based on viewpoint, Stock's First Amendment claim succeeds.

### A. Viewpoint discrimination is impermissible, even when carried out under the guise of regulating professional conduct.

Section 338.055.7's attempt to tilt the scientific, medical, and pharmacological discourse in favor of ivermectin and hydroxychloroquine does not become constitutional just because it

only restricts the speech of licensed pharmacists. Courts have long recognized that "it is no answer to say that the purpose of the regulation is merely to insure high professional standards and not to curtail free expression. For a state may not, under the guide of prohibiting professional misconduct, ignore constitutional rights." *NAACP v. Button*, 371 U.S. 415, 43839 (1963) (simplified). Indeed, one major function of the First Amendment is to serve as an "uninhibited marketplace of ideas," in which the considered independent judgment of medical professionals is of utmost value. *E.g.*, *McCullen v. Coakley*, 573 U.S. 464, 476 (2014).

If there were any lingering doubts about this proposition, the Supreme Court reaffirmed recently that "professional speech" is not "a separate category of speech." *NIFLA*, 138 S. Ct. at 2371. "Speech is not unprotected merely because it is uttered by 'professionals.'" *Id.* at 2371-72. "As with other kinds of speech, regulating the content of professionals' speech poses the inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas or information." *Id.* at 2374 (internal quotations and alterations omitted). *NIFLA* identifies "two circumstances" in which professional speech may be afforded less than full protection. *Id.* at 2372. First, courts may apply "more deferential review to some laws that require professionals to disclose factual, noncontroversial information in their 'commercial speech.'" *Id.* Second, "[s]tates may regulate professional conduct, even though that conduct incidentally involves speech." *Id.*

Section 338.055.7 fits neither exception. Rather, it directly regulates the expressed opinions, views, and beliefs of pharmacists licensed in Missouri. *Stock*, 663 F. Supp. 3d at 1053. A pharmacist expressing his views about a particular drug to a physician or a patient is pure speech. "Speech is not conduct just because the government says it is." *Telescope Media Group v. Lucero*, 936 F.3d 740, 752 (8th Cir. 2019); *accord Parents Defending Educ. v. Linn Mar Cmty. Sch. Dist.*, 83 F.4th 658, 667 (8th Cir. 2023). "Speech is speech, and it must be analyzed as such for purposes of the First Amendment." *Otto*, 981 F.3d at 864 (internal quotations omitted); *Hines v. Quillivan*, 2021 WL 6618658, 2021 U.S. Dist. LEXIS 236801, *26 (S.D. Tex. Jul. 29, 2021) (veterinarian

"engaging in phone calls and emails with animal owners to give them specific medical advice" is speech; whereas "prescribing medication or otherwise treating the animals" would be conduct). The government regulates speech when the "conduct triggering coverage under the statute consists of communicating a message." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010). Without First Amendment protection for professional speech, "the government might easily tell architects that they cannot propose buildings in the style of I.M. Pei, or general contractors that they cannot suggest the use of cheaper foreign steel in construction projects, or accountants that they cannot discuss legal tax avoidance techniques." *Otto*, 981 F.3d at 867 (internal quotations omitted).

Professionals may disagree "on many topics in their respective fields[,]" including matters of ethics, policy, or their craft itself. *NIFLA*, 138 S. Ct. at 2375. Such disagreement is healthy. "[T]he best test of truth is the power of the thought to get itself accepted in the competition of the market, and the people lose when the government is deciding which ideas should prevail." *Id.* (internal quotation omitted). "The very purpose of the First Amendment is to foreclose public authority from assuming a guardianship of the public mind..." *Thomas v. Collins*, 323 U.S. 516, 545 (1945) (Jackson, J., concurring).

A free market for ideas is all the more necessary "[i]n the fields of medicine and public health" where "information can save lives." *NIFLA*, 138 S. Ct. at 2374 (internal quotation omitted). Medical professionals, "therefore, 'must be able to speak frankly and openly to patients.'" *Wollschlaeger v. Governor*, 848 F.3d 1293, 1313 (11th Cir. 2017) (*en banc*) (quoting *Conant*, 309 F.3d at 636). *Wollschlaeger* is instructive. There, Florida passed a law that, among other provisions, generally prohibited medical professionals "from making a written inquiry or asking questions concerning the ownership of a firearm or ammunition by the patient or by a family member of the patient" 848 F.3d at 1303. Florida asserted that its law did not implicate the First Amendment "because any effect on speech" was "merely incidental to the regulation of professional conduct." *Id.* at 1308. The Eleventh Circuit disagreed, finding the law to be a

