## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## CENTRAL DIVISION

ASHLEY STOCK,                              )
                                          )
    Plaintiff,                         )
                                          )
    v.                                 )         No. 2:22-CV-04104-DGK
                                          )
JAMES L. GRAY, III, et al.,                )
in their official capacities as officers or )
members of the Missouri Board of Pharmacy, )
                                          )
    Defendants.                        )

## ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

This lawsuit arises from a Missouri law forbidding a pharmacist from contacting a doctor or patient "to *dispute* the efficacy of ivermectin tablets or hydroxychloroquine sulfate tablets for human use" unless the doctor or patient asks the pharmacist about the drug's efficacy first.   Mo. Rev. Stat. § 338.055.7 (2022) (emphasis added).   A pharmacist who contacts a doctor or patient to tell them that the Food and Drug Administration ("FDA") has not approved either drug to treat a particular disease, such as COVID-19 or cancer, may be professionally disciplined, including losing her license.   But a pharmacist who contacts a doctor or patient to *tout* the efficacy of either drug for a purpose the FDA has not approved, such as COVID-19 or cancer, may not be sanctioned. Plaintiff, a pharmacist, contends this is viewpoint-based regulation of speech which violates the First Amendment.

The Court previously granted Plaintiff's motion for a preliminary injunction.   ECF No. 26.   Now before the Court are the parties' cross-motions for summary judgment.

Because the law is a viewpoint-based restriction on pharmacists' speech, Plaintiff's Motion for Summary Judgment and Permanent Injunction, ECF No. 59, is GRANTED and Defendants'

Motion for Summary Judgment, ECF No. 61, is DENIED. The Court permanently enjoins Defendants in their official capacities as officers or members of the Missouri Board of Pharmacy from reviewing, investigating, prosecuting, adjudicating, or enforcing violations of the second sentence of Missouri Revised Statute § 338.055.7. The Court further declares the second sentence of Missouri Revised Statute § 338.055.7 unconstitutional under the First Amendment as incorporated through the Fourteenth Amendment. Finally, the Court awards Plaintiff her reasonable attorneys' fees, costs, and expenses.

## Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most favorable to the nonmoving party, there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Material facts are those facts "that might affect the outcome of the suit under the governing law," and a genuine dispute over material facts is one "such that a reasonable jury could return a verdict for the nonmoving part[ies]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment bears the burden of showing a lack of a genuine dispute as to any material fact, *Celotex Corp.*, 477 U.S. at 323, and the Court views the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in that party's favor, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588–89 (1986).

## Undisputed Material Facts

The material, undisputed facts are as follows.[1]

### Stock's Background as a Pharmacist

Plaintiff Ashley Stock ("Stock") is a Missouri citizen domiciled in Fenton, Missouri. She graduated in 2012 from the St. Louis College of Pharmacy at University of Health Sciences and Pharmacy with a Doctorate in Pharmacy. In July 2012, the State of Missouri licensed her as a pharmacist. She is currently licensed and in good standing subject to oversight and discipline by the Missouri Board of Pharmacy.

When Stock filed the Complaint, she worked as a retail pharmacist for Van's Delivery Pharmacy in St. Louis, Missouri. In late 2022, she accepted a position as pharmacist-in-charge at ReadyMed Pharmacy in St. Louis. In August 2023, Stock left ReadyMed and accepted a position as a retail staff pharmacist with Walgreens in St. Louis, a position in which she had previously worked before joining Van's.

Stock's job responsibilities include dispensing prescription medications and counseling patients on the safe use of such medications. Stock regularly interacts with prescribers and patients, consulting and counseling both regarding pharmaceutical efficacy and possible alternatives to prescribed drugs and dosages. Such communication includes, but is not limited to, consulting, inquiring, debating, disputing the efficacy of, or otherwise discussing her professional opinions with prescribers and patients about hydroxychloroquine and ivermectin.

Since March 2020, physicians have sent Stock prescriptions for hydroxychloroquine and

---

[1] The Court has limited the facts to those that are undisputed and *material* to the pending summary judgment motion. *See* Fed. R. Civ. P. 56(c) (emphasis added); L.R. 56.1(a). The Court has excluded legal conclusions, argument presented as fact, proposed facts which are duplicative of other proposed facts, and proposed facts which are not admitted and not properly supported by the record or admissible evidence. *See* Fed. R. Civ. P. 56(c); L.R. 56.1(a). The Court has included proposed material facts which have been improperly controverted. *See* Fed. R. Civ. P. 56(c); L.R. 56.1(a).

3

ivermectin for her to fill and dispense at the pharmacy. Since that time, she has had conversations with doctors and patients during which she disputed the efficacy of both hydroxychloroquine and ivermectin for human use as a COVID-19 treatment. Since March 2020, Stock has contacted prescribing physicians from which she received prescriptions for hydroxychloroquine and ivermectin, to discuss and dispute the efficacy of both hydroxychloroquine and ivermectin for human use as a COVID-19 treatment and the dosage amounts of the prescription. If, after discussing the issue with Stock, the prescribing physicians or patients insisted on seeking hydroxychloroquine or ivermectin to treat COVID-19, she refused to fill those prescriptions.

**Pharmacists' Ethical Duties**

Under the Code of Ethics for Pharmacists, pharmacists must "help individuals achieve optimum benefit from their medications"; they must "place[] concern for the well-being of the patient at the center of professional practice"; they must "tell the truth and . . . act with conviction of conscience"; they must "maintain knowledge and abilities as new medications, devices, and technologies become available and as health information advances;" and they should "encourag[e] patients to participate in decisions about their health." Under Missouri law, the practice of pharmacy includes "consultation with patients and other health care practitioners . . . about the safe and effective use of drugs and devices . . . ." Missouri law permits pharmacists to decline to fill a prescription if they so object. It also permits pharmacies to decline to carry drugs if they so choose.

The specialty of doctors is diagnosing a patient's medical condition and how best to treat it. The pharmacists' role is to check and make sure that the way doctors are prescribing medications are within the bounds of general medical knowledge and that it will be safe and in the patient's best interest. A doctor almost always has more knowledge about the medical situation

4

and the circumstances than the pharmacist since pharmacists do not generally have access to medical records unless they request them.

The prescriber-patient relationship requires individual assessment and personalized care after examination by a doctor or medical professional. This relationship involves a level of time, trust, and sharing of information that is critical for society and the health of individual patients. Pharmacists are in a position to influence the way patients perceive their doctors and whether the patients follow their prescribers' information. If patient trust in their prescriber is undermined, patient health may be jeopardized. Pharmacists support the prescriber-patient relationship in important ways including ensuring that prescriptions are accurately filled, informing patients and doctors about possible concerns and alternatives, and answering questions.