textbook case of "ignor[ing] constitutional rights" "under the guise of prohibiting professional misconduct." *Id.* at 1310. And the law could not be sustained under any form of heightened scrutiny. *Id.* at 1311-1317. Even by comparison to Florida's infirm law, § 338.055.7 fares poorly. Whereas Florida imposed a content-based distinction on the face of the statute (no inquiries about the subject matter of firearms), § 338.055.7 carries a viewpoint-based distinction on its face: no disparagement about the subject matter of certain drugs. And the "power imbalance" rationale declaring that the law is necessary to protect "vulnerable" patients—a rationale that *Wollschlaeger* discredits, 838 F.3d at 1315—has no application to speech from one professional (a pharmacist) to another (a doctor).

In the end, "[t]hat the Act focuses on [pharmacists] is irrelevant. The need to prevent the government from picking ideological winners and losers is as important in medicine as it is in any other context." *Wollschlaeger*, 838 F.3d at 1328 (Pryor, J., concurring).

### B. Section 338.055.7 is also unconstitutional because it is substantially overbroad and cannot satisfy strict scrutiny.

Because § 338.055.7 is viewpoint discriminatory on its face, that "end[s] the matter" and "renders unnecessary any extended treatment of other questions." *Iancu*, 139 S. Ct. at 2302; *Matal*, 582 U.S. at 248 (Kennedy, J., concurring). The law "must be invalidated"—and a preliminary injunction granted—even without considering the statute's "permissible applications." *Iancu*, 139 S. Ct. at 2302. But there is some Eighth Circuit law subjecting viewpoint-discriminatory laws to the same strict-scrutiny analysis due a content-based restriction. *See, e.g.*, *Gerlich*, 861 F.3d at 704-707. Under this analysis, the government must "demonstrate[] that its regulation is narrowly drawn and is necessary to effectuate a compelling state interest." *Id.* at 705 (internal quotation omitted). Section 338.055.7 cannot meet that standard because it is a ham-fisted attempt at silencing debate that lacks the "touchstone" "[p]recision of regulation." *Button*, 371 U.S. at 438. Because "a substantial number of its applications are unconstitutional, judged in

relation to the statute's plainly legitimate sweep," the law is unconstitutionally overbroad. *United States v. Stevens*, 559 U.S. 460, 473 (2010) (internal quotation omitted)

At the preliminary injunction stage, Defendants mustered a hodgepodge of generalized interests purportedly justifying the law: "ensuring licensed professions promote public health," "protecting the physician-patient relationship," preventing the "ero[sion] [of] trust in the physician-patient relationship," protecting the "sick and credulous from ignorant and incompetent practitioners," preventing "unwanted contact," addressing the danger of "undue politicization" of hydroxychloroquine and ivermectin. Defendants' Resp. to Prelim. Inj. Mot. (Dkt. 24) at 18-19; Defendants' Mot. to Dismiss (Dkt. 19-1) at 9-12.

Missouri's justifications are unsupported in the legislative record, which reflects the state's concern was exclusively about the politicization of the drugs. Complaint ¶¶ 59-62. But injecting government power to squelch one side of the scientific debate only aggravates the problem. And if the real problem was the "weaponization of the board of healing arts," Complaint ¶ 61, that rationale has nothing to do with the professional speech of pharmacists.

The rest of the asserted "interests" are unsatisfactory, *post hoc* rationalizations for the speech restriction. "Government justifications for interfering with First Amendment rights must be genuine, not hypothesized or invented post hoc in response to litigation." *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2432 n.8 (2022) (internal quotations and alterations omitted). "When the state defends a regulation on speech as a means to redress past harms or prevent anticipated harms, it must do more than simply posit the existence of the disease to be cured." *Wollschlaeger*, 848 F.3d at 1316 (internal quotations and alterations omitted). Even if Defendants' asserted interests can be legitimately inferred from HB 2149, and even if they constitute "compelling" interests for strict scrutiny purposes, § 338.055.7 is not narrowly tailored to serve them, let alone the least restrictive way to serve them. *See 281 Care Comm. v. Arneson*, 766 F.3d 774, 793-94 (8th Cir. 2014) (discussing the least restrictive means requirement).