FDA approved drugs have been reviewed for an intended use, and it has been determined that the benefits outweigh the known and potential risks of the drugs for that use. Stock agrees that medications continue to be studied after FDA approval for safety and efficacy. At any point, it may be determined that a medicine is no longer considered to be safe or effective because the long-term studies show that it is not safe and effective statistically. FDA approval does not include studies that are ongoing and not yet FDA approved, and if a doctor decides that they want to take that risk and prescribe a medication for a patient as an off-label use because other current medications are not working, that would be the doctor's decision.

Stock consults a drug search engine called Facts and Comparisons, by UpToDate, Inc., 2023, for information on hydroxychloroquine and ivermectin. The UpToDate, Inc., 2023's resource page on hydroxychloroquine says it may be used to prevent malaria, treat lupus, treat rheumatoid arthritis, and "it may be given to you for other reasons. Talk with the doctor."

Stock believes that counseling patients and doctors to the best of her professional judgment

5

is required as a matter of professional ethics, even when that means contacting the patient or doctor to dispute the efficacy of a given medication. She exercises her judgment regarding the efficacy of drugs in the context of a given patient and a given prescription. Stock will reach out to a prescriber when she has questions about the dosing, directions, or safety of a prescription. Patients and doctors have thanked Stock for contacting them to provide guidance or to suggest alternative drugs that are more effective.

Free, frank, and full discussion of controversial medications and treatments is essential to the proper practice of pharmacy. Pharmaceutical knowledge changes over time. As professionals discard once prevailing opinions, other opinions, once unorthodox, may become mainstream.

Stock brings this lawsuit to vindicate the right of herself and other Missouri pharmacists to participate in the scientific debate about hydroxychloroquine and ivermectin without risking professional liability. She is also a patient who receives prescriptions from a doctor, and she brings this lawsuit to vindicate the right of patients to receive information from pharmacists relating to their prescriptions.

**Defendants and the Disciplinary Process**

Defendants James L. Gray III, Christian S. Tadrus, Douglas R. Lang, Anita L. Parran, Christina M. Lindsay, Colby Grove, and Pamela L. Marshall, are the members of the Missouri Board of Pharmacy ("the Board"), each of whom is being sued in his or her official capacity. The Board's address is 3605 Missouri Blvd., Jefferson City, Missouri, 65109.

The Board was created in 1909 by a state statute. The Board is governed mainly by the Missouri Pharmacy Practice Act contained in Missouri Revised Statute § 338. Among the Board's primary duties are "[i]nvestigating complaints . . . against any licensee or registrant," and

"[d]isciplining licensees which may include, [sic] public censure, probation, suspension or revocation of a licensee/registrant . . . ." Investigations may result in disciplinary action. And investigations "may be based on public complaints, information from other state and/or federal agencies, or violations discovered by the Board." Board of Pharmacy, Missouri Division of Professional Registration, About the Board, https://pr.mo.gov/pharmacists-about-the-board.asp [https://web.archive.org/web/20201206185331/https://pr.mo.gov/pharmacists-about-the-board.asp]. Public complaints "may be based upon personal knowledge or upon information and belief." Mo. Code Regs. Ann. Tit. 20 § 2220-2.050(2). Any individual who files a complaint with the Board may publicize the complaint's filing, its substance, or the details and facts of any subsequent investigation (as much as he or she is aware of it).

Missouri Revised Statute § 338.140 vests the Board with its rulemaking power and the "power to employ an attorney to conduct prosecutions or to assist in the conduct of prosecutions pursuant to sections [of § 338, including § 338.055.7]." It also vests the Board with the power to "issue letters of reprimand, censure or warning . . . for any violations that could result in disciplinary action," and, at its sole discretion, "enter into a voluntary compliance agreement . . . in lieu of board discipline," where such agreements "shall be a public record." The Board has the authority to investigate putative violations of § 338.055.7, and the authority to prosecute or cause the prosecution of enforcement actions against Missouri-licensed pharmacists.

In enforcing disciplinary rules, the Board can receive and investigate complaints lodged by any person, including any member of the public, Mo. Code Regs. Ann. Tit. 20 § 2220-2.050(1), either with knowledge of the alleged violation or upon information and belief, *id.* § 2220-2.050(2). Submitting a complaint requires filling out a single page form available on the Board's website and submitting it to the Board by fax or mail.

Upon receiving a complaint, if the Board office determines it has jurisdiction, it will forward the complaint to an inspector for an investigation or inquiry. An investigation report will be forwarded to the Board after the investigation is finished. If the Board determines a violation has been established, it may issue an administrative letter of concern or letter of warning which becomes part of the pharmacist's permanent file.

With or without a public complaint, the Board "may cause a complaint to be filed with the administrative hearing commission." The administrative hearing commission will hold a hearing and convey its record and findings, along with a non-binding disciplinary recommendation. Within thirty days after receipt of the record of the proceedings before the commission and the findings of fact, conclusions of law, and recommendations, if any, of the commission, the Board will set the matter for hearing and notify the respondent- pharmacist of the time and place of the hearing.

At or after the hearing, the Board may issue the disciplinary measure it sees fit, including censure, suspension, or revocation of the respondent-pharmacist or her license.

**Hydroxychloroquine**

Hydroxychloroquine is a structural analog to chloroquine, an antimalarial drug. Hydroxychloroquine was developed in the 1940s for human consumption as an anti-malarial medication. The FDA has indicated use of the drug for the treatment of malaria, certain drug-resistant parasites uncommon in the United States, rheumatoid arthritis, and lupus. The FDA has approved no animal drug product that contains hydroxychloroquine. The FDA cautions against the use of hydroxychloroquine for the treatment of COVID-19 outside the hospital setting or clinical trials.

Early in the recent pandemic, as doctors were experimenting with treatments, health authorities in India, China, South Korea, and Italy recommended chloroquine for the treatment of COVID-19. On March 18, 2020, the World Health Organization announced that chloroquine and hydroxychloroquine would be among the four drugs studied as part of the multinational clinical trial. On March 19, 2020, then-President Trump encouraged the use of hydroxychloroquine during a national press conference. This led to a massive increase in demand for the drug.