Consider the claimed concerns about the physician-patient relationship or patient-physician trust. Section 338.055.7 is simultaneously over- and underinclusive with respect to these aims. It is overinclusive because it covers communications from a pharmacist to the prescribing physician, to which the patient is not privy, and so would have no way of "seed[ing] doubt into the physician-patient relationship" and "convinc[ing] some patients not to take their medication." On the other hand, § 338.055.7 is also underinclusive; the purported "erosion of trust" interest proves too much because pharmacists regularly and appropriately raise concerns with patients that "cast doubt" on their physician's proficiency. Pharmacists question the dosage prescribed, observe that drugs are contra-indicated with other prescriptions, recommend a better more cost-effective substitute that the patient should consider, or even refuse to dispense a prescription altogether. Although these actions erode the unquestioning trust defendants envision for the physician-patient relationship, all fall within the core competency of the pharmacy profession and none are expressly outlawed by § 338.055.7. Section 338.055.7 is underinclusive in a second respect: it captures disputes only about two drugs used for COVID-19 treatment. Thus, the law "leaves significant influence bearing on the interest unregulated." *Rodgers v. Bryant*, 942 F.3d 451, 457 (8th Cir. 2019) (internal quotation omitted). From all appearances, the government is not pursuing the rationale it invokes, rather it is "disfavoring a particular … viewpoint." *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 802 (2011). This viewpoint discrimination remains unconstitutional even if everything § 338.055.7 captured was unprotected speech amounting to malpractice. *E.g., R.A.V. v. St. Paul*, 505 U.S. 377, 386-87 (1992).

More to the point, Missouri simply has no legitimate interest in protecting the sensibilities of either doctors or patients from hearing speech simply because it presents an alternative, unsolicited, or even offensive view. *See* Suggestions in Support of Prelim. Inj. Mot. (Dkt. 8) at 10 (citing cases holding that fractious speech is fully protected); Suggestions in Opp. to Mot. to Dismiss (Dkt. 5) at 5 (citing others rejecting an unwelcome speech rationale). Even if this were a compelling state interest, § 338.055.7 is overinclusive because many prescribing doctors or

patients welcome pharmacist contact to express a contrary view on prescribed medication. Complaint ¶ 24; *Wollschlaeger*, 848 F.3d at 1313.

Section 338.055.7 violates patients' and doctors' rights to receive information from a pharmacist who would otherwise be a willing speaker. *See, e.g.*, *Va. State Bd. of Pharm.*, 425 U.S. at 756. "Paternalistic[] interfere[nce] with the ability of physicians and patients to receive potentially relevant treatment information … could inhibit, to the public's detriment, informed and intelligent treatment decisions." *United States v. Caronia*, 703 F.3d 149, 166 (2d Cir. 2012). Missouri's law itself interferes with the integrity of medical decisions.

Likewise, the interest in protecting the sick/promoting public health suffers the same lack of tailoring. Missouri cannot justify a blanket ban on disputing the efficacy of the drugs for any given prescribed human use. It is not reasonable to suggest that disputing the effectiveness of the drugs for human use as a COVID-19 treatment, and instead recommending alternatives like Paxlovid, could be considered acting contrary to the promotion of public health. The way that the medical profession functions, and has always functioned, is through free discussion and sharing of opinions. Pharmacists have a role to play in that scientific discourse.

Again, on the other hand, § 338.055.7 is also underinclusive with respect to this interest: it permits a pharmacist to tell any patient that the drugs have no human use, as long as the patient has first made an inquiry. *See* McAllister Depo. Tr. vol. 2 113:11 (opining that this would be "below the standard of care"). This "inquiry" carve-out suggests that the real reason for the speech ban is to shield patients and doctors from unwanted alternative views. Again, that rationale is anathema to the First Amendment. Section 338.055.7 is also underinclusive vis-à-vis this interest because it singles out two drugs even though a patient or doctor has an equal interest in being given medically accurate information about any drug or any prescription. *See id.* at 126:24-127:5 (admitting that the state's interest would call for including "all drugs"). Relatedly, the patient has an equal interest in not being misled into thinking that the two drugs are cure-alls. *See id.* at 119:24-120:7. The statute doesn't serve a compelling interest "by picking and

choosing what kind of [misinformation] [is] okay." *Intervarsity Christian Fellowship/USA v. Univ. of Iowa*, 5 F.4th 855, 865 (8th Cir. 2021); *see also Mo. Broadcasters Ass'n v. Lacy*, 846 F.3d 295, 302 (8th Cir. 2017). "[S]elective application" "cannot survive strict scrutiny." 5 F.4th at 865.