On April 24, 2020, after reviewing case reports of adverse effects including ventricular tachycardia, ventricular fibrillation, and, in some cases, death, the FDA cautioned against using hydroxychloroquine outside a hospital setting or clinical trial. On June 15, 2020, the FDA revoked the emergency use authorization, citing consultation with the Biomedical Advanced Research and Development Authority that led it to conclude that "it is no longer reasonable to believe that oral formulations of hydroxychloroquine (HCQ) and chloroquine (CQ) may be effective in treating COVID-19." It explained that because of "ongoing serious cardiac adverse events and other potential serious side effects, the known and potential benefits of chloroquine and hydroxychloroquine no longer outweigh the known and potential risks for the authorized use."

In November 2020, a National Institutes of Health clinical trial evaluating the safety and effectiveness of hydroxychloroquine for the treatment of adults with COVID-19 formally concluded that the drug provided no clinical benefit for COVID-19 treatment and recommended against its use. Even so, telehealth organizations have continued to prescribe hydroxychloroquine, and claims about hydroxychloroquine for human use as a COVID-19 treatment continue to persist on social media.

The efficacy of hydroxychloroquine for human use to treat COVID-19 is a controversial and politicized subject. The Board's September 3, 2021, COVID-19 guidance document contains

a joint statement made with the Missouri Board of Healing Arts. The statement advises that, "[p]rescribing hydroxychloroquine, chloroquine and azithromycin for COVID-19 prophylactic use is discouraged and not recommended by the Board. It also states that "[p]harmacists should use their professional judgment and take appropriate steps to verify that newly issued prescriptions for hydroxychloroquine, chloroquine and azithromycin are issued for a legitimate medical purpose." It adds, "the Board is recommending that pharmacies use caution" when determining whether to fill prescriptions for hydroxychloroquine.

Stock does not believe hydroxychloroquine is an effective human use treatment for COVID-19 compared to available alternatives.

**Ivermectin**

Ivermectin is an anti-parasitic drug which has been used in humans and animals since the 1970s. The FDA has not approved Ivermectin for treatment of COVID-19.

Scientists studied ivermectin as a potential COVID-19-inhibiting drug. Some in-vitro drug screening studies early in the pandemic showed that ivermectin has an antiviral effect on certain positive-sense single-strand RNA viruses, including SARS-CoV-2, the virus that causes COVID-19. Follow-up studies concluded that, while ivermectin could inhibit replication of SARS-CoV-2, the doses needed would be significantly greater than humans could safely ingest.

In December 2020, Dr. Pierre Kory testified before the Senate Homeland Security and Government Affairs Committee that ivermectin is a "miracle drug" for the treatment of COVID-19. Many lawmakers, as well as then-President Trump, endorsed Dr. Kory's testimony, and promoted ivermectin as a COVID-19 drug.

Subsequently, in January 2021 the National Institutes of Health released Treatment Guidelines that suggest there is insufficient evidence of ivermectin's effects against COVID-19 to

recommend for or against it. In early 2021, the European Medicines Agency recommended against ivermectin's use for the prevention of COVID-19 outside of controlled clinical trials.

In early 2021, Merck, the branded manufacturer of FDA-approved ivermectin tablets for human use in the United States, issued a statement that attempting to use ivermectin to treat COVID-19 may be unsafe. In March 2021, the World Health Organization stated that ivermectin should not be used for the treatment of COVID-19.

Prescriptions for ivermectin nonetheless ballooned, reaching 88,000 prescriptions dispensed during the week of August 13, 2021, compared to an average of 3,600 weekly prescriptions before 2020. Telehealth companies dedicated pages advertising, in part, the ease of obtaining a prescription of ivermectin. These prescriptions are off-label, and some patients refuse to divulge what the prescriptions are for.

Some Missouri pharmacists are skeptical of ivermectin's effectiveness as a COVID-19 cure. They seek to consult and counsel patients about why they were prescribed ivermectin, dispute the efficacy of the drug, and refuse to fill the prescriptions.

The efficacy of ivermectin for human use to treat COVID-19 is highly controversial and politicized. The Board's September 3, 2021, COVID-19 guidance document states it "does not have a position on ivermectin at this time," and recommends pharmacists "use their discretion when asked to fill any prescription they believe is questionable/not issued for a legitimate medical purpose." It also notes "the FDA has not approved ivermectin for use in treating or preventing COVID-19 in humans." Stock does not believe that ivermectin is an effective human use treatment for COVID-19 compared to available alternatives.

Further, in 2022 and 2023, groups such as Front Line Covid-19 Critical Care Alliance began to promote ivermectin as a human use treatment for influenza and RSV (Respiratory

Syncytial Virus). By 2024, some doctors began promoting ivermectin as a treatment for cancer in human. Stock does not believe that ivermectin is an effective human use treatment for influenza, RSV, or cancer compared to available alternatives.

**Missouri Revised Statute § 338.055.7**

Section 338.055.7 protects pharmacists from Board sanction for filling prescriptions for hydroxychloroquine and ivermectin and forbids pharmacists from communicating any professional opinion *against* the efficacy of the drugs to either prescribers or patients unless first approached. The statute states:

> The board shall not deny, revoke, or suspend, or otherwise take any disciplinary action against, a certificate of registration or authority, permit, or license required by this chapter for any person due to the lawful dispensing, distributing, or selling of ivermectin tablets or hydroxychloroquine sulfate tablets for human use in accordance with prescriber directions. *A pharmacist shall not contact the prescribing physician or the patient to dispute the efficacy of ivermectin tablets or hydroxychloroquine sulfate tablets for human use unless the physician or patient inquires of the pharmacist about the efficacy of ivermectin tablets or hydroxychloroquine sulfate tablets*.

Mo. Rev. Stat. § 338.055.7 (emphasis added).

Even before the enactment of § 338.055.7, the Board possessed power under Missouri Revised Statute § 338.055.2(5), to file a disciplinary complaint against a pharmacist for "[i]ncompetence, misconduct, gross negligence, fraud, misrepresentation or dishonesty in the performance of the functions or duties" of her licensed profession.

Defendant's own expert, Dennis McAllister, R.ph., FASHP,[2] concedes that § 338.055.7, is "unique" in its attempt to target supposed misinformation about two specific drugs. McAllister

---

[2] "R.Ph." stands for Registered Pharmacist. "FASHP" stands for Fellow of the American Society of Health-System Pharmacists.

Dep. 86:6, ECF No. 63-4. In his decades of experience, he has "not seen it in any other format" or "any other arena." *Id*.