Malpractice liability addresses defendants' public health concern, and it does so without indulging in viewpoint bias. Malpractice operates *ex post* in a fact-specific context and imposes liability only after a finding "harm" and "causation," thus supplying the "breathing space" that "First Amendment freedoms need … to survive" *Button*, 371 U.S. at 433. Section 338.055.7 discards the traditional limitations of malpractice and categorically bans speech that it considers scientific misinformation. *Contra United States v. Alvarez*, 567 U.S. 709 (2012) (false speech untethered to harm is fully protected).

Section 338.055.7, unlike malpractice liability, has no constitutional pedigree. It is not "long familiar to the bar." *NIFLA*, 138 S. Ct. at 2373. In the words of Defendants' expert, § 338.055.7 is "unique." McAllister Depo. Tr. vol. 1 86:6. The novelty of the law highlights the lack of tailoring. "No other state" has a drug-specific speech ban like Missouri seeks to impose here. *McCullen*, 573 U.S. at 490. When a regulation is unprecedented, as § 338.055.7 is, that "raise[s] concern" that the government "has too readily forgone options that could serve its interests just as well, without substantially burdening the kind of speech in which petitioners wish to engage." *Id.* And, as in *McCullen*, there are myriad other speech-neutral options available to combat the problem of pharmacist speech that escalates into harassment or professional misconduct. Suggestions in Support of Prelim. Inj. Mot. (citing five state laws); *see also* § 338.055.2(5), RSMo. (allowing discipline for "incompetence, misconduct, gross negligence, fraud, misrepresentation or dishonesty in the performance of the functions or duties" of the pharmacy profession); McAllister Depo Tr. vol. 2 125-126 (acknowledging § 338.055.7, RSMo., is not necessary to discipline egregious falsehoods given pharmacy boards' traditional authority); Board Guidance Statement (Jun. 26, 2024) (reading § 338.055.7, RSMo., to cover the same ground as § 338.055.2(5), RSMo.).

As Missouri recognizes elsewhere, "[o]ur constitutional tradition stands against the idea that we need Oceania's Ministry of Truth." Complaint ¶¶ 5, 37, *Missouri v. Biden*, No. 22-cv-01213, Dkt. 1 (W.D. La. May 5, 2022). The way to combat "misinformation" is to engage in public awareness campaigns or other government speech; it is not to shut down speakers with an opposing view. Complaint ¶¶ 39-42, *Missouri v. Biden* (advocating "counterspeech, not censorship."). "This distinction is not hard to grasp, and it imposes no novel or extraordinary burden." Brief for Plaintiffs-Appellees at 54-55, *Missouri v. Biden*, No. 23-30445 (5th Cir. Aug. 4, 2023). To let "the citizenry … discern for themselves what the truth is," the "preferred First Amendment remedy" is "more speech, not enforced silence." *281 Care Comm.*, 766 F.3d at 793.

Just before dispositive motions were due, the Board issued guidance on § 338.055.7. It interprets the statute to allow sharing "truthful and accurate" information, "consistent with the standard of care, current FDA guidance, or evidence based scientific data/research." This eleventh-hour attempt to avoid summary judgment founders for three major reasons.

First, the statute contains no hint of the Board's proposed safe harbor. Courts may not "write nonbinding limits into a silent state statute" or "rewrite a law to conform it to constitutional requirements." *Iancu*, 139 S. Ct. at 2301 (quoting *Stevens*, 559 U.S. at 481). They are "without power to adopt a narrowing construction of a state statute unless such a construction is reasonable and readily apparent." *Stenberg v. Carhart*, 530 U.S. 914, 944 (2000). "[T]he First Amendment protects against the Government; it does not leave us at the mercy of noblesse oblige." *Stevens*, 559 U.S. at 480. Courts may not uphold an unconstitutional rule just because defendants "promise[] to use it responsibly." *Id*. There is no reasonable and readily apparent construction that can salvage § 338.055.7.

Second, the Board's reading of the statute does nothing to alleviate § 338.055.7's viewpoint discrimination, in singling out critical views about two particular drugs (*see supra* at 30 (citing *R.A.V.*, 505 U.S. at 386-87)), and its underinclusiveness in differentiating between a pharmacist who initiates contact and one who responds to an inquiry (*see supra* at 31).