**Legislative History**

The genesis of the law was in Missouri House Bill No. 2149, whose original purpose was to repeal §§ 334.530 and 334.655 and to improve retention of physical therapy graduates from Missouri universities. The bill evolved to deal with professional licensing requirements in Missouri. On February 12, 2022, the bill was amended in the Missouri Senate to add the following text:

> The board shall not deny, revoke, or suspend, or otherwise take any disciplinary action against, a certificate of registration or authority, permit, or license required by this chapter for any person due to the lawful dispensing, distributing, or selling of ivermectin tablets or hydroxychloroquine sulfate tablets for human use in accordance with prescriber directions. No person licensed under this chapter who dispenses, distributes, or sells ivermectin tablets or hydroxychloroquine sulfate tablets for human use shall ask the patient or prescriber, or otherwise require of the patient or prescriber, the reason or purpose for which the medications shall be used, except in circumstances in which it is necessary for purposes of the patient's health insurance or to clarify dosage for the health and safety of the patient.

During a debate on the Senate floor, Senator Rick Brattin, speaking in support of the amendment, focused his attention on the provision of the amendment that insulates doctors from professional liability. He stated that it was "true" that "[the choice of ivermectin and hydroxychloroquine] is very political." During the same debate, he agreed that "[ivermectin and hydroxychloroquine have] been the most politicized medication ever." In response to an allegation that the bill was politically motivated, Senator Brattin alleged that the Board of Registration for the Healing Arts was itself "weaponized." In an interview with the Kansas City

13

Star, Senator Brattin again stated that he wanted to protect doctors from "the politicization of those two drugs" and protect doctors from being targeted.

There was no public legislative debate about any significant burden to the state or citizens caused by pharmacists engaging in speech disputing or questioning the efficaciousness of ivermectin or hydroxychloroquine. The amendment passed unanimously later that afternoon with these minor changes:

> The board shall not deny, revoke, or suspend, or otherwise take any disciplinary action against, a certificate of registration or authority, permit, or license required by this chapter for any person due to the lawful dispensing, distributing, or selling of ivermectin tablets or hydroxychloroquine sulfate tablets for human use in accordance with prescriber directions. A pharmacist shall not contact the prescribing physician or the patient to dispute the efficacy of ivermectin tablets or hydroxychloroquine sulfate tablets for human use unless the physician or patient inquires of the pharmacist about the efficacy of ivermectin tablets or hydroxychloroquine sulfate tablets.

The Board has not promulgated, drafted, conveyed, or proposed internal written or verbal guidance or training specifically related to enforcement of § 338.055.7.95.

**Board Guidance Concerning Missouri Revised Statute § 338.055.7**

On June 26, 2024—two days before summary judgment motions were due in this case—the Board issued a public "Guidance Statement on Section 338.055.7." It states:

> Pharmacists have a responsibility to communicate with patients and providers in an accurate and competent manner. Pharmacists also have a duty to exercise their clinical judgment when consulting with prescribers and patients to ensure patient safety consistent with the standard of care, current FDA guidance, or evidence-based scientific data/research.
>
> Section 338.055.2(5) authorizes the Board to discipline a pharmacist for "[i]ncompetence, misconduct, gross negligence, fraud,

14

misrepresentation or dishonesty in the performance of the functions or duties of any profession licensed or regulated by this chapter." Section 338.055.7 further provides that a pharmacist "shall not contact the prescribing physician or the patient to dispute the efficacy of ivermectin tablets or hydroxychloroquine sulfate tablets for human use unless the physician or patient inquires of the pharmacist about the efficacy of ivermectin tablets or hydroxychloroquine sulfate tablets."

Consistent with Section 338.055, a pharmacist is prohibited from providing medical/drug information or counseling that is false, misleading, deceptive, or dishonest for any drug or medical device, including, but not limited to, ivermectin and hydroxychloroquine. This would include initiating contact with a prescriber or patient to dispute that ivermectin or hydroxychloroquine are efficacious for human use as approved by the FDA. Section 338.055.7 does not prohibit a pharmacist from sharing truthful and accurate medical/drug information with prescribers or patients, consistent with the standard of care, current FDA guidance, or evidence-based scientific data/research.

Prior to June 26, 2024, the Board had not issued any external written policy guidance to pharmacists specifically related to enforcement of § 338.055.7. Previously, the Board's September 3, 2021, and April 13, 2021, COVID-19 guidance documents were the only form of official guidance for Missouri-licensed pharmacists with respect to the Board's views on hydroxychloroquine and ivermectin.

**Plaintiff's Plans**

Stock plans to continue working as a retail pharmacist in Missouri. As a result, she will likely again confront a prescription for either hydroxychloroquine or ivermectin as a COVID-19 treatment. Should she receive either such prescription, she intends to contact the prescriber to discuss, debate, or dispute the efficacy of the drugs, both generally and relative to current alternatives, and to counsel the patient about efficacy and alternatives.

15

Stock does not wish to face a disciplinary investigation by the Board. Stock does not wish to face disciplinary proceedings in front of the Board or an administrative hearing commission, or disciplinary sanctions by the Board. A disciplinary investigation or a disciplinary sanction would harm Stock's professional reputation, available job opportunities, and ability to earn a living in her chosen profession. Stock will be forced to censor herself, and act against her professional judgment of the possible best course of treatment for a patient to protect herself from potential Board sanction. But for § 338.055.7, Stock could freely fulfill her professional duties and protect patients by communicating her concerns without the fear of disciplinary consequences for expressing her professional opinion.

Even if Defendants assured Stock that they would not enforce § 338.055.7 as written, Stock would not feel comfortable speaking freely with prescribing physicians and patients about the drugs and would fear the effects of complaints or other professional liability.

**This Lawsuit**

The Complaint brings one count, a claim for Unconstitutional Infringement of Free Speech. For relief, it seeks: (1) a declaratory judgment that that the second sentence of § 338.055.7 facially violates the First and Fourteenth Amendments to the United States Constitution; (2) a permanent injunction prohibiting Defendants and their agents from enforcing the second sentence of § 338.055.7; and (3) an award of attorneys' fees, costs, and expenses.

On March 22, 2023, the Court granted Stock's motion for a preliminary injunction. ECF No. 26. Defendants did not appeal.

After engaging in discovery, including expert discovery,[3] the parties filed the pending motions for summary judgment.