Third, even under the Board's interpretation, § 338.055.7 chills valuable speech and impedes the flow of information between professionals. Under the Board's view, § 338.055.7 still removes the traditional First Amendment "breathing space" elements of malpractice: causation and harm. Instead, it relies only on "current FDA guidance" and existing "evidence based/science data." But, "the truth is served by allowing consensus to be challenged without fear of reprisal. Today's accepted wisdom sometimes turns out to be mistaken." *Alvarez*, 567 U.S. at 752 (Alito, J., dissenting) (taking narrower view of First Amendment than majority opinion, but contrasting hypothetical laws prohibiting false statements about science with Stolen Valor Act). Section 338.055.7, as interpreted by the Board, would retard medical knowledge. Yesterday's medical misinformation often becomes today's truth. McAllister Depo. Tr. vol. 2 117-18, 140-42, 145-47 (discussing examples of phenylephrine, as Fen-Phen, and Vioxx as FDA-approved drugs later found to be either unsafe or ineffective).

Section 338.055.7 is fundamentally incompatible with the First Amendment. As a viewpoint-based restriction of protected speech, it is automatically infirm. Interpreted as a subject matter/content-based restriction, it is fatally overbroad. State regulators may not anoint themselves gatekeepers of the marketplace of ideas. Pharmacists have no monopoly on the truth, but they are every bit as entitled as any other citizen to share their opinions. Stock meets the burden of showing § 338.055.7's speech ban is unconstitutional.

## II. Stock will suffer irreparable harm if Defendants are not enjoined from enforcing § 338.055.7.

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373–74 (1976). Without this Court's injunction, § 338.055.7 would be enforced immediately, chilling Stock in the exercise of her First Amendment rights. Compl. ¶ 83. Even if Defendants wield their powers responsibly, pharmacists will be deterred by the statute's reach and that any member of the public can register a disciplinary complaint. *Id.* at ¶ 68. Doctors continue to prescribe the drugs

for human uses Stock does not consider effective; injunctive relief remains necessary. *See* Stock Decl. ¶¶ 4-8. Stock has again established irreparable harm. *Stock*, 663 F. Supp. 3d at 1055.

## III. The balance of equities and public interest also support permanent relief.

The remaining two factors—the public interest and effect on other interested persons—also favor granting relief given the First Amendment violation. *Lowry*, 540 F.3d at 762. "[T]he public interest will perforce be served by enjoining the enforcement of the invalid provisions of state law." *Bank One, N.A. v. Guttau*, 190 F.3d 844, 848 (8th Cir. 1999).

Because the Rule deters not only Stock's speech, but that of all Missouri pharmacists, "the balance of equities and the public interest thus tip sharply in favor of enjoining the [statute]." *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009). A pharmacist's opinion "could mean the alleviation of physical pain or the enjoyment of basic necessities;" it can even "save lives." *Va. State Bd. of Pharm.*, 425 U.S. at 764; *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 566 (2011).

If § 338.055.7 goes into effect, it will mean states have the power to tinker with the processes of medical, scientific, and pharmacological development. "Were this law to be sustained, there could be an endless list of subjects the National Government or the States could single out." *Alvarez*, 567 U.S. at 723. History brims with cautionary examples of governments "'manipulating the content of doctor-patient discourse' to increase state power and suppress minorities." *NIFLA*, 138 S. Ct. at 2374 (simplified).

Where, as here, the statutory provision is facially unconstitutional, the proper remedy is an injunction prohibiting Defendants from enforcing it. *Stock*, 663 F. Supp. 3d at 1051-52; *accord Rodgers*, 942 F.3d at 458; *Lowry*, 540 F.3d at 762 (rejecting government's argument that facial injunction should not have been granted because there was "no evidence of irreparable harm to students other than plaintiffs"); *Turtle Island Foods SPC v. Soman*, 632 F. Supp. 3d 909, 948 (E.D. Ark. 2022) (granting statewide relief on a showing of facial unconstitutionality).

## CONCLUSION

For these reasons, the Court should grant Stock's motion for summary judgment.

Dated: June 28, 2024

/s/ Jonathan R. Whitehead
Jonathan R. Whitehead, Mo. Bar. 56848
LAW OFFICES OF JONATHAN R. WHITEHEAD LLC
229 SE Douglas, Suite 210
Lee's Summit, MO 64063
Phone: (816) 398-8305
Email: jon@whiteheadlawllc.com

Adam E. Schulman (*pro hac vice*)
HAMILTON LINCOLN LAW INSTITUTE
1629 K Street, NW Suite 300
Washington, DC 20006
Phone: (610) 457-0856
Email: adam.schulman@hlli.org

**CERTIFICATE OF SERVICE**

 I hereby certify that on this 28th day of June, 2024, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court using CM/ECF system.

       <u>/s/ Jonathan Whitehead</u>