---

[3] The Court has excluded those portions of the defense expert's report which sought to engage in statutory interpretation and legal analysis, but included all relevant, admissible opinions contained in the report regarding

**Discussion**

**I.    Stock has standing to challenge § 338.055.7's constitutionality.**

Defendants contend Stock lacks standing to bring this lawsuit.   "A plaintiff claiming an abridgment of the right to free speech has standing to seek pre-enforcement review of a policy 'under circumstances that render the threatened enforcement sufficiently imminent.'"   *Parents Defending Educ. v. Linn Mar Cmty. Sch. Dist.*, 83 F.4th 658, 666 (8th Cir. 2023) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014)).   This requirement is satisfied where the plaintiff alleges (1) an intention to engage in a course of conduct arguably affected with a constitutional interest, that is (2) proscribed by the statute, and (3) there is a credible threat of prosecution.   *Id.* (citing *Driehaus*, 573 U.S. at 159) (finding parents had standing to challenge a school's policy prohibiting certain speech as "bullying" or "harassment").   In their reply brief,[4]

---

standards for pharmacists or the pharmacy profession.   ECF No. 57.   For example, in his report, the expert opined that, "Stating that FDA-approved medications for human use are not effective for human use would be false, misleading, and likely violate multiple professional standards."   Stock objected to this statement and pointed out that during his deposition, the expert identified several FDA approved drugs for which it would be ethically appropriate for a pharmacist to dispute the efficacy or safety.   Since these counterexamples flatly contradict the forgoing unconditional, unqualified statement in his expert report, pursuant to *Daubert*, the Court would not permit the expert to deliver such an unconditional, unqualified opinion at trial.

[4]  The standing arguments made in Defendants reply brief are different from those raised in Defendants' initial brief supporting their motion for summary judgment.   Defendants initial brief cited *Lujan v Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992), and made three relatively generic assertions concerning standing, arguing: (1) there was no injury in fact; (2) there was no causal connection between Stock's injury and the statute; and (3) Stock could not demonstrate redressability.   *See* Defs.' Am. Suggestions in Supp. at 38–43, ECF No. 63-1.   In her response, Stock rightly cites *Parents Defending Education v. Linn Mar Community School District* for the requirements governing standing in the context of a First Amendment case.   *See* Pl.'s Suggestions in Opp'n at 15, ECF No. 65.   The standard articulated in *Parents Defending Education* is different from the one discussed in *Lujan*.   *Compare Parents Defending Educ.*, 83 F.4th at 666, *with Lujan*, 504 U.S. at 560–61.   But in their reply brief, Defendants cite *Parents Defending Education* for the first time and then make new arguments that Stock lacks standing because § 338.055.7 does not "arguably proscribe" her speech, therefore she faces "no credible threat of professional liability for competent professional communication,"—arguments based on *Parents Defendant Education*.   Reply at 2, ECF No. 68.

While Defendants' assertions are nominally responses to arguments made in Stock's brief, they are effectively new arguments which Defendants could have—and should have—made in their initial brief by researching the applicable law on standing before filing their brief.   Moreover, this is the second time in this case the Court has observed that Defendants failed to cite the relevant controlling caselaw in a brief.   *See Stock v. Gray*, 663 F.Supp.3d 1044, 1053 n.4 (W.D. Mo. 2023) ("The Court notes Defendants' brief fails to cite *Rodgers v. Bryant*, the controlling caselaw on the preliminary injunction standard applicable here.   The Court reminds counsel for Defendants to ensure he is citing relevant controlling caselaw to the Court.").

Ordinarily if a party makes new arguments in their reply brief, the Court will not consider them, deeming them to

17

Defendants argue the second and third elements are not present, and perhaps the first as well. Reply Suggestions in Supp. Of Defs.' Mot. for Summ. J. at 2, 5, ECF No. 68. These arguments are unconvincing.

With respect to the first element, Defendants suggest that regulating what a pharmacist can tell a doctor or patient about the efficacy of a given drug is not speech protected by the First Amendment, it is conduct. Reply at 5 ("Sharing competent pharmaceutical information in a commercial capacity is not 'expressive activity' in this context"). But the "conduct" that is forbidden—contacting a doctor or patient—is forbidden only if the pharmacist wants to say certain things, making clear that the "conduct" here is expressive activity protected by the First Amendment. If a pharmacist calls a doctor to tell her the FDA has revoked the emergency use authorization to use hydroxychloroquine and chloroquine to treat COVID-19 because the known and potential benefits of the drugs no longer outweighs the known and potential risks, or that the Missouri Board of Healing Arts has stated "use [of these drugs] is discouraged and not recommended by the Board," then the "conduct" is forbidden. On the other hand, if a pharmacist calls a doctor to tell her that hydroxychloroquine and chloroquine are great drugs which are very effective in treating COVID-19, then the "conduct" is allowed. Since the statute bans initiating contact to express a particular viewpoint, this is viewpoint-based regulation of speech. *Stock v. Gray*, 663 F. Supp. 3d 1044, 1053 (W.D. Mo. 2023); s*ee Animal Legal Defense Fund v. Kelly*, 9 F.4th 1219, 1233-34 (10th Cir. 2021) (holding a state statute which criminalizes lying in order to gain access to a farm to take an undercover video disparaging farming operations, but does not

___

have been waived. *See Mahaney v. Warren County*, 206 F.3d 770, 771 n.2 (8th Cir. 2000) ("Claims not raised in an initial brief are waived, and we generally do not consider issues raised for the first time ... in a reply brief." (citations omitted)). Standing arguments, however, cannot be waived and must be considered by a court. *See Sierra Club v. Robertson*, 28 F.3d 753, 757 n.4 (8th Cir. 1994) (observing "[I]t is elementary that standing relates to the justiciability of a case and cannot be waived by the parties."). While Defendants have effectively sandbagged Stock by making new standing arguments in their reply brief to which she cannot reply, there is ultimately no unfairness here because these new standing arguments are without merit.

criminalize lying to gain access to the same farm to take an undercover video lauding it, is a speech-based restriction subject to strict scrutiny); *Conant v. Walters*, 309 F.3d 629 (9th Cir. 2002) (holding the federal government's policy of revoking the DEA registrations of doctors who recommended the use of marijuana was a viewpoint-based restriction). Thus, the activity Stock seeks to engage in here is speech which is not just arguably, but actually, protected by the First Amendment.

With respect to the second element of standing articulated in *Parents Defending Education*, the record demonstrates that in the future Stock will likely receive an order to fill a prescription for ivermectin or hydroxychloroquine under circumstances suggesting that the purpose of the prescription is to treat or prevent COVID-19. When she does so, she will contact the physician, the patient, or both on her own initiative to dispute the efficacy of ivermectin and hydroxychloroquine for human use in treating COVID-19. Thus, Stock will be engaging in conduct proscribed by the statute.

Defendants' suggestion that Stock will not be engaging in proscribed conduct because she would not be disputing these drugs efficacy, just reaching out to "question and inquire," is unpersuasive. The record here is clear: when Stock reaches out to doctors and patients about a prescription for hydroxychloroquine or ivermectin to treat COVID-19, she is doing so to dispute the drugs' effectiveness in humans.

Even less persuasive is Defendants claim that this element will not be satisfied because if a patient approaches Stock at a pharmacy counter (where Defendants contend most such interactions occur), the patient is extending an invitation for Stock to enter a pharmacist-patient relationship, thereby giving Stock implicit permission to engage the patient or the patient's doctor in speech disputing the drugs' efficacy. This argument fails for a variety of reasons, chief among

19

them that it ignores a primary canon of statutory construction. The text of the statute states, "[a] pharmacist shall not contact the prescribing physician or the patient to dispute the efficacy of [ivermectin or hydroxychloroquine] for human use unless the physician or patient inquires of the pharmacist about the efficacy of [ivermectin or hydroxychloroquine]." But Defendants' interpretation effectively reads the verb "contact" out of the statute because, if read as Defendants propose, there could almost never be pharmacist-initiated contact. Defendants' reading would violate the "cardinal principle" that no statute should be construed to render a "clause, sentence, or word" "superfluous, void, or insignificant." *RW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (applying the "elementary canon of construction that a statute should be interpreted so as not to render one part inoperative") (citations omitted); Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 174 (2012) (observing "every word and every provision is to be given effect").

The third element of standing—that Stock faces a credible threat of prosecution under the statute—is also satisfied. Where a court is presented with a pre-enforcement challenge to a recently enacted statute that facially restricts expressive activity by the plaintiff, the court "will assume a credible threat of prosecution in the absence of compelling contrary evidence." *St. Paul Area Chamber of Com. v. Gaertner*, 439 F.3d 481, 486 (8th Cir. 2006) (internal quotation omitted). Here, § 338.055.7 prohibits Stock from contacting patients and doctors to dispute the effectiveness of ivermectin or hydroxychloroquine for treating COVID-19 in humans, so this Court assumes a credible threat of prosecution, and there is no compelling evidence suggesting otherwise.

Defendants' argument that Stock will not be prosecuted is unavailing. Defendants contend the Court should defer to the Board's Guidance Statement which, Defendants intimate, is compelling evidence that she will not be prosecuted. As a threshold matter, this argument fails

because standing is assessed as of the date the lawsuit is filed, *Davis v. FEC*, 554 U.S. 724, 734 (2008), and the Board did not issue the Guidance Statement until two years after Stock initiated this lawsuit. Thus, as of the relevant time, there was no Guidance Statement to consider. Further, the Guidance Statement is not the sort of guidance a federal court can consider. Furthermore, a federal court may only "defer to a state agency's interpretation of its own regulation if the meaning of the words is in doubt." *Sisney v. Kaemingk*, 15 F.4th 1181, 1199 (8th Cir. 2021). But the Guidance Statement is not a regulation, and the statute's meaning is not "in doubt," it is clear: It prohibits pharmacists from initiating contact with doctors or patients to dispute the efficacy of ivermectin or hydroxychloroquine in humans.[5] Finally, even if the Court could defer to the Guidance Statement, nothing prevents the Board from changing its mind and enforcing the law as written in the future. *See Rodgers v. Bryant*, 942 F.3d 451, 455 (8th Cir. 2019) (holding Arkansas's assurances during litigation that it would not enforce an anti-loitering statute against "polite" and "courteous" beggars like the plaintiffs did not defeat standing because of the possibility that the state would change its mind and enforce the law more aggressively in the future).

Consequently, Stock possesses standing to challenge the statute's constitutionality.

## II. Missouri Revised Statute 338.055.7 infringes the First Amendment rights of Missouri pharmacists by imposing liability based on the viewpoint of their speech.

### A. The law is unconstitutional viewpoint restriction.

"The First Amendment guards against laws targeted at specific subject matter, a form of speech suppression known as content-based discrimination." *Matal v. Tam*, 582 U.S. 218, 248 (2017) (internal quotation omitted) (Kennedy, J., concurring). This includes laws aimed at the

---

[5] Additionally, since the statutory language is unambiguous, there is no path for the Court to construe the statute in such a way to avoid serious constitutional doubts. *See United States v. Stevens*, 559 US. 460, 481 (2010).

suppression of a particular view on a subject. *Id*. "A law found to discriminate based on viewpoint is an egregious form of content discrimination, which is presumptively unconstitutional." *Id*. "At its most basic, the test for viewpoint discrimination is whether—within the relevant subject category—the government has singled out a subset of messages for disfavor based on the views expressed." *Id*.

Although counsel for Defendants gamely argues otherwise, § 338.055.7 is "cut from the same cloth" as other unconstitutional viewpoint-based laws. It prohibits pharmacists from "contact[ing] the prescribing physician or the patient to dispute the efficacy of ivermectin tablets or hydroxychloroquine sulfate tablets for human use," unless the patient or physician asks first. It thus discourages speech educating patients and doctors in a way that disputes the effectiveness of ivermectin or hydroxychloroquine but favors speech to patients and doctors in a way endorsing, promoting, or affirming these drugs' effectiveness. This is viewpoint-based regulation. *Stock*, 663 F. Supp. 3d at 1053. It singles out a subset of messages about ivermectin and hydroxychloroquine "for disfavor based on the views expressed." *Matal*, 582 U.S. at 248. Hence it is unconstitutional.

The most recent guidance from the Supreme Court indicates that once the Court has determined that § 338.055.7 engages in viewpoint discrimination, that is the end of the analysis. *See Iancu v. Brunetti*, 588 U.S. 388, 399 (2019) (noting the finding of viewpoint bias "ended the matter"); *Matal*, 582 U.S. at 248 (Kennedy, J., concurring) (explaining why the finding of viewpoint discrimination "renders unnecessary any extended treatment of other questions"). That said, to aid in any appellate review, the Court will address Defendants' arguments that the statute is permissible regulation of professional speech or, at worst, is subject to strict scrutiny analysis, which it survives. Both arguments are unavailing.

**B.      The law is not permissible regulation of professional speech.**

The statute is not permissible regulation of professional speech.   At the outset, the Court is mindful the Supreme Court has recently made clear that professional speech is not a separate, disfavored category of speech.   *Nat'l. Inst. Of Fam. & Life Advocs. v. Becerra (NIFLA)*, 585 U.S. 755, 767 (2018).

> Speech is not unprotected merely because it is uttered by 'professionals.'   This Court has been reluctant to mark off new categories of speech for diminished constitutional protection.   And it has been especially reluctant to exempt a category of speech from the normal prohibition on content-based restrictions.   This Court's precedents do not permit governments to impose content-based restrictions on speech without persuasive evidence of a long (if heretofore unrecognized) tradition to that effect.   This Court's precedents do not recognize such a tradition for a category called "professional speech."

*Id.* at 767–68 (cleaned up).   Of course, deferential review applies to laws: (1) "requir[ing] professionals to disclose factual, noncontroversial information in their 'commercial speech," and (2) "regulat[ing] professional conduct, even though that conduct incidentally involves speech." *Id.*   But these limitations do not stem from the fact that it is professionals engaging in the speaking. *Id.* at 768.

In the present case, neither exception applies.   Defendants' argument that the first exception applies is this: The Board's Guidance Statement should govern what the statute means. And the Guidance Statement instructs the statute *requires* "the disclosure of factual, noncontroversial information, such as the approval status of the FDA for the medications for human use or information based on evidence-based scientific/research," because to ethically dispute a drug's effectiveness, a pharmacist must have support for her position.   Defs.' Suggestions in Opp'n at 29, ECF No. 66.

This argument fails, however, because even if the Court could consider the Guidance Statement, its interpretation cannot override the plain text of the statute. The statute states, "[a] pharmacist shall not contact the prescribing physician or the patient to dispute the efficacy of ivermectin tablets or hydroxychloroquine sulfate tablets for human use unless the physician or patient inquires of the pharmacist about the efficacy of ivermectin tablets or hydroxychloroquine sulfate tablets." Thus, it prohibits a pharmacist from contacting a patient to inform him that the FDA has revoked the emergency use authorization to use hydroxychloroquine and chloroquine to treat COVID-19 because the known and potential benefits of the drugs no longer outweigh the known and potential risks. While one can argue whether the FDA made the right decision, disclosing the FDA's decision and reasoning to a patient indisputably provides the patient with factual, noncontroversial information. In such a case, instead of mandating the disclosure of factual, noncontroversial information, § 338.055.7 forbids it. Hence, the first exception cannot not apply.

The second exception, which pertains to laws regulating professional conduct which incidentally regulates speech, does not apply here either. Defendants contend it does for three reasons. First, the statute is regulating conduct, not speech, because it prohibits pharmacists from initiating contact with doctors and patients to engage in disputes generally. Second, the statute is akin to laws requiring "age verification, recordkeeping, and labeling requirements," which are constitutional. Third, the statute prohibits a kind of fraud, commercial speech which is more likely to deceive the public than inform it, which the legislature may also do.

The first rationale is problematic from the start because it requires the Court to defer to the Guidance Statement. More importantly though, as the Court observed in its preliminary injunction order, this argument is undercut by the plain language of the statute. *See Stock*, 663 F.

24

Supp. at 1054. The text does not say pharmacists may not engage doctors and patients in any kind of dispute, it says a pharmacist may not contact doctors and patients "*to dispute the efficacy of ivermectin tablets or hydroxychloroquine sulfate tablets for human use.*" Mo. Rev. Stat. § 338.055.7 (2022) (emphasis added). That is, it prohibits them from offering a particular viewpoint.

"Basic grammar tells us what the sentence means." *United States v. Hernandez-Barajas*, 71 F.4th 1104, 1106 (8th Cir. 2023). The statute does not use the intransitive form for the verb "to dispute;" it uses the transitive form: "dispute the efficacy." When a verb takes a transitive form, the "direct object" (here "efficacy") "receiv[es] the action" of that verb. *United States v. Sanders*, 966 F.3d 397, 406 (5th Cir. 2020) (cited with approval by *Hernandez-Barajas*, 71 F.4th at 1106). In this context, the transitive form of "dispute" with the direct object of "efficacy" most naturally means: "to call into question or cast doubt upon" that efficacy. This interpretation of the statute is confirmed by a common definition of "dispute," which is "to question the truth or validity of; doubt." *Dispute*, *The American Heritage Dictionary* (5th ed. 2018). This interpretation also dovetails with the purpose of the prior sentence which prohibits the Board from taking any action against a pharmacist who dispenses ivermectin or hydroxychloroquine. It is also consistent with the legislature's apparent purpose in enacting § 338.055.7: to insulate ivermectin or hydroxychloroquine from criticism.

The second rationale offered by Defendants is even less persuasive. Although Defendants analogize the law to "age verification, recordkeeping, and labeling requirements," Defs.' Suggestions in Opp'n at 29, the law does not require pharmacist to verify, record, or label anything, and Defendants fail to explain how it is otherwise analogous to any constitutional law. This argument is so undeveloped, the Court cannot consider it.

As for the third rationale, it is not applicable because § 338.055.7 is not a regulation of commerce or advertising in any way, shape, or form. Additionally, the law applies even if the pharmacist encourages the patient not to buy any drug at all or to seek a second opinion from another prescriber.

Finally, all three rationales fail to justify § 338.055.7 as a regulation of speech incidental to professional conduct because there is no "persuasive evidence of a long (if heretofore unrecognized) tradition" of such a content-based restriction on speech. *NIFLA*, 585 U.S. at 768. Indeed, Defendants' expert, with his decades of experience in the regulation of pharmacy practice, agreed that the speech ban is "unique," and he has "not seen it any other format" or "any other arena."

### C. The law cannot not survive strict scrutiny.

In the event strict-scrutiny analysis applies to the statute, Defendants would have to demonstrate that the law is narrowly tailored to serve a compelling state interest. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015); *Gerlich v. Leath*, 861 F.3d 697, 705 (8th Cir. 2017). Defendants have not carried this burden.

With respect to the compelling state interest, Defendants offer up a dog's breakfast of possible justifications. They argue the law

> serves the substantial government interests of protecting public health by ensuring appropriate competence from pharmacists, ensuring truthful and accurate drug or medical information is provided, responding to a crisis to prevent imminent harm, ensuring appropriate professional competence from pharmacists, protecting the doctor-patient [relationship] from improper interference that may undermine patient confidence in their treatment plan, and ensuring that pharmacists are conveying accurate and evidence-backed information.

Defs.' Am. Suggestions in Supp. at 47, ECF No. 63-1. Given the record, only one of these—

26

protecting the doctor-patient relationship from improper interference that may undermine patient confidence in their treatment plan—is remotely plausible. The rest are unsatisfactory, *post hoc* rationalizations. *See Kennedy v. Bremerton School Dist.*, 597 U.S. 507, 543 (2022) ("Government 'justifications' for interfering with First Amendment rights must be genuine, not hypothesized or invented *post hoc* in response to litigation."). Even this possibly compelling state interest is insufficient because nothing in the record indicates that before enacting the law the Missouri legislature possessed any evidence, even anecdotal evidence, suggesting any pharmacists, even one, were improperly interfering with the doctor-patient relationship by contacting patients or doctors to dispute the efficacy of ivermectin tablets or hydroxychloroquine sulfate tablets for human use. This is insufficient evidence "to demonstrate harms that are real and not merely conjectural." *Wollschlaeger v. Governor*, 848 F.3d 1283, 1302–03 (11th Cir. 2017) (cleaned up) (holding six anecdotes of doctors asking patients unwelcome or intrusive questions about firearms in the home did not demonstrate a compelling state interest justifying a law discouraging physicians from asking patients about the presence of firearms in the home). A state's authority to regulate a profession does not give it carte blanche to restrict the speech of medical professionals on medical related topics. *Id*. at 1316. The record here indicates the Missouri legislature passed § 338.055.7 solely to attempt to silence one side of a politicized medical debate.

Even if one of the justifications cited above was a legitimate compelling state interest, Defendants have not demonstrated that § 338.055.7 is narrowly tailored to serve this compelling interest, let alone in the least restrictive way. Consider, for example, the claims concerning the doctor-patient relationship. Section 338.055.7 is simultaneously over- and underinclusive with respect to this justification. It is overinclusive because it covers communications from a pharmacist to the prescribing physician, to which the patient is not privy, and so would have no

way of sowing doubt in the physician-patient relationship and convincing some patients not to take their medication.   At the same time, § 338.055.7 is also underinclusive.   If the concern is about pharmacists eroding patients' trust in their doctors, why restrict the law's reach to just ivermectin tablets or hydroxychloroquine sulfate tablets?   Pharmacists regularly and appropriately raise concerns with patients that "cast doubt" on their physician's proficiency.   Pharmacists question the dosage prescribed, observe that drugs are contra-indicated with other prescriptions, recommend a better more cost-effective substitute that the patient should consider, or even refuse to dispense a prescription altogether.   Although Defendants contend these actions erode the physician-patient relationship, and all fall within the core competency of the pharmacy profession but none are expressly outlawed by § 338.055.7.   Section 338.055.7 is underinclusive in a second respect: it captures disputes about only two drugs used to treat COVID-19.   Thus, the law "leaves significant influence bearing on the interest unregulated." *Rodgers*, 942 F.3d at 457.   These are just a few of the ways the law is not narrowly tailored.   Hence, it cannot pass strict scrutiny.

## III.    The Court's preliminary injunction should be extended permanently, statewide.

Finally, the Court holds it should grant Stock's request to make permanent its preliminary injunction and permanently enjoin Defendants in their official capacities as officers or members of the Missouri Board of Pharmacy from reviewing, investigating, prosecuting, adjudicating, or enforcing violations of the second sentence of Missouri Revised Statute § 338.055.7.

To obtain a permanent injunction, "the moving party [must] show actual success on the merits, rather than the fair chance of prevailing on the merits required for a standard preliminary injunction." *Oglala Sioux Tribe v. C & W Enters., Inc.*, 542 F.3d 224, 229 (8th Cir. 2008). "If a court finds actual success on the merits, it then considers the following factors in deciding whether to grant a permanent injunction: (1) the threat of irreparable harm to the moving party; (2) the

28

balance of harms with any injury an injunction might inflict on other parties; and (3) the public interest." *Id*.

As discussed above, Stock has shown actual success on the merits, and the Court finds the three additional factors all weigh in favor of granting a permanent injunction.

First, Stock will suffer irreparable harm is Defendants are not permanently enjoined from enforcing the law. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Lowry ex rel. Crow v. Watson Chapel Sch. Dist.*, 540 F.3d 752, 762 (8th Cir. 2008) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Without a permanent injunction, § 338.055.7 could be enforced immediately, chilling Stock and other pharmacists in the exercise of their First Amendment rights. Even if Defendants wield their powers responsibly, Stock and other pharmacists will be deterred by the statute's reach and the fact that any member of the public can register a disciplinary complaint. Doctors continue to prescribe the drugs at issue for human uses which Stock does not consider effective, so injunctive relief remains necessary. Hence, Stock has again established irreparable harm. *Stock*, 663 F. Supp. 3d at 1055.

Second, the balance of harms weighs in favor of a permanent injunction. Preventing the harm caused by the loss of Stock and other pharmacists' First Amendment rights outweighs any interest Defendants may have in enforcing an unconstitutional law. *See Make Liberty Win v. Ziegler*, 499 F. Supp. 3d 635, 646 (W.D. Mo. 2020).

Third, a permanent injunction is in the public interest. "The public has a compelling interest in protecting First Amendment rights" and "no interest in enforcing an unconstitutional" law. *Fernandez v. St. Louis Cnty., Missouri*, 538 F. Supp. 3d 888, 903 (E.D. Mo. 2021).

Thus, a permanent injunction is warranted. Finally, because § 338.055.7 applies to all

Missouri pharmacists, a statewide permanent injunction is warranted. *Rodgers v. Bryant*, 942 F.3d at 458 (holding "injunctive relief should extend statewide because the violation established— the plain unconstitutionality of Arkansas's anti-loitering law—impacts the entire state of Arkansas.").

## Conclusion

For the reasons set forth above, Plaintiff's Motion for Summary Judgment and Permanent Injunction, ECF No. 59, is GRANTED and Defendants' Motion for Summary Judgment, ECF No. 61, is DENIED.   The Court permanently enjoins Defendants in their official capacities as officers or members of the Missouri Board of Pharmacy from reviewing, investigating, prosecuting, adjudicating, or enforcing violations of the second sentence of Missouri Revised Statute § 338.055.7.   The Court further declares the second sentence of Missouri Revised Statute § 338.055.7 unconstitutional under the First Amendment as incorporated through the Fourteenth Amendment.   Finally, the Court awards Plaintiff her reasonable attorneys' fees, costs, and expenses.

**IT IS SO ORDERED.**

Date:   March 28, 2025                           /s/ Greg Kays
                                                 GREG KAYS, JUDGE
                                                 UNITED STATES DISTRICT COURT